**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                          Chapter 11

**BIOVEST INTERNATIONAL, INC.,**                 Case No. 8:13-bk-02892-KRM

     **Debtor.**

_____/

**FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF**
**REORGANIZATION OF BIOVEST INTERNATIONAL, INC.**
**UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE**

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Charles A. Postler (Florida Bar No. 455318)
Daniel R. Fogarty (Florida Bar No. 0017532)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:   (813) 229-0144
Facsimile:   (813) 229-1811
Email:      cpostler@srbp.com
          dfogarty@srbp.com
Counsel for Debtor and Debtor in Possession

Tampa, Florida
Dated as of April 18, 2013

THIS FIRST AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF APRIL 18, 2013 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, INCLUDING ON EXHIBIT 1, DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT, PURSUANT TO THIS SOLICITATION. THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST THAT IS ENTITLED TO VOTE ON THE PLAN SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN. AS STATED IN ARTICLE 5.10 OF THE PLAN, THE HOLDERS OF EQUITY INTERESTS IN THE DEBTOR ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

**THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTOR AND VARIOUS NON-DEBTOR PARTIES AND RELEASES AS TO VARIOUS NON-DEBTOR PARTIES FOR CERTAIN POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASE, WHICH PROVISIONS WOULD ENJOIN THE DEBTOR, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN. ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 11.2 OF THE PLAN ON EXCULPATION FROM LIABILITY AND ARTICLE 11.3 OF THE PLAN ON RELEASES.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF BIOVEST INTERNATIONAL, INC. SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL

FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS DISCLOSURE STATEMENT IS DATED AS OF APRIL 18, 2013, AND CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY CASE IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR IN THE BANKRUPTCY CASE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLAN CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR, CERTAIN PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTOR OR ANY COMMITTEE IN THE BANKRUPTCY CASE MAKES ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

THE DEBTOR HAS ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTOR, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTOR'S CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS VOTES TO REJECT THE PLAN, (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. ANY TERM USED IN THE PLAN OR HEREIN THAT IS NOT DEFINED IN THE PLAN OR HEREIN AND THAT IS USED IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES HAS THE MEANING ASSIGNED TO THAT TERM IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES, AS THE CASE MAY BE. IF THERE IS ANY CONFLICT BETWEEN THE DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE DEFINITIONS CONTAINED IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL.

## INDEX TO EXHIBITS

Exhibit 1 –     Cash Flow Projections for Reorganized Biovest for the months ended April 30, 2013 through March 31, 2014

Exhibit 2 –     Liquidation Analysis as of April 15, 2013

Exhibit 3 –     List of payments made by the Debtor during the 90-day period prior to the Petition Date

## DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE


## INTRODUCTION


Biovest International, Inc., as debtor and debtor in possession in the Bankruptcy Case ("Biovest" or the "Debtor"), has filed with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), its First Amended Plan of Reorganization of Biovest International, Inc. Under Chapter 11 of Title 11, United States Code dated as of April 18, 2013 (as amended from time to time, the "Plan"). This First Amended Disclosure Statement for First Amended Plan of Reorganization of Biovest International, Inc. Under Chapter 11 of Title 11, United States Code dated as of April 18, 2013 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Equity Interests in, the Debtor entitled to vote on the Plan. The hearing on Confirmation of the Plan is scheduled for _____ _____, 2013, at _____ __.m.

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims and Equity Interests in the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Such approval of this Disclosure Statement by the Bankruptcy Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Bankruptcy Court either to accept or reject the Plan.

IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER A LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

**IN ADDITION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF UNSECURED CREDITORS AND RECOMMENDS THAT UNSECURED CREDITORS VOTE TO ACCEPT THE PLAN. UNSECURED CREDITORS ARE ENCOURAGED TO READ THE COMMITTEE SUPPORT LETTER INCLUDED WITH THE DISCLOSURE STATEMENT AND THE PLAN.**

Accompanying or included as Exhibits to this Disclosure Statement are copies of the following documents:

(a)  the Plan, including all Exhibits thereto (except as otherwise expressly provided in the Plan);

(b)  Cash Flow Projections for Reorganized Biovest for the period commencing April 2013 and ending March, 2014, included as Exhibit 1 to this Disclosure Statement;

(c)  Liquidation Analysis as of April 15, 2013, included as Exhibit 2 to this Disclosure Statement;

(d)  List of payments made by the Debtor during the 90-day period prior to the Petition Date, included as Exhibit 3 to this Disclosure Statement;

(e)  the Bankruptcy Court's Order Approving First Amended Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of Plan, and Setting Deadlines with Respect to Confirmation Hearing, dated April __, 2013, entered in the Bankruptcy Case (Doc. No. ___) (the "Disclosure Statement Approval Order");

(f)  in the case of Impaired Classes of Claims entitled to vote on the Plan (Classes 2, 3, and 8) (each, a "Voting Class"), a Ballot for acceptance or rejection of the Plan; and

(g)  a letter from the Committee to Unsecured Creditors dated April __, 2013, recommending that Unsecured Creditors vote to accept the Plan.

## PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests entitled to vote on the Plan with adequate information to make an informed judgment about the Plan. This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan (including the securities of Biovest to be issued under the Plan), (c) general information about the businesses, properties, and operations of the Debtor, (d) the events leading to the filing of the Bankruptcy Case, (e) certain Projections for the Debtor's future operations, and (f) a summary of significant events which have occurred to date in the Bankruptcy Case.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan. All Holders of Claims and Equity Interests entitled to vote on the Plan are encouraged to review carefully this Disclosure Statement.

## VOTING INSTRUCTIONS

**Who May Vote**

Only the Holders of Claims and Equity Interests which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. Holders of Class 9 Equity Interests, Class 10 Existing Biovest Stock Options and Class 11 Existing Biovest Stock Warrants will not receive or retain any Property or equity interest under the Plan on account of such Class 9 Equity Interests, Class 10 Existing Biovest Stock Options and Class 11 Existing Biovest Stock Warrants and, therefore, Classes 9, 10 and 11 are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Claims and Equity Interests in the Voting Classes (Classes 2, 3 and 8) are Impaired under the Plan and thus may vote to accept or reject the Plan. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES.

**How to Vote**

*I. Voting on the Plan by the Holder of a Claim*

Each Holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including marking your vote with respect to the Plan, and return it as provided below. If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Charles A. Postler, counsel to the Debtor, by telephone at (813) 229-0144 or by electronic mail at cpostler@srbp.com.

**YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS FOR THE BANKRUPTCY COURT PROVIDED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY THE CLERK OF THE BANKRUPTCY COURT BY NO LATER THAN _____, 2013 (THE "VOTING DEADLINE").**

All Ballots should be returned either by regular mail, hand delivery or overnight delivery to:

Clerk, United States Bankruptcy Court
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue, 5th Floor
Tampa, Florida  33602-3826

**Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of a Claim in one of the Voting Classes, your vote on the Plan is extremely important. The Debtor is soliciting acceptances of the Plan only from Holders of Claims in Classes 2, 3, and 8, which are the only Classes entitled to vote on the Plan. You may be contacted by the Debtor or its agent with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims which votes to reject, or is deemed to have rejected, the Plan (a "Rejecting Class"), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any Property under the Plan unless all Holders of Claims in the Rejecting Class receive or retain under the Plan Property having a value equal to the full amount of their Allowed Claims. For a more complete description of the implementation of the "cram- down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes."

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for __ _____, 2013, at ____ __.m. of said day (the "Confirmation Hearing"), at the United States Bankruptcy Court, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Courtroom 9B, Tampa, Florida 33602, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to Confirmation of the Plan must be filed and served in accordance with the Disclosure Statement Approval Order. Pursuant to the Disclosure Statement Approval Order, any such objection must be filed with the Bankruptcy Court by no later than _____, 2013.

## SUMMARY OF THE PLAN

**Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each holder of a claim or equity interest to vote in favor of the plan in order for the bankruptcy court to confirm the plan. However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" (within the meaning of Section 101(31) of the Bankruptcy Code) in that impaired class.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself (including the Plan Supplement and the Plan Documents which are referred to therein). The Plan (including the Plan Supplement and the Plan Documents) shall control and, upon Confirmation and the Effective Date, bind the Debtor, Reorganized Biovest, all of the Debtor's Creditors, Holders of Equity Interests and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

The Plan Documents (i.e., all documents that aid in effectuating the Plan, including the Reorganized Biovest Bylaws, the Reorganized Biovest Charter, and the documents providing for the issuance of the New Stock Options) will be contained in the Plan Supplement (unless already on file with the Bankruptcy Court) and filed with the Bankruptcy Court and posted at www.srbp.com at least ten (10) days prior to the Voting Deadline; provided, however, that (i) the Debtor may amend the Plan Supplement through and including the Confirmation Date, and (ii) in lieu of filing the Plan Supplement with the Bankruptcy Court, the Debtor may provide copies of the Plan Documents to the applicable Creditor on or prior to the Voting Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from the Debtor's Bankruptcy Counsel's website at www.srbp.com.

By way of background, the Bankruptcy Case was commenced on March 6, 2013 (the "Petition Date"). Following the Petition Date, the Debtor will continue to operate its businesses and maintain its Properties as Debtor in Possession.

As of the Petition Date, all of the assets of the Debtor were subject to first priority Liens in favor of Corps Real, LLC and the Laurus/Valens Entities (collectively, the "Senior Secured Lenders"). Corps Real, LLC is an Illinois limited liability company. The members of Corps Real, LLC are MRB&B, LLC, an Illinois limited liability company of which Ronald E. Osman and various of his family members are the members, and Kathleen M. O'Donnell as Trustee of

5

the Francis E. O'Donnell Descendants Irrevocable Trust. Ronald E. Osman is the managing member of Corps Real, LLC. Ronald E. Osman is a director of Biovest.

The total amount of secured debt asserted against the Debtor by the Senior Secured Creditors at the Petition Date was approximately $38 million. In addition, on November 17, 2010, certain of the Laurus/Valens Entities had entered into agreements with Biovest pursuant to which they were granted contingent payments in the aggregate amount of 6.25% of the gross revenues derived from the sale, license or other disposition of the Biovest Biologic Products, including Biovest's BiovaxID™ anti-cancer vaccine.

On November 17, 2012, approximately $28 million of the secured debt owed to the Senior Secured Lenders matured. On November 17, 2012, Biovest, Corps Real, LLC and the Laurus/Valens Entities entered into a Standstill Agreement, pursuant to which Corps Real, LLC and the Laurus/Valens Entities agreed that the maturity dates of their respective matured secured debt against Biovest would be extended to January 31, 2013. Corps Real, LLC and the Laurus/Valens Entities thereafter agreed that the maturity dates of their respective matured secured debt against Biovest would be further extended to the Petition Date. Prior to the Petition Date, Biovest was involved in extensive negotiations with the Senior Secured Lenders regarding the treatment of their secured debt against Biovest, the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code, and the terms and conditions for a debtor in possession financing facility from the Senior Secured Lenders.

The Debtor has filed the Plan with the Court. The Plan represents the culmination of Biovest's efforts to restructure its business operations and concentrate on the continued efforts to obtain regulatory/marketing approval for BiovaxID™ and emerge from Chapter 11 as a viable business entity. As of the Petition Date, Biovest was advised by the Senior Secured Lenders that they agreed to support the Plan in the form that has been filed with the Court. The Debtor believes that the going concern value of Biovest's business is greater than the liquidation value of its assets, that only through continued operations will Creditors receive any return on account of their Claims, that many trade creditors will benefit from Biovest's continued business operations through ongoing transactions with Reorganized Biovest, and that the filing for Chapter 11 has preserved jobs for the Debtor's employees. The Debtor believes that the Plan, if confirmed, will permit Biovest, as stated below, to (i) complete its pending efforts to obtain regulatory/marketing approval for BiovaxID, permitting the sale of BiovaxID to follicular lymphoma patients in Canada and the European Union (such approval is expected in late 2014); (ii) advance BiovaxID into an additional Phase 3 clinical trial in the United States, as a necessary step toward regulatory/marketing approval of BiovaxID in the United States which will increase the market value of Biovest; (iii) complete the ongoing commercializing of the AutovaxID instrument and related hollow fiber systems under various relationships with the Department of Defense and other parties, for the efficient production of vaccines for viral contagions; (iv) complete negotiations with pharmaceutical company partnering candidates, which could provide funding in the form of milestone payments to fund Biovest's future operations, including the additional Phase 3 clinical trial for BiovaxID in the United States; and (v) seek access to the capital markets for additional funding. The result of the foregoing is to provide the Holders of Allowed Unsecured Claims against, and Equity Interests in, the Debtor with a substantially greater return and value than if the Senior Secured Lenders were to foreclose

on their matured secured debt or if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

**General Overview of the Plan**

The Plan provides for the continued operation of the Debtor as Reorganized Biovest. The Plan essentially provides for the exchange by the Senior Secured Lenders of all of their secured debt against Biovest, including any secured debt under the DIP Facility (as hereinafter defined), or approximately $44 million, for shares representing ninety percent (90%) of the issued and outstanding shares of Reorganized Biovest capital stock as of the Effective Date of the Plan, with the remaining ten percent (10%) of the issued and outstanding shares of common stock of Biovest to be distributed in exchange for all of the Allowed Unsecured Claims against the Debtor. The Plan also provides for Cash payments to certain Holders of Allowed Claims, all as more particularly described in Article 3 and Article 5 of the Plan.

The Senior Secured Lenders have agreed to (i) consent to the use of cash collateral (as defined in Section 363(a) of the Bankruptcy Code) by the Debtor, and (ii) provide a debtor in possession financing facility to the Debtor in the amount of up to $6,000,000.00 (the "DIP Facility"). Under the terms of the DIP Facility, Biovest is permitted to request DIP Advances thereunder during the course of the Bankruptcy Case and also following the Effective Date, subject to the terms and conditions of the DIP Loan Documents and the DIP Financing Orders. Reorganized Biovest intends to utilize cash collateral and DIP Advances under the DIP Facility to pay its operating expenses, pay the costs of administration in the Bankruptcy Case, provide additional working capital to conduct its operations, complete its pending efforts to obtain regulatory/marketing approval for BiovaxID, and to fund, to the extent necessary, Cash payments required to be made to certain Holders of Allowed Claims under the Plan on or after the Effective Date.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of Reorganized Biovest and the DIP Advances received from the DIP Facility. At the present time, the Debtor believes that Reorganized Biovest will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Claims in Class 1, and Allowed Secured Tax Claims in Class 6. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Allowed Claims in Classes 4, 5, and 7 will be derived from the operations of Reorganized Biovest, DIP Advances under the DIP Facility, or from any new capital or financing raised by Reorganized Biovest, in each case as shown in the Projections.

**Classification of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interests of a debtor's equity holders. The Plan divides the Claims and Equity Interests into eleven (11) Classes.

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." The Debtor is required under Section 1122 of the Bankruptcy Code to classify the Claims and Equity Interests into separate Classes which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within such Class.

The Debtor believes that it has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code. However, it is possible that a Holder of a Claim or another interested party may challenge the classification of Claims and Equity Interests contained in the Plan and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtor, to the extent permitted by the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. A reclassification of Claims after approval of the Disclosure Statement might necessitate a resolicitation of acceptances or rejections of the Plan.

**Summary of Plan Distributions**

Set forth below is a summary of each Class of Claims and Equity Interests and the expected Distributions under the Plan to Holders of Allowed Claims against and Allowed Equity Interests in the Debtor. Any estimates of Claims set forth in this Disclosure Statement are approximate and are based on amounts to be scheduled by the Debtor in its Schedules. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

*Administrative Expense Claims.* The Holders of Allowed Administrative Expense Claims are entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. The Debtor believes that the Administrative Expense Claims will consist primarily of Postpetition operating expenses incurred by the Debtor (including unpaid wages and employee benefits), fees and costs of Professionals, fees required to be paid to the United States Trustee, the costs of solicitation of votes on the Plan (including photocopying and postage charges), and any Administrative Expense Claims filed with the Bankruptcy Court by the Administrative Expense Claim Bar Date, in each of the foregoing cases as Allowed by a Final Order of the Bankruptcy Court or as otherwise provided in the Plan.

The Plan provides that, except as otherwise provided in Article 3.1.2, Article 3.1.3 and

Article 3.1.4 of the Plan, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized Biovest equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

The fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) for the periods prior to the Effective Date also constitute Administrative Expense Claims. The Plan provides that all unpaid fees and charges assessed against the Estate under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter (or portion thereof) ending prior to the Effective Date shall be paid to the United States Trustee by Reorganized Biovest by no later than thirty (30) days following the Effective Date. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Case shall be paid by Reorganized Biovest, until the earlier of (i) the closing of the Bankruptcy Case by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to another chapter under the Bankruptcy Code; provided, however, that following the Claims Resolution Deadline, to the extent that the only remaining matters in the Bankruptcy Case relate to objections to Claims, then the Creditors Committee shall thereafter pay any fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6). Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by Reorganized Biovest (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

All Allowed Administrative Expense Claims of Professionals employed by the Committees shall be subject to the limitations imposed in paragraph 16 of the DIP Financing Final Order.

*Priority Tax Claims.* The Holders of Allowed Priority Tax Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. As of the date of this Disclosure Statement, the Debtor believes that the total amount of Allowed Priority Tax Claims in the Bankruptcy Case will be less than $5,000.00.

The Plan provides that each Holder of an Allowed Priority Tax Claim shall receive from Reorganized Biovest, on account of such Allowed Priority Tax Claim, regular installment payments in Cash on the Distribution Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Holders of Allowed Priority Tax Claims shall receive interest on account of

their Allowed Priority Tax Claims at the rate established for delinquent tax obligations pursuant to 26 U.S.C. § 6621; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid (i) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Biovest, as the case may be, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

*DIP Loan Claims.*  Pursuant to the terms of the DIP Financing Orders, the Bankruptcy Court has approved a $6,000,000.00 Postpetition credit facility from the DIP Lenders to the Debtor, secured by a first priority priming Lien (subject to the Permitted Liens) in favor of the DIP Lenders on all of the Property of the Debtor and a Superpriority Claim in favor of the DIP Lenders. Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lenders are entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Loan Claims, Cash equal to the amount of the DIP Loan Claims. Subject to and pursuant to the terms of the Plan, Corps Real has agreed that, in consideration for the treatment of the Corps Real DIP Loan Claims as set forth in Article 5.3 of the Plan, (a) the Corps Real DIP Loan Claims shall not constitute Administrative Expense Claims under the Plan, and (b) upon and subject to the occurrence of the Effective Date, the Corps Real DIP Loan Claims shall be deemed fully paid and the Liens and security interests granted in favor of Corps Real under the DIP Loan Documents and the DIP Financing Orders shall be deemed released and terminated. Subject to and pursuant to the terms of the Plan, the Laurus/Valens Lenders have agreed that, in consideration for the treatment of the Laurus/Valens Lenders DIP Loan Claims as set forth in Article 5.4 of the Plan, (a) the Laurus/Valens Lenders DIP Loan Claims shall not constitute Administrative Expense Claims under the Plan, and (b) upon and subject to the occurrence of the Effective Date, the Laurus/Valens Lenders DIP Loan Claims shall be deemed fully paid and the Liens and security interests granted in favor of the Laurus/Valens Lenders under the DIP Loan Documents and the DIP Financing Orders shall be deemed released and terminated.

*Class 1:  Priority Claims.*  Class 1 consists of all Priority Claims. The Holders of Allowed Priority Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. As of the date of this Disclosure Statement, the Debtor believes that the total amount of Allowed Priority Claims in the Bankruptcy Case will be approximately $107,564.00.

The Plan provides that each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized Biovest equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court. Class 1 is Unimpaired by the Plan. Each Holder of a Priority Claim in Class 1 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 2:  Secured Claims and Other Claims of Corps Real.*  Class 2 consists of all of the Corps Real DIP Loan Claims and all of the Corps Real Prepetition Claims. As of the Petition Date, the Debtor was indebted to Corps Real in an aggregate amount, including principal,

interest, fees, charges and attorneys fees, of approximately $5,093,494.00 with respect to the Corps Real Prepetition Claims (the "Corps Real Allowed Class 2 Secured Claims"), which are secured by first priority liens on and security interests in all of the Debtor's assets as described herein, junior only to (a) the Liens in favor of the DIP Lenders granted in the DIP Financing Orders, and (b) the Permitted Liens. Under the Plan, the Corps Real Allowed Class 2 Secured Claims and the Corps Real DIP Loan Claims will be allowed in the aggregate amount of approximately $8,093,494.00, subject to adjustment downward based on the actual amount of DIP Advances made by Corps Real (collectively, the "Corps Real Allowed Class 2 Claims").

Under the Plan, on and subject to the occurrence of the Effective Date, the following shall occur with respect to the Corps Real Allowed Class 2 Claims:

(i)    The Corps Real Allowed Class 2 Claims shall be exchanged under the Plan for that number of shares of Reorganized Biovest Common Stock that will represent approximately twenty-seven percent (27%) of the one hundred million issued and outstanding shares of Reorganized Biovest Common Stock as of the Effective Date (the "Class 2 Plan Shares") in full and final satisfaction of the Corps Real Allowed Class 2 Claims. The exact number of Class 2 Plan Shares to be received by Corps Real under the Plan, and the percentage that such number represents of the Secured Creditors Plan Shares, shall be determined in accordance with the Secured Creditors Plan Shares Allocation; provided, however, that the Secured Creditors Plan Shares shall constitute ninety percent (90%) of the issued and outstanding shares of Reorganized Biovest Common Stock on the Effective Date.

(ii)    The Class 2 Plan Shares shall be issued to Corps Real pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws. The transfer or resale of the Class 2 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.10 of the Plan for a further discussion of the securities law issues relating to underwriters).

(iii)    Upon the issuance of the Class 2 Plan Shares to Corps Real, without any further action by any party, the Corps Real Allowed Class 2 Claims shall be deemed fully paid and Corps Real shall have no further Claims against the Debtor. Except for the Class 2 Plan Shares, Corps Real shall not be entitled to any further Distribution under the Plan with respect to the Corps Real Allowed Class 2 Claims.

(iv)    Notwithstanding anything to the contrary contained in the DIP Loan Documents, the DIP Financing Orders, the Corps Real Prepetition Loan Documents, any order of the Bankruptcy Court, or the Plan, the Liens, lien priority, administrative priorities and other rights and remedies granted to Corps Real pursuant to the DIP Loan Documents, the DIP Financing Orders, the Corps Real Prepetition Loan Documents, or any order of the Bankruptcy Court (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided in any of the foregoing, and the administrative priority provided in any of the foregoing) shall be terminated and no longer of any force and effect as of the Effective Date. As of the Effective Date, without any further action by any party, the Liens and security interests

granted by the Debtor to Corps Real with respect to the Corps Real Allowed Class 2 Claims shall be deemed to be extinguished, satisfied and released. To the extent that any such Liens or security interests have been filed or recorded publicly, Corps Real will authorize Reorganized Biovest to take all necessary actions and record and file all necessary filings that are necessary to cancel, terminate and/or extinguish such Liens and security interests.

(v)    The Contingent Payment Agreements shall be amended and modified to reallocate 4.75% of the Biovest Contingent Payments to Calliope, PSource, Valens Offshore I, Valens Offshore II, and Valens U.S. and 1.50% of the Biovest Contingent Payments (the "Assigned Biovest Contingent Payment") to Corps Real. Notwithstanding anything to the contrary contained in the Plan, the Assigned Biovest Contingent Payment shall remain in effect following the Effective Date in accordance with the terms and conditions of the Contingent Payment Agreements.

(vi)    The Debtor shall amend and restate its bylaws and certificate of incorporation to incorporate provisions required by the Plan, the Confirmation Order, and/or the Bankruptcy Code.

(vii)    Except as to any obligations under the DIP Loan Documents or the Plan, the Debtor, on behalf of itself and its Estate, and Corps Real and their respective officers, directors, employees, agents, and attorneys shall be deemed to have released each other, as of the Effective Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action now held, owned or possessed, directly or indirectly.

(viii)    Effective as of and subject to the occurrence of the Effective Date, any and all of the Corps Real Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

Class 2 is Impaired by the Plan. Corps Real, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

*Class 3: Secured Claims and Other Claims of LV and the Laurus/Valens Entities.* Class 3 consists of all of the Laurus/Valens Lenders DIP Loan Claims and all of the Laurus/Valens Prepetition Claims. As of the Petition Date, the Debtor was indebted to LV and the Laurus/Valens Entities in an aggregate amount, including principal, interest, fees, charges and attorneys fees, of approximately $32,719,423.00 with respect to the Laurus/Valens Prepetition Claims (the "Laurus/Valens Allowed Class 3 Secured Claims"), which are secured by first priority liens on and security interests in all of the Debtor's assets, junior only to (a) the Liens in favor of the DIP Lenders granted in the DIP Financing Orders, (b) the first priority liens on and security interests in all of the Debtor's assets in favor of Corps Real as described herein, and (c) the Permitted Liens. Under the Plan, the Laurus/Valens Allowed Class 3 Secured Claims and the Laurus/Valens Lenders DIP Loan Claims will be allowed in the aggregate amount of approximately $35,719,423.00, subject to adjustment downward based on the actual amount of

DIP Advances made by the Laurus/Valens Entities (collectively, the "Laurus/Valens Allowed Class 3 Claims").

Under the Plan, on and subject to the occurrence of the Effective Date, the following shall occur with respect to the Laurus/Valens Allowed Class 3 Claims:

   (i) The Laurus/Valens Allowed Class 3 Claims shall be exchanged under the Plan for that number of shares of Reorganized Biovest Common Stock that will represent approximately sixty-three percent (63%) of the one hundred million issued and outstanding shares of Reorganized Biovest Common Stock as of the Effective Date (the "Class 3 Plan Shares") in full and final satisfaction of the Laurus/Valens Allowed Class 3 Claims. The exact number of Class 3 Plan Shares to be received by the Laurus/Valens Entities under the Plan, and the percentage that such number represents of the Secured Creditors Plan Shares, shall be determined in accordance with the Secured Creditors Plan Shares Allocation; provided, however, that the Secured Creditors Plan Shares shall constitute ninety percent (90%) of the issued and outstanding shares of Reorganized Biovest Common Stock on the Effective Date.

   (ii) The Class 3 Plan Shares shall be issued to the Laurus/Valens Entities pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws. The transfer or resale of the Class 3 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.10 of the Plan for a further discussion of the securities law issues relating to underwriters).

   (iii) Upon the issuance of the Class 3 Plan Shares to the Laurus/Valens Entities, without any further action by any party, the Laurus/Valens Allowed Class 3 Claims shall be deemed fully paid and LV and the Laurus/Valens Entities shall have no further Claims against the Debtor. Except for the Class 3 Plan Shares, LV and the Laurus/Valens Entities shall not be entitled to any further Distribution under the Plan with respect to the Laurus/Valens Allowed Class 3 Claims.

   (iv) Notwithstanding anything to the contrary contained in the DIP Loan Documents, the DIP Financing Orders, the Laurus/Valens Prepetition Loan Documents, any order of the Bankruptcy Court, or the Plan, the Liens, lien priority, administrative priorities and other rights and remedies granted to LV and the Laurus/Valens Entities pursuant to the DIP Loan Documents, the DIP Financing Orders, the Laurus/Valens Prepetition Loan Documents, or any order of the Bankruptcy Court (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided in any of the foregoing, and the administrative priority provided in any of the foregoing) shall be terminated and no longer of any force and effect as of the Effective Date. As of the Effective Date, without any further action by any party, the Liens and security interests granted by the Debtor to LV and the Laurus/Valens Entities with respect to the Laurus/Valens Allowed Class 3 Claims shall be deemed to be extinguished, satisfied and released. To the extent that any such Liens or security interests have been filed or recorded publicly, LV and the Laurus/Valens Entities

will authorize Reorganized Biovest to take all necessary actions and record and file all necessary filings that are necessary to cancel, terminate and/or extinguish such Liens and security interests.

(v)     The Contingent Payment Agreements shall be amended and modified to reallocate 4.75% of the Biovest Contingent Payments (the "Retained Biovest Contingent Payment") to Calliope, PSource, Valens Offshore I, Valens Offshore II, and Valens U.S. and 1.50% of the Biovest Contingent Payments to Corps Real.  Notwithstanding anything to the contrary contained in the Plan, the Retained Biovest Contingent Payment shall remain in effect following the Effective Date in accordance with the terms and conditions of the Contingent Payment Agreements.

(vi)    The Debtor shall amend and restate its bylaws and certificate of incorporation to incorporate provisions required by the Plan, the Confirmation Order, and/or the Bankruptcy Code.

(vii)   Except as to any obligations under the DIP Loan Documents or the Plan, the Debtor, on behalf of itself and its Estate, and LV and the Laurus/Valens Entities and their respective officers, directors, employees, agents, and attorneys shall be deemed to have released each other, as of the Effective Date, from any and all claims of any nature whatsoever that they have or may have against each other, known or unknown, contingent or otherwise, asserted or unasserted, at law or in equity, as well as any other kind or character of action now held, owned or possessed, directly or indirectly.

(viii)  Effective as of and subject to the occurrence of the Effective Date, any and all of the Laurus/Valens Prepetition Loan Documents, including the Accentia Guaranty and the Accentia Stock Pledge Agreement, shall be deemed cancelled and void and of no further force and effect; provided, however, that the Contingent Payment Agreements, as amended and modified as provided in the Plan, shall remain in effect following the Effective Date.

Class 3 is Impaired by the Plan.  LV and the Laurus/Valens Entities, as the Holders of the Class 3 Claims, are entitled to vote to accept or reject the Plan.

*Class 4: Secured Claims and Other Claims of the City of Coon Rapids*.  Class 4 consists of all of the Coon Rapids Prepetition Claims.  As of the Petition Date, the Debtor was indebted to the City of Coon Rapids in an aggregate amount, including principal, interest, fees, charges and attorneys fees, of approximately $232,327.00 with respect to the Coon Rapids Prepetition Claims (the "Coon Rapids Allowed Class 4 Claims"), which are secured by first priority liens on and security interests in certain of the Debtor's assets located in the State of Minnesota and other collateral (collectively, the "Coon Rapids Collateral").

Under the Plan, the following shall occur with respect to the Coon Rapids Allowed Class 4 Claims:

(i)    On the Effective Date, in accordance with Section 1124 of the Bankruptcy Code, Reorganized Biovest shall (a) cure any defaults (other than defaults relating to the insolvency or the financial condition of the Debtor or its status as Debtor in Possession in the Bankruptcy Case) of the Debtor under the Coon Rapids Prepetition Loan Documents that occurred before or after the commencement of the Bankruptcy Case, and (b) reinstate the maturity of the Coon Rapids Prepetition Claims as such maturity existed under the Coon Rapids Prepetition Loan Documents, thus leaving unaltered the legal, equitable, and contractual rights to which the City of Coon Rapids is entitled to with respect to the Coon Rapids Prepetition Claims.

(ii)    Following the Effective Date, Reorganized Biovest shall continue to perform its obligations under the Coon Rapids Prepetition Loan Documents, including making any payments required under the Coon Rapids Note.

(iii)    Following the Effective Date, Reorganized Biovest's obligations under the Coon Rapids Prepetition Loan Documents shall continue to be secured by any security interest in the Coon Rapids Collateral granted Prepetition to the City of Coon Rapids.

Class 4 is Unimpaired by the Plan. The City of Coon Rapids, as the Holder of the Class 4 Claims, conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 5: Secured Claims and Other Claims of The Economic Development Authority in and for the City of Coon Rapids.* Class 5 consists of all of the Coon Rapids EDA Prepetition Claims. As of the Petition Date, the Debtor was indebted to the Coon Rapids EDA in an aggregate amount, including principal, interest, fees, charges and attorneys fees, of approximately $95,719.00 with respect to the Coon Rapids EDA Prepetition Claims (the "Coon Rapids EDA Allowed Class 5 Claims"), which are secured by first priority liens on and security interests in certain of the Debtor's assets located in the State of Minnesota and other collateral (collectively, the "Coon Rapids EDA Collateral").

Under the Plan, the following shall occur with respect to the Coon Rapids EDA Allowed Class 5 Claims:

(i)    On the Effective Date, in accordance with Section 1124 of the Bankruptcy Code, Reorganized Biovest shall (a) cure any defaults (other than defaults relating to the insolvency or the financial condition of the Debtor or its status as Debtor in Possession in the Bankruptcy Case) of the Debtor under the Coon Rapids EDA Prepetition Loan Documents that occurred before or after the commencement of the Bankruptcy Case, and (b) reinstate the maturity of the Coon Rapids EDA Prepetition Claims as such maturity existed under the Coon Rapids EDA Prepetition Loan Documents, thus leaving unaltered the legal, equitable, and contractual rights to which the Coon Rapids EDA is entitled to with respect to the Coon Rapids EDA Prepetition Claims.

(ii)    Following the Effective Date, Reorganized Biovest shall continue to perform its obligations under the Coon Rapids EDA Prepetition Loan Documents, including making any payments required under the Coon Rapids EDA Note.

(iii)    Following the Effective Date, Reorganized Biovest's obligations under the Coon Rapids EDA Prepetition Loan Documents shall continue to be secured by any security interest in the Coon Rapids EDA Collateral granted Prepetition to the Coon Rapids EDA.

Class 5 is Unimpaired by the Plan. The Coon Rapids EDA, as the Holder of the Class 5 Claims, conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 6:  Secured Tax Claims of Governmental Units.*  Class 6 consists of all Secured Tax Claims of Governmental Units. As of the date of this Disclosure Statement, the Debtor believes there will be no Allowed Secured Tax Claims of Governmental Units in this Class. On the Distribution Date, Reorganized Biovest shall pay to a Governmental Unit, in Cash, the Allowed Amount of its Secured Tax Claim. Class 6 is Unimpaired by the Plan. Each Holder of a Secured Tax Claim in Class 6 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 7:  Other Secured Claims.*  Class 7 consists of all Secured Claims not otherwise specifically classified in the Plan, including the Secured Claim of Royal Bank. As of the date of this Disclosure Statement, the Debtor believes that Royal Bank will have the only Secured Claim in Class 7. As of the Petition Date, the aggregate outstanding balance owed to Royal Bank, including principal, interest, fees and charges, was approximately $48,785.00. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 7.

Under the Plan, the following shall occur with respect to the Allowed Class 7 Claims:

(i)    On the Effective Date, in accordance with Section 1124 of the Bankruptcy Code, Reorganized Biovest shall (a) cure any defaults (other than defaults relating to the insolvency or the financial condition of the Debtor or its status as Debtor in Possession in the Bankruptcy Case) of the Debtor under the loan and/or security documents evidencing an Allowed Class 7 Claim that occurred before or after the commencement of the Bankruptcy Case, and (b) reinstate the maturity of such Allowed Class 7 Claim as such maturity existed under the loan and/or security documents evidencing such Allowed Class 7 Claim, thus leaving unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Class 7 Claim is entitled to with respect to such Allowed Class 7 Claim.

(ii)    Following the Effective Date, Reorganized Biovest shall continue to perform its obligations under the loan and/or security documents evidencing an Allowed Class 7 Claim, including making any payments required under such loan and/or security documents.

16

(iii)    Following the Effective Date, Reorganized Biovest's obligations under the loan and/or security documents evidencing an Allowed Class 7 Claim shall continue to be secured by any security interest in the Debtor's Property granted Prepetition to the Holder of such Allowed Class 7 Claim.

(iv)    Any deficiency owing to a Secured Creditor with respect to a Class 7 Claim shall be classified and treated as a Class 8 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

Class 7 is Unimpaired by the Plan.  Each Holder of a Secured Claim in Class 7 conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 8:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).*  Class 8 consists of all Unsecured Claims not otherwise classified in the Plan. As of the Petition Date, the books and records of Biovest reflected unsecured claims of approximately $5.4 million owed to approximately 130 creditors.  Additionally, Accentia has filed Proof of Claim No. 2, asserting an Unsecured Claim in the amount of $4,981,968.23 as of the Petition Date.  To the extent that the Accentia Unsecured Claim is Allowed as filed, and without including any potential rejection damages or similar claims, the total Class 8 Unsecured Claims would be approximately $10.3 million.

Under the Plan, on the Effective Date, the following shall occur with respect to Allowed Unsecured Claims in Class 8:

(i)    Each Holder of an Allowed Unsecured Claim in Class 8 will receive a Distribution through the automatic exchange under the Plan of its Allowed Class 8 Unsecured Claim for its Pro Rata Share of that number of shares of Reorganized Biovest Common Stock that will represent ten percent (10%) of the one hundred million issued and outstanding shares of Reorganized Biovest Common Stock as of the Effective Date (the "Class 8 Plan Shares") in full and final satisfaction of such Holder's Allowed Class 8 Unsecured Claim.

(ii)    The Class 8 Plan Shares shall be issued to the Holders of Allowed Unsecured Claims in Class 8 as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws.  The transfer or resale of the Class 8 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.10 of the Plan for a further discussion of the securities law issues relating to underwriters).

The timing and procedures for, and amount of, Distributions to Holders of Allowed Class 8 Unsecured Claims shall be in accordance with Article 9 of the Plan and the Confirmation Order.

Class 8 is Impaired by the Plan. Each Holder of an Unsecured Claim in Class 8 is entitled to vote to accept or reject the Plan.

*Class 9: Equity Interests.* Class 9 consists of all of the Equity Interests. On the Effective Date, all of the Class 9 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 9 Equity Interests will not receive or retain any Property or equity interest  under the Plan on account of the Class 9 Equity Interests. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Class 9 Equity Interests. Class 9 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 9 is deemed not to have accepted the Plan and, thus, the Holders of the Class 9 Equity Interests are not entitled to vote to accept or reject the Plan.

*Class 10: Existing Biovest Stock Options.* Class 10 consists of all Existing Biovest Stock Options. On the Effective Date, all of the Class 10 Existing Biovest Stock Options shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 10 Existing Biovest Stock Options will not receive or retain any Property or equity interest under the Plan on account of the Class 10 Existing Biovest Stock Options. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Class 10 Existing Biovest Stock Options. Class 10 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 10 is deemed not to have accepted the Plan and, thus, the Holders of the Class 10 Existing Biovest Stock Options are not entitled to vote to accept or reject the Plan.

*Class 11: Existing Biovest Stock Warrants.* Class 11 consists of all Existing Biovest Stock Warrants. On the Effective Date, all of the Class 11 Existing Biovest Stock Warrants shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. The Holders of the Class 11 Existing Biovest Stock Warrants will not receive or retain any Property or equity interest under the Plan on account of the Class 11 Existing Biovest Stock Warrants. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Class 11 Existing Biovest Stock Warrants. Class 11 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 11 is deemed not to have accepted the Plan and, thus, the Holders of the Class 11 Existing Biovest Stock Warrants are not entitled to vote to accept or reject the Plan.

**Conditions Precedent to Confirmation of the Plan and the Effective Date**

*Conditions Precedent to Confirmation of the Plan.* The following is a condition precedent to Confirmation of the Plan, which may be waived by the Debtor: the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

*Conditions Precedent to the Effective Date.* The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtor, Corps Real and the Laurus/Valens Entities: (i) the Confirmation Order shall be a Final Order; (ii) all conditions precedent to the Closing shall have been satisfied or waived in writing by Corps Real and the Laurus/Valens Entities, and all actions

set forth in Article 8.3.1.1 and Article 8.3.1.3 of the Plan shall have occurred; and (iii) each Plan Document shall be in form and substance reasonably acceptable to the Debtor, Corps Real and the Laurus/Valens Entities.

*Notice of the Effective Date.* Promptly following the satisfaction, or the waiver by the Debtor, Corps Real and the Laurus/Valens Entities of all of the conditions set forth in Article 10.2 of the Plan, the Debtor shall file a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date. The Debtor shall serve the Effective Date Notice on all of the Notice Parties.

## Treatment of Executory Contracts and Unexpired Leases

*Assumption or Rejection of Executory Contracts and Unexpired Leases.* Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and not listed on Exhibit D attached to the Plan shall be deemed assumed by the Debtor as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend Exhibit D to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtor shall provide notice of any amendments to Exhibit D to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit D shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder. Any executory contract or unexpired lease that exists between the Debtor and another Person or Entity and that is listed on Exhibit D attached to the Plan shall be deemed rejected by the Debtor as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtor shall be deemed to be executory contracts and Assumed Contracts, and (ii) except as provided in Article 7.7 of the Plan, all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtor for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit D).

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 of the Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 of the Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by the Debtor of an Assumed Contract shall be binding upon any and all parties to

19

such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by Reorganized Biovest in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

*Inclusiveness.*  Unless otherwise specified on Exhibit D attached to the Plan, each executory contract and unexpired lease listed or to be listed on Exhibit D shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit D.

*Cure of Defaults.*  Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1 of the Plan, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor or Reorganized Biovest.  Reorganized Biovest shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim.  Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than ninety (90) days following the Effective Date, Reorganized Biovest shall cure any and all undisputed Cure Claims.  All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties.

*Claims under Rejected Executory Contracts and Unexpired Leases.*  Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or Reorganized Biovest. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 8.

*Insurance Policies.*  All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that

the Debtor or Reorganized Biovest may hold against any Person or Entity, including the insurers under any of the Debtor's insurance policies or under the D&O Policy.

*Indemnification Rights.*  All Claims for Indemnification Rights against the Debtor by an Indemnitee for defense and indemnification shall be reinstated against Reorganized Biovest and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtor, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtor's insurance policies, including the D&O Policy.   The reinstated Claim against Reorganized Biovest, and Reorganized Biovest's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

**Vesting of Property of the Estate in Reorganized Biovest**

On the Effective Date, and except as otherwise expressly provided in the Plan, all Property of the Estate (including the Causes of Action and any net operating losses) shall vest in Reorganized Biovest free and clear of any and all Liens, Debts, obligations, Claims (including the Disputed Accentia Intellectual Property Claim), Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide. Reorganized Biovest intends to preserve net operating losses to the maximum extent permitted under applicable law.  As of the Effective Date, Reorganized Biovest may operate its businesses and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.   All privileges with respect to the Property of the Debtor's Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, Reorganized Biovest.

**Continued Corporate Existence**

Biovest will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under the Delaware General Corporation Law and pursuant to its certificate of incorporation and bylaws in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

**Amendment and Restatement of Certificate of Incorporation and Bylaws of Biovest**

The Independent Board Committee shall take such action as may be necessary to cause the certificate of incorporation of Biovest to be amended and restated (a) if applicable, to authorize a sufficient number of shares of Reorganized Biovest Common Stock necessary to meet (i) the requirements set forth in the Plan as to the issuance of the Plan Shares, and (ii) the obligations of Reorganized Biovest under the New Stock Options, (b) to contain any provisions as may be required in order that such certificate of incorporation is consistent with the provisions of the Plan, the Bankruptcy Code, and the Confirmation Order, and (c) to provide, pursuant to

Section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6). The bylaws of Biovest shall be amended and restated as necessary to satisfy the provisions of the Plan (as amended and restated, the "Reorganized Biovest Bylaws"). To the extent necessary, the Confirmation Order shall include appropriate language approving the Reorganized Biovest Charter and the Reorganized Biovest Bylaws. The Reorganized Biovest Charter and the Reorganized Biovest Bylaws shall be the charter and bylaws governing Reorganized Biovest on and after the Effective Date, subject to any right to amend the foregoing as permitted by applicable law as such right may be limited by the terms of the Reorganized Biovest Charter and the Reorganized Biovest Bylaws.

**Board of Directors and Executive Officers of Reorganized Biovest**

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the executive officers and directors of the Debtor immediately prior to the Effective Date shall be deemed to be the executive officers and directors of Reorganized Biovest without any further action by any party; provided, however, that the Board of Directors of Reorganized Biovest shall initially consist of the current members of the Board of Directors (Edmund C. King, Ronald E. Osman, John Sitilides, Jeffrey A. Scott, Peter J. Pappas, Sr., and Raphael J. Mannino), plus one individual to be appointed by the Laurus/Valens Entities (provided that, in accordance with their rights as shareholders of Reorganized Biovest, after the Effective Date, Corps Real and the Laurus/Valens Entities shall in no way be precluded from changing the number of members of, or the individuals serving on, the Board of Directors of Reorganized Biovest). A biographical summary for each of the current directors of Biovest is contained in Biovest's Form 10-K Annual Report for the fiscal year ended September 30, 2012 on file with the SEC. On and after the Effective Date, the operations of Reorganized Biovest shall continue to be the responsibility of its Board of Directors. Each director of Reorganized Biovest shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of Reorganized Biovest.

Each executive officer of Reorganized Biovest shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of Reorganized Biovest. The initial executive officers of Reorganized Biovest will be Samuel S. Duffey, Chief Executive Officer and President, Brian D. Bottjer, Acting Chief Financial Officer and Controller, Mark D. Hirschel, Chief Science Officer, Carlos F. Santos, Senior Vice President, Product Development & Regulatory Affairs, Douglas W. Calder, Vice President, Strategic Planning & Capital Markets, and David Moser, Secretary. A biographical summary for each of these individuals is contained in Biovest's Form 10-K Annual Report for the fiscal year ended September 30, 2012 on file with the SEC.

From and after the Confirmation Date and until the Effective Date, the Independent Board Committee and executive officers of the Debtor shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order. From and after the Effective

Date, the Board of Directors and executive officers of Reorganized Biovest shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

**Discharge, Exculpation from Liability, Release and Injunction Provisions under the Plan**

Article 11 of the Plan contains detailed discharge, exculpation from liability, release and injunction provisions for the benefit of the Debtor, Reorganized Biovest and other parties.  In addition, the Plan provides for the complete and unconditional discharge, to the fullest extent permitted by law, of any and all Debts and Claims of any nature whatsoever against the Debtor or Reorganized Biovest that arose on or before the Effective Date.  Each holder of a Claim against or Equity Interest in the Debtor is encouraged to read Article 11 of the Plan in its entirety.  Set forth below is a summary of these provisions.

*Discharge of Claims.*  Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor and its Estate and Reorganized Biovest from any and all Debts of and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtor and its Estate and Reorganized Biovest, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan.  As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor or its Estate or Reorganized Biovest, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, including any action or proceeding which may be brought pursuant to the Securities Act or the Exchange Act, and the Confirmation Order shall contain appropriate injunctive language to that effect.  As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests.  In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities and Equity Interests against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, Debt, or Equity Interest.  Notwithstanding the foregoing, Reorganized Biovest shall

remain obligated to make payments to Holders of Allowed Claims and issue the Plan Shares as required pursuant to the Plan.

*Exculpation from Liability.* The Debtor and its Postpetition directors and officers, the Independent Board Committee, the Professionals for the Debtor (acting in such capacity), the Creditors Committee and its members, the Professionals for the Creditors Committee (acting in such capacity), the Professionals for the Equity Holders Committee (acting in such capacity), and the DIP Lenders and their respective officers, directors, employees, Affiliates, attorneys, agents and representatives (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, the Asset Purchase Agreement, any Plan Document, the DIP Facility, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under Article 11.2 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase or securities, including the Plan Shares. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.2 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

*Release.* On the Effective Date, the Debtor, Reorganized Biovest, the Committee, the DIP Lenders, and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtor's Postpetition directors and officers, the Independent Board Committee, the members of the Creditors Committee, and the Professionals employed by the Debtor and the Committees (collectively, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtor, the Bankruptcy Case, any Property of the Debtor, the business or operations of the Debtor, the DIP Facility, the Asset Purchase Agreement, any Plan Documents, the Plan, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exclusion from this

release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Released Parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of <u>Article 11.3</u> of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

*General Injunction. Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability, or Equity Interest that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtor or Reorganized Biovest or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or Reorganized Biovest or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or Reorganized Biovest or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or Reorganized Biovest; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor or Reorganized Biovest under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtor and Reorganized Biovest shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained in this Disclosure Statement or the Plan, the provisions of* <u>*Article 11.4*</u> *of the Plan shall not release, or be deemed a release of, any of the Causes of Action.*

*Term of Certain Injunctions and Automatic Stay.* All injunctions or automatic stays for the benefit of the Debtor pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court. With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor's liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the

Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elects to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided above.

*No Liability for Tax Claims.* Unless a taxing Governmental Unit has asserted a Claim against the Debtor before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtor, Reorganized Biovest or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

*Regulatory or Enforcement Actions.* Notwithstanding anything to the contrary set forth in this Disclosure Statement, the Plan, or the Confirmation Order nothing in the Plan or the Confirmation Order shall restrict any federal government regulatory agency, including the SEC, from pursuing any regulatory or police enforcement action, including for violations of the federal securities laws, or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code. Nothing contained in <u>Article 11.7</u> of the Plan is intended to, nor shall it, supersede or alter any applicable provisions of the Bankruptcy Code.

**Distributions under the Plan**

*Initial Distribution.* As soon as reasonably practicable (as determined by Reorganized Biovest) after the Effective Date, Reorganized Biovest shall (i) make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 1 and 6; provided, however, that the Distributions as to Allowed Administrative Expense Claims of Professionals shall be made no more than ten (10) days after the Determination Date; and (ii) issue the Plan Shares to the Holders of Allowed Claims in Classes 2, 3 and 8 as required by the terms of the Plan ((i) and (ii), collectively, the "Initial Distribution"). Thereafter, Reorganized Biovest shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

*Determination of Claims.* From and after the Effective Date, Reorganized Biovest shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims; provided, however, that the Creditors Committee shall have the right to independently object to any Unsecured Claim on or before the Claims Resolution Deadline. Any fees or costs incurred by the Creditors Committee following the Effective Date with respect to objections to Claims shall be the responsibility of the Creditors Committee and

shall not be paid by the Debtor or Reorganized Biovest.  Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than the Claims Resolution Deadline, and the Confirmation Order shall contain appropriate language to that effect.  Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims.  If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 8 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Biovest receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor or Reorganized Biovest, as the case may be, effect service in any of the following manners:  (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution.  The Debtor or Reorganized Biovest may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Biovest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Biovest may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

*Distributions as to Allowed Claims in Class 8.*  Notwithstanding any provision in the Plan to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 8 unless and until such Disputed Claim becomes an Allowed Claim. If, on the Distribution Date, any

Disputed Claims in Class 8 remain, then Reorganized Biovest shall withhold from any such Distribution the amount of Class 8 Plan Shares that would be necessary to make the same proportionate distribution to the Holders of all Class 8 Claims which are Disputed Claims as if each such Disputed Claim were an Allowed Class 8 Claim. At such time that such Disputed Claim becomes an Allowed Class 8 Claim, the Holder of such Allowed Class 8 Claim shall receive the Distribution to which such Holder is then entitled under the Plan. Notwithstanding any provision in the Plan to the contrary, if, on any applicable Distribution Date, the Holder of a Class 8 Claim is subject to a proceeding against it by Reorganized Biovest under Section 502(d) of the Bankruptcy Code, then Reorganized Biovest (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding. Distributions to a Holder of an Allowed Claim in Class 8 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtor or Reorganized Biovest at the time of the Distribution, unless Reorganized Biovest has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Biovest shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided above.

*Unclaimed Distributions.* If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Biovest shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim. If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Biovest due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized Biovest as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim. Any unclaimed Distribution as described above sent by Reorganized Biovest shall become the property of Reorganized Biovest. If a stock certificate for Reorganized Biovest Common Stock distributed to the Holder of an Allowed Claim pursuant to the Plan is returned to Reorganized Biovest or the Transfer Agent due to an incorrect or incomplete address for the recipient, and no claim is made in writing to Reorganized Biovest or the Transfer Agent as to such stock certificate within ninety (90) days of the date such stock certificate was distributed, then the number of shares of Reorganized Biovest Common Stock evidenced by such stock certificate shall be deemed to be unclaimed and such recipient shall be deemed to have no further rights in respect of such stock certificate or the shares of Reorganized Biovest Common Stock evidenced thereby.

**Issuance of Reorganized Biovest Common Stock**

Reorganized Biovest shall issue and distribute, in accordance with the provisions of the Plan, shares of Reorganized Biovest Common Stock to those Entities entitled to receive the Plan

Shares hereunder. Under the Plan, the Secured Creditors Plan Shares shall constitute ninety percent (90%) of the issued and outstanding shares of Reorganized Biovest Common Stock on the Effective Date, and the Class 8 Plan Shares shall constitute ten percent (10%) of the issued and outstanding shares of Reorganized Biovest Common Stock on the Effective Date.

## Exemptions from Securities Laws

*General.* Pursuant to Section 1125(e) of the Bankruptcy Code, any Person that solicits the acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security, offered or sold under the plan, of the debtor, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of Securities.

*Issuance of Reorganized Biovest Common Stock under the Plan.* Section 1145(a) of the Bankruptcy Code exempts from registration under the Securities Act and under equivalent state securities or "blue sky" laws (a) the offer or sale under a plan of reorganization of a Security of a debtor, of an affiliate participating in a joint plan with a debtor, or of a successor of a debtor under a plan, if such offer or sale is either (i) in exchange for a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor or such affiliate, or (ii) "principally in such exchange and partly for cash or property", or (b) the offer of a Security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in subparagraph (a) above, or the sale of a Security upon the exercise of such a warrant, option, right to subscribe, or conversion privilege. The Debtor believes that the offer and issuance of the Plan Shares in exchange for Claims and Equity Interests under the Plan satisfy the requirements of Section 1145(a) of the Bankruptcy Code and such transactions, therefore, are exempt from registration under federal and state securities laws. The Confirmation Order will include a finding and conclusion to the effect that such offer and issuance fall within the exemptions from registration under the Securities Act and state and local securities laws pursuant to Section 1145 of the Bankruptcy Code.

*Subsequent Transfers of Plan Shares.*

*Plan Shares Issued Pursuant to Section 1145 Exemption.* The Plan Shares may be freely transferred by most recipients thereof, and all resales of and subsequent transactions for the Plan Shares are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to the Plan Shares. Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":

(i) an Entity that purchases a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such a claim or interest;

        (ii)     an Entity that offers to sell Securities offered or sold under a bankruptcy plan for the holders of such Securities;

        (iii)     an Entity that offers to buy Securities offered or sold under a bankruptcy plan from the holders of such Securities, if the offer to buy is (x) with a view to distribution of such Securities, and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of Securities under the plan; and

        (iv)     an Entity that is an "issuer" with respect to such Securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that Persons deemed to be "underwriters" receive Plan Shares pursuant to the Plan, resales of such Plan Shares by such Persons would not be exempted by Section 1145(a) of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters, however, may be able to sell such Plan Shares without registration subject to the provisions of Rule 144 under the Securities Act as discussed below.

*Plan Shares Held by Underwriters.* Holders of Plan Shares who are deemed to be "underwriters" within the meaning of Section 1145(b)(1) of the Bankruptcy Code or who may otherwise be deemed to be "affiliates" of, or to exercise "control" over, Reorganized Biovest within the meaning of Rule 405 of Regulation C under the Securities Act, may, in addition to any other exemptions that may be available under federal and state securities laws, under certain circumstances, be able to sell their Plan Shares pursuant to the more limited safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that, if certain conditions are met (e.g., volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who resell such securities and are "affiliates" of the issuer of the securities sought to be resold will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act.

The foregoing summary discussion regarding Section 1145 of the Bankruptcy Code is general in nature and has been included in this Disclosure Statement solely for informational purposes. Although the Plan Shares will become freely tradable by most recipients thereof as

described above, it should be noted that there can be no assurance that an active trading market for the Reorganized Biovest Common Stock will develop or, if developed, that it will continue. Accordingly, no assurance can be given concerning the actual market for the Plan Shares or a Person's ability to sell the Plan Shares at any particular time. The Debtor does not make any representations concerning, and does not provide any opinion or advice with respect to, the securities law and bankruptcy law matters described above. In view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws to a recipient of Plan Shares who may be deemed to be an "underwriter" (within the meaning of Section 1145(b)(1) of the Bankruptcy Code) and/or an "affiliate" of, or a person who exercises "control" over, Reorganized Biovest under applicable federal and state securities laws, the Debtor encourages each Person who is to receive Plan Shares pursuant to the Plan to consider carefully and consult with its own legal advisor(s) with respect to such (and any related) matters.

**Fractional Shares**

The Distribution of shares of Reorganized Biovest Common Stock as provided in the Plan may mathematically entitle the recipient to a fractional share of Reorganized Biovest Common Stock. Notwithstanding any provision in the Plan to the contrary, payments of fractions of shares of Reorganized Biovest Common Stock shall not be made and shall be deemed to be zero. No consideration (Cash or otherwise) shall be provided in lieu of fractional shares that are deemed to be zero.

**SEC Public Reports**

The Biovest Common Stock is registered under the Exchange Act. Section 13(a) of the Exchange Act requires that Biovest file with the SEC annual reports on Form 10-K and quarterly reports on Form 10-Q. Prior to the Petition Date, Biovest filed with the SEC its Form 10-K Annual Report for the fiscal year ended September 30, 2012 and its Form 10-Q Quarterly Report for the fiscal quarter ended December 31, 2012. Thus, Biovest is current in its SEC filings as of the date of this Disclosure Statement. Each of the above-referenced reports can be accessed on the Internet at www.sec.gov or on Biovest's website at www.biovest.com.

**Corporate Action**

All matters provided for under the Plan involving the corporate structure of the Debtor or Reorganized Biovest, or any corporate action to be taken by or required of the Debtor or Reorganized Biovest, including all action taken or required to be taken to approve the Reorganized Biovest Charter and the Reorganized Biovest Bylaws or to approve the DIP Facility or the issuance of the Plan Shares, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of the Debtor or Reorganized Biovest.

**Section 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security (including the Reorganized Biovest Common Stock), or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtor or its Estate or Reorganized Biovest pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Pursuit of Causes of Action**

On the Effective Date, the Causes of Action shall be vested in Reorganized Biovest, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. Reorganized Biovest will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.14 of the Plan. The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. Reorganized Biovest will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to, or on the belief that it will, obtain any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED BIOVEST. Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtor to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Reorganized Biovest does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the

32

benefit of Reorganized Biovest. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall Reorganized Biovest, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Biovest will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

At this time, the Debtor believes the Causes of Action consist primarily of Avoidance Actions, claims against the members of the Equity Holders Committee, and claims against ASM Capital and its Affiliates. Although the Debtor does not know the full extent of the Causes of Action, and without prejudice to the retention of any and Causes of Action as outlined herein, to facilitate the preservation of Causes of Action and the reservation of rights provided herein, the Debtor incorporates the response to question 3.b of the Statement of Financial Affairs filed by the Debtor (Doc. No. 78). A copy of the payments made by the Debtor for the 90-day period prior to the Petition Date is attached as Exhibit 3 to this Disclosure Statement. Each Entity having received a transfer as reflected in such response is hereby notified that the Debtor may institute litigation to recover such transfers. However, the Debtor incorporation of the Statement of Financial Affairs is without prejudice to the ability of the Debtor to identify and pursue such other Causes of Action not specifically identified in such response. Additionally, the Debtor also anticipates, at the present time, that it will be filing an adversary proceeding against Accentia with respect to the Disputed Accentia Intellectual Property Claim.. To the extent the Debtor determines after the date hereof that there are additional Causes of Action, such Causes of Action will be described in an amendment to the Disclosure Statement approved by the Bankruptcy Court.

Except as otherwise provided in the DIP Financing Orders, the Debtor and Reorganized Biovest reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

The Estate shall remain open, even if the Bankruptcy Case shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by Reorganized Biovest; provided, however, that nothing in the Plan or the Disclosure Statement shall prohibit Reorganized Biovest from pursuing any Causes of Action (excluding the Avoidance Actions) in any courts other than the Bankruptcy Court.

**Prosecution and Settlement of Claims and Causes of Action**

Reorganized Biovest (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, Reorganized Biovest shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $100,000.00, then Reorganized Biovest may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee, counsel to Corps Real, counsel to the Laurus/Valens Entities, and counsel to the Creditors Committee of the terms of the settlement agreement; provided, however, that if the United States Trustee, counsel to Corps Real, counsel to the Laurus/Valens Entities, and counsel to the Creditors Committee indicate their approval or do not provide Reorganized Biovest with an objection to the proposed settlement within ten (10) days after they receive notice of such settlement in writing, then Reorganized Biovest shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee, counsel to Corps Real, counsel to the Laurus/Valens Entities, or counsel to the Creditors Committee to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $100,000.00, then Reorganized Biovest shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

**Issuance of New Stock Options**

Under the Plan, on the Effective Date, Reorganized Biovest shall issue to certain employees, officers, consultants and directors of the Debtor, pursuant to the Biovest Stock Option Plan, options to purchase fifteen (15) million shares of Reorganized Biovest Common Stock which options will have been approved within one hundred fifty (150) days of the Petition Date as described below (the "New Stock Options") and shall be based upon future performance of each individual as determined by established milestones set by the Independent Board Committee. The exercise price for the New Stock Options will be $1.00 per share, provided that, if by the 24 Month Anniversary Date, all or substantially all of the assets of Reorganized Biovest are sold or BiovaxID™ is sold, the exercise price will be reduced to $0.64 per share. The New Stock Options will vest as determined by the Independent Board Committee. Upon the sale of the vaccine business, instruments business or substantially all of the assets of Reorganized Biovest, any unvested portion of the New Stock Options shall fully vest. The final allocation of the New Stock Options shall be made within one hundred fifty (150) days of the Petition Date by the Independent Board Committee, which in making the allocations shall be guided by a special stock option committee consisting of Carlos Santos and John Sitilides as the representatives of the Debtor, Eugene Grin as the representative of the Laurus/Valens Entities, and Ronald E.

34

Osman as the representative of Corps Real. The New Stock Options are not being issued pursuant to Section 1145 of the Bankruptcy Code.

**Post-Effective Date Financing**

In accordance with the DIP Loan Documents and the DIP Financing Orders, each of Corps Real and the Laurus/Valens Lenders have agreed that, following the Effective Date, if Reorganized Biovest is unable to obtain funding from a capital raise, third party financing, or proceeds from a partnership/licensing agreement or otherwise, they will advance to Reorganized Biovest their respective share of any unadvanced amount of the DIP Facility up to the maximum amount of the DIP Facility. If, following the Effective Date, the maximum amount of the DIP Facility has been advanced and new funding for Reorganized Biovest from a capital raise, third party financing, or proceeds from a partnership/licensing agreement or otherwise with respect to Reorganized Biovest's products is not forthcoming or is delayed, Corps Real and the Laurus/Valens Entities agree that, if any additional funding is provided by them, at their option, to Reorganized Biovest, it will be provided on a pro rata basis, in accordance with their relative equity ownership in Reorganized Biovest, pari passu in priority and payment, and subject to further loan documentation with terms and provisions acceptable to the parties.

**Dissolution of the Committee**

Except as provided in Article 9.2.1 of the Plan with respect to the Creditors Committee's right to object to Claims, the Committees shall continue in existence until the Effective Date. Thereafter, the Committees shall be deemed dissolved and the members of the Committees shall be deemed discharged from all rights, duties and liabilities arising from, or related to, the Bankruptcy Case, and the Professionals for the Committees, if any, shall cease providing any services to the Committee or otherwise in connection with the Bankruptcy Case.

**Modification of Plan**

The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements. Specifically, the Debtor may modify the Plan to satisfy any requirements under Section 1145 of the Bankruptcy Code, and any such modifications shall be deemed non-material and to not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan. In addition, the Debtor, with the consent of the Senior Secured Lenders and the Bankruptcy Court, may modify the Plan under this Article 13.1.1 to provide for a Distribution to the Holders of Class 9 Equity Interests, and any such modifications shall be deemed non-material and to not materially adversely affect the interests, rights, or treatment of the Holders of Class 9 Equity Interests under the Plan and, accordingly, shall not require the solicitation of votes to accept or reject the Plan, as so modified, from the Holders of Class 9 Equity Interests. After the entry of the Confirmation Order, the Debtor (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date) may modify the Plan to remedy any defect or omission therein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtor or Reorganized Biovest (as the

case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims under the Plan. After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtor (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtor or Reorganized Biovest (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and the Class of Claims materially adversely affected and a hearing, (c) such modification is accepted by (i) at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification, and (d) the Debtor or Reorganized Biovest (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified. Notwithstanding anything to the contrary contained in Article 13.1 of the Plan or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtor (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date).

**Confirmation Over Objections**

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 14.2 of the Plan, the Debtor will request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtor may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtor reserves any and all rights it may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

**Retention of Jurisdiction**

The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby. See Article 12 of the Plan for a more detailed description.

**BUSINESS OF BIOVEST**

The information contained in this section of the Disclosure Statement is intended as a summary of the Debtor's history and business operations prior to the Petition Date. For a more detailed description of events and matters occurring prior to the Petition Date, Holders of Claims and Equity Interests are encouraged to review the Debtor's Annual Report on Form 10-K for the fiscal year ended September 30, 2012 filed with the SEC on December 26, 2012 or any of the Debtor's Annual Reports on Form 10-K for prior fiscal years, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act on file with the SEC. Each of the above-referenced Reports can be accessed on the Internet at http://www.sec.gov or on the Debtor's website at www.biovest.com. In addition, Holders of Claims and Equity Interests are encouraged to review information contained on the Debtor's website for current business and other developments.

**Introduction**

Biovest is a Delaware corporation which owns one hundred percent (100%) of the equity interests of Biovest Europe Limited, a private limited company incorporated in the United Kingdom. Biovest was originally incorporated in Minnesota in 1981, under the name Endotronics, Inc. In 1993, Biovest's name was changed to Cellex Biosciences, Inc. In 2001, Cellex Biosciences, Inc. changed its corporate name to Biovest International, Inc. and the Minnesota corporation changed its state of incorporation from Minnesota to Delaware via a merger of the Minnesota corporation into the current Delaware corporation. Biovest is a publicly held company and, as of the Petition Date, there were 146,510,818 shares of its common stock issued and outstanding. Biovest's largest stockholder is Accentia Biopharmaceuticals, Inc. ("Accentia"), who owns approximately 80 million shares of Biovest common stock.

**Overview of Businesses**

As a result of Biovest's collaboration with the National Cancer Institute ("NCI"), Biovest is developing BiovaxID™, a personalized therapeutic cancer vaccine for the treatment of non-Hodgkin's lymphoma ("NHL"), a B-cell cancer, specifically, follicular lymphoma and mantle cell lymphoma, and potentially other B-cell blood cancers. Both follicular lymphoma and mantle cell lymphoma are generally considered to be incurable with currently approved therapies. These generally fatal diseases arise from the lymphoid tissue and are characterized by an uncontrolled proliferation and spread throughout the body of mature B-cells, which are a type of white blood cell. Three clinical trials conducted under Biovest's investigational new drug application ("IND") have studied BiovaxID in NHL. These studies include a Phase 2 clinical trial and a Phase 3 clinical trial in patients with follicular lymphoma, as well as a Phase 2 clinical trial in patients with mantle cell lymphoma. BiovaxID has demonstrated statistically significant Phase 3 clinical benefit by prolonging disease-free survival in follicular lymphoma patients treated with BiovaxID. Biovest believes that these clinical trials demonstrate the safety and efficacy of BiovaxID.

Based on Biovest's scientific advice meetings with multiple European Union (the "EU") Member national medicines agencies, Biovest filed its formal notice of intent to file a marketing authorization application ("MAA") with the European Medicines Agency (the "EMA") which

begins the EU marketing approval application process for BiovaxID. Additionally, based on a scientific advice meeting conducted with Health Canada, Biovest announced plans to file a new drug submission application ("NDS") seeking regulatory approval for BiovaxID in Canada. Biovest could receive a decision regarding EU marketing and Canadian regulatory approvals for BiovaxID within twelve (12) months after the submission of its MAA and NDS, assuming that the rigorous review process advances forward in a timely and positive manner and no substantial regulatory issues or problems are encountered. Biovest also conducted a formal guidance meeting with the United States Food and Drug Administration (the "FDA") in order to define the path for its filing of a biologics licensing application ("BLA") for BiovaxID's United States regulatory/marketing approval. In its guidance, the FDA required that Biovest conduct a second Phase 3 clinical trial to complete the clinical data gained through Biovest's first Phase 3 clinical trial and Biovest's BiovaxID development program to support its filing of the BLA for BiovaxID. Subject to required funding and regulatory requirements, Biovest anticipates initiating this second Phase 3 clinical trial to advance BiovaxID toward the United States market.

To support Biovest's planned commercialization of BiovaxID and personalized medicine and, particularly, patient specific oncology products, Biovest developed a fully automated, reusable instrument called AutovaxID® that employs a fully disposable, closed-system cell-growth chamber incorporating a hollow fiber cell-growth cartridge. Since it is fully enclosed, computer controlled and automated, AutovaxID requires limited supervision and manpower to operate, compared to manual instruments. AutovaxID is suitable for growing antibody-secreting cell lines, including hybridomas and Chinese hamster ovary ("CHO") cells, which are among the leading kinds of cell lines used for commercial therapeutic protein manufacture. AutovaxID has a small footprint and supports scalable production. Biovest plans to utilize the AutovaxID technology to streamline the commercial manufacture of BiovaxID. Biovest believes that AutovaxID is the first cell culture system that enables production of personalized cell-based treatments economically. AutovaxID uses a disposable production unit which provides for robust and dependable manufacturing while complying with the industry current good manufacturing practices ("cGMP") standards. Biovest is collaborating with the United States Department of Defense (the "DOD") and others to further develop AutovaxID and related hollow fiber systems and to explore potential production of additional vaccines, including vaccines for viral indications such as influenza and other contagious diseases.

Biovest also manufactures instruments and disposables used in the hollow fiber production of cell culture products. Biovest manufactures mammalian cell culture products such as whole cells, recombinant and secreted proteins, and monoclonal antibodies for third parties, primarily researchers. Biovest has produced over 7,000 cell-based products for an estimated 2,500 researchers around the world. Biovest considers its vast experience in manufacturing small batches of different cell-based products, together with Biovest's expertise in designing and manufacturing instruments for personalized medicines, as important competencies supporting its development of patient specific immunotherapies.

**BiovaxID - Personalized Therapeutic Cancer Vaccine**

*The Human Immune System*

The immune system functions as the body's natural defense mechanism for identifying and killing or eliminating disease-causing pathogens, such as bacteria, viruses, or other foreign microorganisms. However, with regard to cancer, including lymphomas, the immune system's natural defense mechanism is believed to be largely thwarted by natural immune system mechanisms which seek to protect "self-cells" from attack. In humans, the primary disease fighting function of the immune system is carried out by white blood cells (leukocytes), which mediate two types of immune responses: innate immunity and adaptive immunity. Innate immunity refers to the broad first-line immune defense that recognizes and eliminates certain pathogens prior to the initiation of a more specific adaptive immune response. While the cells of the innate immune system provide a first line of defense, they cannot always eliminate or recognize infectious organisms. In some cases, new infections may not always be recognized or detected by the innate immune system. In these cases, the adaptive immune response has evolved to provide a highly-specific and versatile means of defense which also provides long-lasting protection (immune memory) against subsequent re-infection by the same pathogen. This adaptive immune response facilitates the use of preventative vaccines that protect against viral and bacterial infections such as measles, polio, diphtheria, and tetanus. Biovest believes that BiovaxID creates an adaptive immune response to cancerous B-cells.

Adaptive immunity is mediated by a subset of white blood cells called lymphocytes, which are divided into two types: B-cells and T-cells. In the bloodstream, B-cells and T-cells recognize antigens, which are molecules that are capable of triggering a response in the immune system. Antigens are molecules from bacterial, viral, or fungal origin, foreign (non-self) proteins and, in some cases, tumor-derived proteins that can stimulate an immune response. The human body makes millions of different types of B-cells that circulate in the blood and lymphatic systems and perform immune surveillance. Each B-cell has a unique receptor protein (immunoglobulin) on its surface that binds to one particular antigen. Once a B-cell recognizes its specific antigen and receives additional signals from a T-helper cell, it can proliferate and become activated in order to secrete antibodies (immunoglobulins) which can neutralize the antigen and target it for destruction. T-cells may also recognize antigens on foreign cells, whereby they can promote the activation of other white blood cells or initiate destruction of the targeted cells directly. A person's B-cells and T-cells can collectively recognize a wide variety of antigens, but each individual B-cell or T-cell will recognize only one specific antigen. Consequently, in each person's bloodstream, only a relatively few lymphocytes will recognize the same antigen.

Since B-cell cancers such as NHL are tumors arising from a single malignant transformed B-cell, the tumor cells in NHL maintain on their surface the original malignant B-cell's immunoglobulin (collectively referred to as the "tumor idiotype") that is distinct from those found on normal B-cells. The tumor idiotype maintained on the surface of each B-cell lymphoma serves as the tumor-specific antigen for the BiovaxID cancer vaccine.

In many cases, including in NHL, cancer cells produce molecules known as tumor-associated antigens, which may or may not be present in normal cells but may be over-produced in cancer cells. T-cells and B-cells have receptors on their surfaces that enable them to recognize the tumor associated antigens. While cancer cells may naturally trigger a B-cell or T-cell-based immune response during the initial appearance of the disease, this response may be only weakly specific or attenuated in such a way that it does not fully eradicate all tumor cells. Subsequently,

tumor cells gradually evolve and escape from this weak immune response and are able to grow into larger tumors. In addition, because cancer cells arise from normal tissue cells, they are often able to exploit or increase existing immune tolerance mechanisms to suppress the body's immune response which would normally destroy them. In other cases, chemotherapy or other treatment regimens used to treat the cancer may themselves weaken the immune response and render it unable to reject and kill tumor cells. Even with an activated immune system, however, the number and size of tumors can often overwhelm the immune system.

In the case of cancer and other diseases, immunotherapies are designed to activate a person's immune system in an attempt to combat the disease. There are two forms of immunotherapy used to treat diseases: passive and active. Passive immunotherapy is exemplified by the intravenous infusion into a patient of antibodies specific to the particular antigen. While passive immunotherapies have shown clinical benefits in some cancers, they require repeated infusions and can cause the destruction of normal cells in addition to cancer cells. An example of passive immunotherapy to treat lymphoma is monoclonal antibodies such as rituximab. An active immunotherapy, on the other hand, seeks to generate a durable adaptive immune response by introducing an antigen into a patient, often in combination with other components that can enhance an immune response to the antigen. BiovaxID is an example of active specific immunotherapy. Although active immunotherapies have been successful in preventing many infectious diseases, their ability to combat cancers of various types has been limited by a variety of factors, including the inability of tumor antigens to elicit an effective immune response, difficulty in identifying suitable target tumor antigens, inability to manufacture tumor antigens in sufficiently pure form, and inability to manufacture sufficient quantities of tumor antigens.

A number of features of the NHLs make these tumors particularly suitable for treatment with a therapeutic cancer vaccine. The malignant B-cell lymphocytes of NHL express a unique, identifiable tumor-specific antigen which is not expressed by other (healthy) cells in the body. In contrast, the majority of human cancers typically lack strong ubiquitous expression of tumor-specific antigens to distinguish them from normal cells, or they express a potentially widely-varying mix of antigens which can be difficult to identify and formulate into a successful therapeutic vaccine.

Nevertheless, in 2010 one active immunotherapy, Provenge® (sipuleucel-T), developed by Dendreon Corporation, received marketing approval from the FDA for the treatment of asymptomatic or minimally symptomatic metastatic castrate resistant (hormone refractory) prostate cancer. This represents the first case of an active immunotherapy to successfully gain marketing approval in the United States. In March 2011, a second active immunotherapy, Yervoy® (ipilimumab), developed by Bristol-Myers Squibb, received marketing approval from the FDA for the treatment of late-stage metastatic melanoma. In addition to BiovaxID, there are a number of other active immunotherapeutics for cancer in various stages of clinical trials that have demonstrated promising results.

### *Non-Hodgkin's Lymphoma*

NHL is a heterogeneous group of malignancies of the lymphatic system with differing clinical behaviors and responses to treatment. BiovaxID has been studied in two distinct forms of NHL, namely, follicular lymphoma and mantle cell lymphoma. NHL was the seventh most

common type of cancer in the United States in 2011 (Lymphoma and Leukemia Society-Facts 2012), with an estimated prevalence of 484,336 cases in 2011 in the United States (Surveillance, Epidemiology, and End Results-SEER Stat Fact Sheets: Non-Hodgkin's Lymphoma). NHL accounts for three percent (3%) of all cancer deaths in the United States (American Cancer Society-Facts and Figures 2012). NHL is one of the few malignancies in which there continues to be a rise in incidence. Since the early 1970s, incidence rates for NHL have nearly doubled. Moreover, in spite of recent advances in the standard of care, the overall five-year survival rate remains at approximately 63%. In 2012, it was estimated that 70,130 new cases of NHL will be diagnosed and 18,940 Americans will die from the disease (American Cancer Society-Facts and Figures 2012), with comparable numbers estimated in Europe.

NHL is usually classified for clinical purposes as being either "indolent" or "aggressive," depending on how quickly the cancer cells are likely to grow and spread. The indolent, or slow-growing, form of NHL has a very slow growth rate and may need little or no treatment for months or possibly years. The aggressive, or fast-growing, form of NHL tends to grow and spread quickly and cause severe symptoms, and patients with aggressive NHL have shorter overall survival ("OS").

### Follicular Lymphoma

Indolent (slow growing) and aggressive (fast growing) NHL each constitute approximately half of all newly diagnosed B-cell NHL, and roughly half of the indolent B-cell NHL is follicular lymphoma. Accordingly, approximately 22% of new cases of NHL fall into the category of disease known as indolent follicular lymphoma, which translates to about 106,550 cases in 2011 in the United States (Surveillance, Epidemiology, and End Results-SEER Stat Fact Sheets: Non-Hodgkin's Lymphoma). Biovest has conducted a Phase 2 clinical trial followed by a Phase 3 clinical trial in follicular lymphoma under Biovest's IND. Follicular lymphoma is a form of NHL that is derived from a type of cell known as a follicle center cell. Despite its slow progression, follicular lymphoma is almost invariably fatal. The median OS reported for follicular lymphoma patients ranges between eight (8) and ten (10) years, although these figures may have become slightly higher within the last decade as a result of improvements in the standard of care for follicular lymphoma.

The current standard of care for treatment of advanced, bulky follicular lymphoma (bulky Stage II, Stage III-IV) as specified by the National Comprehensive Cancer Network ("NCCN") includes initial treatment of newly-diagnosed patients with rituximab-containing chemotherapy. Rituximab is a monoclonal antibody (an immune protein capable of selectively recognizing and binding to a molecule) which targets a protein primarily found on the surface of both healthy and cancerous B-cells, known as CD20. Accordingly, rituximab seeks to bind and destroy all B-cells, including healthy B-cells, as a means of controlling the progression of follicular lymphoma in treated patients.

Rituximab and other biologics currently approved for lymphoma are characterized as "passive immunotherapies". Following administration, rituximab exerts its effects primarily through an unselective and near total destruction of a patient's B-cells, including malignant as well as healthy B-cells. Rituximab and other passive immunotherapies are often administered in sequential, repeated doses to achieve their effect, and following cessation of administration are

over time eliminated from the patient's circulation by normal bodily functions. Rituximab is characterized as a targeted therapy since it targets CD20, which is present on both healthy and tumor cells. Rituximab is manufactured in bulk and is not considered to be a personalized therapy.

By comparison, BiovaxID is characterized as an "active immunotherapy". Active immunotherapies attempt to stimulate the patient's immune system to respond to a disease. "Specific active immunotherapies", such as BiovaxID, specifically seek to induce cellular and/or humoral immune responses focused on specific antigens present on a diseased cell (such as a tumor cell). As a specific active immunotherapy, BiovaxID targets only the cancerous B-cells while sparing healthy B-cells. Accordingly, BiovaxID is highly targeted. BiovaxID is manufactured specifically and entirely for each patient and is considered to be a highly "personalized therapy". If approved, BiovaxID will represent the only specific active immunotherapeutic approved for the treatment of follicular lymphoma and therefore will represent a new class of drugs that provides a new therapeutic option for patients with lymphoma.

In February 2011, the NCCN issued treatment guidelines recognizing "consolidation therapy" as a defined treatment category for follicular lymphoma in first remission. Current consolidation therapy options differ from induction therapies in that they primarily seek to prolong first remission duration by consolidating the effects of induction therapy, which primarily seeks to reduce active, bulky tumor masses. The following anti-CD20 monoclonal antibody drug products are currently approved consolidation treatment options for the treatment of follicular lymphoma: Rituxan® and Zevalin® (see Figure 1 below). All of these treatment options are passive immunotherapies that result in profound B-cell depletion. Following the results of the Eastern Cooperative Oncology Group E4402 protocol, also called RESORT (Rituximab Extended Schedule or Re-treatment Trial) (the "RESORT Protocol"), reported at the 2011 annual meeting of the American Society of Hematology ("ASH"), the NCCN revised its clinical practice guidelines on follicular lymphoma. The revised 2012 NCCN guidelines consider Rituxan maintenance therapy and Zevalin consolidation therapy as "optional" therapeutic approaches post-induction therapy, rather than "recommended" therapeutic approaches.



Figure 1. BiovaxID targets tumor-specific idiotype, a protein unique to the tumor and not found on healthy (non-malignant) B-cells. In contrast, current monoclonal antibody-based therapies for NHL, including rituximab (Rituxan®) and ibritumomab tiuxetan (Zevalin®), target CD20, a cell-

surface protein expressed by both tumor and healthy B-cells. As such, through its unique mode of action, BiovaxID represents a new therapeutic approach to treating follicular lymphoma.

*Current United States Approved Consolidation Therapies for NHL and Urgent Need for Alternative Treatment Options*

Rituxan® (rituximab):  Rituximab maintenance consists of administration of the anti-CD20 antibody rituximab administered at a dose of 375 mg/m2 every 8 weeks for 24 months (12 injections) administered by IV infusion every 8 weeks starting 8 weeks ± 7 days after the last induction treatment (whether immuno-chemotherapy or rituximab, whichever is later). Administration of rituximab (and other anti-CD20 agent) maintenance extends the profound immunosuppression achieved by induction therapy, as it targets the pan-B-cell CD20 protein. This continued dosing of the induction agent induces profound B-cell depletion for the two-year duration of the regimen.

Zevalin® (ibritumomab tiuxetan):  Zevalin is an immunoconjugate resulting from covalently-bonded anti-CD20 antibody ibritumomab and the linker-chelator tiuxetan [N-[2-bi(carboxymethyl)amino]-3-(p-isothiocyanatophenyl)-propyl]-[N-[2-bis(carboxymethylamino]-2-methyl) ethyl]glycine.  This linker-chelator provides a high affinity, conformationally restricted chelation site for Indium-111 or Yttrium-90. Administration follows induction rituximab and requires preliminary dosimetry and imaging administration of In-111 (Day 1) followed by administration of Y-90 Zevalin on Day 7, 8, or 9.  The maximum allowable dose of Y-90 Zevalin is 32.0 mCi (1184) MBq and physicians and patients receiving the agent must exercise radiation exposure precautions upon administering or handling the agent.

Urgent Need for New Consolidation Treatment Option for NHL:  The currently approved consolidation agents are no longer recommended therapeutic options post-induction therapy by the NCCN clinical practice guidelines.  Following the results of the RESORT Protocol, reported at the 2011 annual meeting of ASH, the 2012 NCCN revised guidelines include rituximab maintenance and radioimmunotherapy as "optional" therapeutic options post-induction. BiovaxID is expected to offer a non-immunosuppressive alternative to rituximab maintenance as a consolidation therapy for follicular lymphoma and mantle cell lymphoma.  Because its mechanism of action is different from the mechanism of Rituximab, BiovaxID is believed to eliminate the risk of development of rituximab-resistance. Thus, BiovaxID represents a potential novel option for consolidation therapy that has demonstrated to be safe and effective and unlikely to interfere with future therapies while potentially increasing the utility of other therapies.

### Mantle Cell Lymphoma

Mantle cell lymphoma is a rare, aggressive subtype of NHL characterized by short remissions and rapid progression similar to aggressive lymphomas and successive relapses, reflecting incurability similar to indolent lymphomas.  The median OS for mantle cell lymphoma has been cited as 5-7 years (Perez-Galan et al. Mantle cell lymphoma: biology, pathogenesis, and the molecular basis of treatment in the genomic era. *Blood*, 2011, 117:26-38).  Mantle cell lymphoma represents approximately six percent (6%) of all NHL cases and worldwide there are

approximately 7,800 new cases each year, of which approximately one-half are in the United States (see "Current treatment approaches for mantle-cell lymphoma" *J Clin Oncol.* Sep 10 2005 and "New approach to classifying non-Hodgkin's lymphomas: clinical features of the major histologic subtypes." *J Clin Oncol.* Aug 1998).

The majority of mantle cell lymphoma patients have disseminated disease and bone marrow involvement at diagnosis. Patients' clinical outcomes from currently available therapies are poor. Although many therapeutic regimens are capable of rendering high initial response rates, these responses are of short duration (i.e., about 20 months) and the relative survival rates of mantle cell lymphoma patients are among the lowest compared to other types of NHL. After a patient's first relapse, the expected disease course and prognosis is very poor, with an expected median OS of about 1-2 years. No currently available therapeutic regimens are curative.

While there are several therapeutic regimens available to treat mantle cell lymphoma patients, there currently exists no consensus standard of care for treatment of first-line relapsed mantle cell lymphoma. As such, mantle cell lymphoma remains incurable and it is generally considered that additional treatment options are required given this significant unmet medical need.

Currently, upon first diagnosis mantle cell lymphoma patients are often evaluated for eligibility for autologous stem cell transplantation ("autoSCT"). Stem cell transplantation, an aggressive treatment protocol consisting of high-dose chemotherapy, immunotherapy and full-body radiation, aims to treat the patient's tumor and purge the bone marrow of lymphoma cells. Mantle cell lymphoma patients who are eligible for autoSCT receive either R-CHOP (rituximab, cyclophophamide, doxorubicin, vincristine, prednisone) followed by autoSCT or R-HyperCVAD (rituximab, cyclophosphamide, vincristine, doxorubicin, and dexamethasone alternating with rituximab plus high dose methotrexate and cytarabine) followed by observation. Although these therapeutic approaches do yield high response rates, they are associated with high rates of adverse events and treatment discontinuation, high risk of myelodysplastic syndrome, and high mortality rates. Consequently, the considerable toxicity associated with these regimens largely limits these options primarily to a select subset of the mantle cell lymphoma patients who are younger and better fit to tolerate these high-intensity treatments. However, even this subset ultimately gains only modest benefits from existing treatment options. Moreover, the use of these more aggressive regimens appears not to result in superior OS as compared to standard therapies. Given that the median age for newly diagnosed mantle cell lymphoma patients is 60 years, less aggressive therapeutic approaches are needed.

### *Development Status of BiovaxID*

Preliminary studies demonstrated that treatment of patients with NHL with an active immunotherapy could allow a patient's immune system to generate clinically significant immune responses. These studies have been published in *The New England Journal of Medicine* (October 1992), *Blood* (May 1997), and *Nature Medicine* (October 1999). In the treatment of cancer, residual tumor cells remaining in the patient after completion of surgery or anti-tumor therapy are often the cause of tumor relapse. These residual tumor cells cannot always be detected by standard imaging techniques but their destruction may be feasible by active immunotherapy. The use of such vaccines differs from traditional cancer treatment in that the

ultimate mechanism of action against the tumor is indirect: the anti-tumor immunity induced by vaccination, rather than the vaccine itself, is ultimately responsible for treatment benefit.

In 1994, the NCI filed for initiation of an IND for the purpose of conducting clinical trial(s) investigating the use of BiovaxID in NHL. Under this IND and also in 1994, the NCI began the Phase 2 clinical trial in follicular lymphoma; in 1999, the Phase 3 clinical trial in follicular lymphoma; and in 2000 a Phase 2 clinical trial in mantle cell lymphoma. The NCI selected Biovest to produce BiovaxID for the initial Phase 2 clinical trial in follicular lymphoma. In 2001, Biovest entered into a formal cooperative research and development agreement ("CRADA") with the NCI which formalized Biovest's collaboration with the NCI. In April 2004, the IND filed by the NCI was formally transferred to Biovest, which made Biovest the exclusive sponsor of the IND with full rights to complete the NCI-initiated Phase 3 clinical trial in follicular lymphoma and the NCI-initiated Phase 2 clinical trial in mantle cell lymphoma, to communicate and negotiate with the FDA relating to marketing approval for BiovaxID and to conduct other clinical studies in NHL under the IND.

### BiovaxID Clinical Trials

*Phase 2 Clinical Trial of BiovaxID for Treatment of Follicular Lymphoma*

In 1994, the Phase 2 clinical trial (NCT00878488) was commenced by the NCI to evaluate the ability of BiovaxID to eradicate residual lymphoma cells in 20 patients with follicular lymphoma who were in chemotherapy-induced first clinical complete remission ("CR"). All 11 patients with a detectable lymphoma gene sequence (translocation) in their primary tumors had cells from the malignant clone detectable in their blood by DNA polymerase chain reaction ("PCR") analysis both at diagnosis and after chemotherapy, despite being in CR. In this clinical trial, molecular remission was defined as patients lacking any detectable residual cancer cells bearing the translocation as determined by a very sensitive PCR technique. After vaccination, 8 of these 11 patients converted to lacking cells in their blood from the malignant lymphoma clone detectable by PCR. Anti-tumor T-cell responses were found in the vast majority of the patients (19 of 20 patients), whereas anti-tumor antibodies were detected, but apparently were not required for molecular remission. Vaccination was thus associated with clearance of residual tumor cells from the blood and long-term disease-free survival. The demonstration of molecular remissions besides uniform, specific T-cell responses against lymphoma tumor targets, as well as the addition of granulocyte-monocyte colony-stimulating factor ("GM-CSF") to the vaccine formulation provided the rationale for the initiation of a larger Phase 3 clinical trial at the NCI in 2000. These results were published in *Nature Medicine* (October 1999). After a median of 9.17 years, 45% of these patients were still in continuous first CR, the median disease free survival ("DFS") for the cohort is 96.5 months, and OS is 95% (Santos et al., ASH 2005).

*Phase 2 Clinical Trial of BiovaxID for Treatment of Mantle Cell Lymphoma*

In 2000, the NCI initiated a Phase 2 open-label clinical trial (NCT00020215) of BiovaxID for the treatment of mantle cell lymphoma. This Phase 2 clinical trial was based upon the NCI's Phase 2 clinical trial in follicular lymphoma. The primary objective of this Phase 2 clinical trial was to study BiovaxID in treatment-naïve patients with mantle cell lymphoma and to determine the safety and efficacy of BiovaxID following a rituximab-based immunotherapy.

Twenty-six patients with untreated, mostly (92%) stage IV mantle cell lymphoma were enrolled. All patients received 6 cycles of EPOCH-R (which is a chemo-immunotherapy consisting of etoposide, prednisone, vincristine, cyclophosphamide, doxorubicin, rituximab); 92% of the patients achieved CR and 8% achieved partial response ("PR"). All but three (3) patients (i.e., due to disease progression or inability to manufacture the vaccine) received BiovaxID together with keyhole limpet hemocyanin ("KLH"), an immunogenic carrier protein, on day 1, along with GM-CSF (100 μg/m2/day) on days 1-4 at 1, 2, 3, 4, and 6 months starting at least 3 months post-chemotherapy.

The results of Biovest's mantle cell lymphoma Phase 2 clinical trial were reported in *Nature Medicine* (August 2005). As reported in *Nature Medicine*, after a median follow-up of 46 months, the OS was 89%, the median event-free survival ("EFS") was 22 months, and 5 patients remained in continuous first CR. Antibody responses to immunization were detected in 30% of the patients, following a delayed pattern (i.e., detected mostly after the 4th-5th vaccination) which paralleled the peripheral blood B-cell recovery. Most importantly, specific CD4+ and CD8+ T-cell responses were detected in 87% of patients post-vaccine, and in 7 of 9 patients tested these responses were detected after the 3rd vaccination when peripheral B-cells were by and large undetectable. The detected cytokine release response included GM-CSF, INF-g, and TNF-a (type I). In this study, BiovaxID induced both humoral and cellular immune responses following almost complete depletion of B-cells following rituximab-containing chemotherapy. The adverse events observed in this clinical trial were minimal and were limited mostly to injection site reactions. The results of the latest follow-up of these patients performed in 2011 were presented at the 2011 annual meeting of ASH (Grant et al., ASH 2011 Abstract #2707).

With 122 months of median follow-up, the median OS was 104 months. In this study, the Mantle Cell Lymphoma International Prognostic Index ("MIPI") was associated with OS (P= 0.01), where median OS estimates were not reached for the low risk MIPI group, 84 months for the intermediate risk MIPI group, and 44 months for the high risk MIPI group. This long term follow-up data presented at the 2011 annual meeting of the ASH and at the 2012 annual meeting of the American Society of Clinical Oncology ("ASCO") provided clinical data suggesting that the mechanism of action of BiovaxID is T-cell mediated and not B-cell (humoral) mediated. There was a significant association between the production of specific anti-tumor T-cell (GM-CSF cytokine induction) immune response following vaccination and OS and time to next treatment (TTNT). The NCI investigators reported at ASH that in patients with normalized GM-CSF cytokine production levels above the median value for the cohort (>4.3pg/mL), median OS was not reached as compared to 79 months in patients with GM-CSF cytokine levels below the median value (<4.3pg/mL) (P= 0.015 unadjusted; P= 0.045 Bonferroni adjusted) (see Figure 2 below). There was no association between OS and specific anti-Id B-cell (humoral) responses or any other type of specific cellular responses. Similarly, patients with normalized GM-CSF cytokine production levels above the median value for the cohort (>4.3pg/mL) had a median TTNT of 51.9 months as compared to 5.5 months in patients with GM-CSF cytokine levels below the median value (<4.3pg/mL) (P= 0.003) (see Figure 3 below).



| Arm | n | Events | Median (mo) | 95% CI |
|---|---|---|---|---|
| < median | 12 | 11 | 5.5 | 3.7 to NA |
| > median | 12 | 10 | 51.9 | 13.8 to NA |

Figure 2. Overall Survival by GM-CSF Cytokine Response (< and > than median)



| Arm | n | Events | Median (mo) | 95% CI |
|---|---|---|---|---|
| < median | 12 | 11 | 5.5 | 3.7 to NA |
| > median | 12 | 10 | 51.9 | 13.8 to NA |

Figure 3. Time to next treatment by GM-CSF Cytokine Response (< and > than median)

### *Phase 3 Clinical Trial of BiovaxID for Treatment of Follicular Lymphoma*

Overview and Objectives.    In January 2000, the Phase 3 clinical trial in follicular lymphoma (NCT00091676) was initiated by the NCI.    The Phase 3 clinical trial was a multi-center, double-blind, randomized, controlled clinical trial that was designed to confirm the results reported in the NCI's Phase 2 clinical trial.

As studied in the Phase 3 clinical trial, BiovaxID consisted of the patient-specific idiotype protein (Id) derived from the patient's cancer cells conjugated or combined with KLH and administered with GM-CSF which is a biological response enhancer. The comparator studied in the Phase 3 clinical trial was a control vaccine consisting of KLH and administered

47

with GM-CSF. Accordingly, the only difference between BiovaxID and the control vaccine was the inclusion of the idiotype protein from the patient's own tumor in BiovaxID. BiovaxID or the control vaccine was administered following chemotherapy (also referred to as induction therapy) with a drug combination of prednisone, doxorubicin, cyclophosphamide, etoposide (referred to as "PACE"). Induction therapy represents the "first-line" treatment for follicular lymphoma patients and attempts to induce complete tumor remission as defined by radiological evidence ("CT scans"). In follicular lymphoma, patients treated with the current standard of care often achieve complete remission but these remissions almost always are of limited duration and most treated patients must eventually be re-treated for their disease. In the majority of cases, however, even with re-treatment, the disease often relapses and develops resistance to therapy, leading to a need for bone marrow transplant and eventually resulting in the death of the patient. In the Phase 3 clinical trial, patients who achieved complete response following induction therapy were assigned to a limited waiting period prior to vaccination to allow for immune reconstitution following the induction chemotherapy. Patients who relapsed during this immune reconstitution period did not receive either BiovaxID or control treatment. Patients who maintained their complete remission following this immune recovery period received either BiovaxID or control administered as 5 subcutaneous injections monthly over a six month period (one month was skipped).

The primary objectives of the Phase 3 clinical trial were to confirm the safety and efficacy of BiovaxID in two predefined groups:

(1)    All Randomized Patients (the "Randomized Patients"): The Randomized Patients including patients who completed initial chemotherapy but relapsed and did not receive either BiovaxID or control; and

(2)    All Treated Patients: the Randomized Patients who were disease-free at the time of vaccination and consequently received at least 1 dose of BiovaxID or control.

The secondary objectives of the Phase 3 clinical trial included:

(1)    to determine the ability of BiovaxID to produce a molecular CR in subjects in clinical CR, but with PCR evidence of residual disease after standard chemotherapy;

(2)    to determine the impact of BiovaxID on molecular remission in follicular lymphoma patients;

(3)    to evaluate the ability of BiovaxID to generate an immune response against autologous tumor;

(4)    to determine and compare the OS of subjects randomized to receive either treatment assignment; and

(5)    to evaluate the safety of BiovaxID administered with GM-CSF.

48

Biopsy, Chemotherapy, and Immune Recovery. Prior to chemotherapy, a small tumor biopsy was performed to obtain tissue for tumor classification and characterization and to provide starting material necessary to manufacture BiovaxID. Following this biopsy, patients were initially treated with PACE chemotherapy in order to induce a CR or a complete response unconfirmed ("CRu") as measured by CT scans.

The clinical trial protocol stipulated that, for all patients, an immune recovery period of approximately six (6) months following completion of chemotherapy was required to be completed without relapse ("Immune Recovery Period") before vaccination. The Immune Recovery Period was required in order to maximize the potential for immune response to vaccine and to avoid confounding factors from any potential lingering immunosuppressive effects of chemotherapy.

Randomization to Immune Recovery Followed by BiovaxID or Control. When the NCI designed the Phase 3 clinical trial in follicular lymphoma protocol, a decision was made to randomize patients immediately after completion of chemotherapy and not to wait for the completion of the Immune Recovery Period in an effort to avoid expending NCI resources to manufacture patient-specific vaccines for patients who were not anticipated to receive the vaccine (e.g., control patients). In the Phase 3 clinical trial, of the 234 patients initially enrolled into the clinical trial, 177 patients completed chemotherapy successfully and were randomized.

As per the design of the Phase 3 clinical trial, patients who relapsed during the Immune Recovery Period were excluded from treatment with BiovaxID or control notwithstanding the fact that they had been randomized. In the Phase 3 clinical trial, of the 177 initially randomized patients, 117 remained eligible to be treated with either BiovaxID (76 patients) or control (41 patients) at the end of the Immune Recovery Period. Sixty patients of the 177 randomized patients relapsed during the Immune Recovery Period and were not treated with either BiovaxID or control (see Figure 4 below).



Figure 4. Enrollment, randomization, and treatment: Two hundred thirty-four patients were enrolled, and 177 patients were randomized to receive at least one dose of the blinded vaccine; 76 patients received Id-vaccine and 41 received control vaccine. Patients receiving fewer than 5 blinded immunizations either withdrew from the study of relapsed before completion. Left: The primary prospectively-defined cohorts for survival analysis (ITT: all randomized patients including patients who did not receive active or control treatment; and mITT: randomized patients excluding patients who did not receive active or control treatment).

Trial Enrollment and the Use of Rituximab-Containing Induction Chemotherapy. During the course of the Phase 3 clinical trial, the standard of care for induction chemotherapy in follicular lymphoma changed to include rituximab, which reduced the ability to recruit and enroll patients into the study. In order to facilitate enrollment in the clinical trial, Biovest amended the study protocol in 2007 to permit the use of a rituximab-containing chemotherapy regimen ("CHOP-R"), as induction therapy. However, the FDA requested that Biovest abstain from vaccinating any patients who received CHOP-R and Biovest did not vaccinate any of the patients who received CHOP-R chemotherapy under the Phase 3 clinical trial protocol.

Due to the protracted enrollment, the Phase 3 clinical trial's Independent Data Monitoring Committee ("DMC", a committee responsible for reviewing the available unblinded clinical trial data in the study and responsible for recommendations to the sponsor and the FDA) recommended an interim analysis of the clinical trial's endpoints and overall safety profile which resulted in the termination and halting of the trial in 2008.

As of April 15, 2008, when the Phase 3 clinical trial was officially closed, a total of 234 subjects had been enrolled and 177 subjects had been randomized. The total number of subjects was less than the original planned sample size which called for 629 subjects to be enrolled and 540 to be randomized. While the termination of the Phase 3 clinical trial before completion of the planned accrual resulted in a smaller sample size than was originally intended, Biovest believes that the randomized nature of its Phase 3 clinical trial yields a valid conclusion because the baseline characteristics of the patients in the 2 groups were balanced, the allocation to treatment arms was concealed, and the study was double-blinded.

Results of Phase 3 Clinical Trial. As reported at the plenary session of the 2009 annual meeting of ASCO, the patient cohort of the 177 randomized patients (which included 117 (66%) treated patients and 60 (35%) patients who were not treated) did not demonstrate statistically significant difference in median DFS from randomization between treatment and control arms.



| Treatment Arm | N | Events | Median (mo) | 95% CI |
|---|---|---|---|---|
| Id-KLH+GM-CSF | 118 | 82 | 23.0 | 16.6-26.2 |
| KLH+GM-CSF | 59 | 46 | 20.6 | 15.6-30.6 |

Figure 5. Disease-free survival (DFS) according to study group for All Randomized Patients (N = 177). Kaplan-Meier actuarial curves for DFS for the Randomized Patients are shown according to their study group of Id-KLH+GM-CSF (N = 118) or KLH+GM-CSF (N = 59). The number of events, median, and 95% confidence intervals for each group are also presented.

At the 2009 annual meeting of ASCO, Biovest further reported the median DFS data for the patients who received at least one vaccination either with BiovaxID or control. In this cohort of 117 patients which remained on study and eligible for treatment, median DFS was 13.6 months longer in patients who received BiovaxID compared to patients who received control. This analysis reflects the prospectively defined primary clinical trial objective. Accordingly, there were 60 patients who were randomized but who did not receive either BiovaxID or control and who are not included in this analysis. Of these 117 treated patients, 76 patients received at least one dose of BiovaxID (the "BiovaxID Arm") and 41 patients received at least one dose of control (the "Control Arm"). No serious adverse events were reported in either the BiovaxID Arm or the Control Arm. At the median follow-up of 56.6 months (range 12.6-89.3 months), a statistically significant improvement of 13.6 months in DFS between patients in the BiovaxID Arm (44.2 months), versus the Control Arm (30.6 months) (log-rank p-value = 0.045; HR = 1.6). Using a Cox proportional-hazard model, a statistically significant hazard ratio (HR) of 0.62 was achieved (p=0.048; 95% CI: 0.39, 0.99). This means that patients receiving BiovaxID experienced an approximately 61% (1/0.62) lower risk of cancer recurrence compared to patients who received the control vaccine. The Phase 3 clinical trial's secondary endpoint of OS has not yet been reached for either group due to the length of follow-up to date.



| Treatment Arm | n | Events | Median (mo) | 95% CI |
|---|---|---|---|---|
| Id-Vaccine | 76 | 44 | 44.2 | 35.1 to 63.9 |
| Control | 41 | 29 | 30.6 | 26.2 to 39.8 |

Figure 6. Disease-free survival (DFS) according to study group for the Randomized Patients who received blinded vaccinations (N = 117). Kaplan-Meier actuarial curves for DFS for the Randomized Patients who received at least one dose of the Id-KLH+GM-CSF (N = 76) or KLH+GM-CSF (N = 41) are shown. The number of events, median, and 95% confidence intervals for each group are also presented.

Analysis of Patients by Isotype. A typical antibody ("immunoglobulin"), including the lymphoma immunoglobulin expressed on the surface of each cancerous lymphoma cell, is composed of protein "heavy chains" and "light chains". In humans, the heavy chains are classified as IgG or IgM, and less frequently as IgA, IgD and IgE. The light chains are classified as either kappa or lambda. The Id protein expressed on the surface of follicular lymphoma cells is characteristic of the single B-cell from which the tumor arose. Figure 7 below illustrates the dramatic differences in the structure of immunoglobulin protein characterized as an IgM-isotype as opposed that characterized as an IgG-isotype. Accordingly, an antibody may be referred to as IgG-isotype or IgM-isotype depending on its heavy-chain classification. In the normal immune response, antibody isotypes may have different roles and may help direct the appropriate immune response. The small region at the tip of the antibody is known as the "variable region", or antibody binding site, and the balance of the isotype is known as the "constant region". When Biovest manufactures BiovaxID, it screens each patient's tumor cells obtained by biopsy for the isotype. Approximately, 60% of patients with follicular lymphoma are diagnosed with tumors expressing an IgM isotype and approximately 40% of patients bear tumors expressing an IgG isotype. In rare cases (<1%), patients are diagnosed with another isotype (e.g., IgA). Infrequently, the patient's tumor also contains cells with one or more isotypes (a heterogenous or "mixed" isotype). In these patients, Biovest selects either an IgG or IgM isotype for manufacture of BiovaxID. Each patient's tumor isotype can be readily determined by standard analytical techniques (flow cytometry) at the time of the patient's tumor biopsy. In both the Phase 2 and Phase 3 clinical trials in follicular lymphoma patients, the determination of tumor heavy-chain isotype determined the specific manufacturing and purification process used to make that patient's vaccine. For patients who have tumors expressing an IgG (or an IgG-containing "mixed" isotype), Biovest manufactures an IgG isotype vaccine and for patients determined to have tumors expressing an IgM (or an IgM-containing "mixed" isotype), Biovest manufactures

52

an IgM vaccine. Due to Biovest's manufacturing process (rescue fusion hybridoma), the isotype (IgG or IgM) of the tumor is entirely reproduced in each patient's vaccine so that each patient's BiovaxID vaccine matches the patient's original tumor isotype (IgG or IgM).



Figure 7. The Id protein expressed on the surface of follicular lymphoma cells is an immunoglobulin protein characteristic of the single B-cell from which the tumor arose.

Preclinical data indicates that the ability to develop an immune response differs between IgM-isotype and IgG-isotype idiotypes; however, Biovest does not currently have immune response data from human clinical trials to confirm this preclinical data. The IgG-isotype idiotype was reported to be tolerogenic, meaning that the immune response against the specific tumor target is suppressed. On the other hand, the IgM-isotype idiotype was reported to be highly immunogenic, meaning that it induces an ample, persistent immune response against the specific tumor target. The unique feature of Biovest's Phase 3 clinical trial was the manufacturing and administration of tumor-matched isotype idiotype vaccines, which allowed Biovest to investigate whether these preclinical data translate into differential clinical efficacy of the two isotype vaccines in its clinical trial.

In an unplanned analysis, Biovest compared DFS of Id-vaccinated patients with control patients by tumor Ig isotype. This analysis was highly consistent with the manufacturing process, which requires isotype identification prior to initiation of vaccine manufacture due to the need for isotype specific vaccine purification. To address whether there was a differential treatment effect on DFS depending on Ig isotype, Biovest used Cox proportional hazards modeling where the interaction term between treatment and Ig isotype was estimated adjusting for main effect and for International Prognostic Index and number of chemotherapy cycles as covariates.

Biovest also analyzed DFS of vaccinated patients by tumor Ig heavy and light chain isotypes. For IgM and IgG heavy chain isotype groups, there were no statistically significant differences in baseline patient characteristics between experimental and control arms (IgM isotype, N= 35 vs N= 25; IgG-isotype, N= 40 vs. N= 15 for Id-vaccine and control arms, respectively). In patients presenting with an IgM tumor isotype and receiving an IgM-Id vaccine, median time to relapse after randomization was 52.9 months versus 28.7 months in IgM

tumor isotype control-treated patients (P= 0.001) and 30.6 months in all controls (see Figure 8 below). Among patients receiving IgG-Id vaccine, median time to relapse after randomization was 35.1 months versus 32.4 months in IgG tumor isotype control-treated patients (P= 0.807) (see Figure 9 below). Cox proportional hazard modeling supports an interaction between treatment arm and Ig isotype (P=0.039). When patients were grouped by light chain type, there was no difference in DFS (data not shown).



Figure 8. Disease free survival in IgM isotype patients



Figure 9. Disease free survival in IgG isotype patients

Biovest's Phase 3 clinical trial had two unique manufacturing features, where: (a) the vaccine consists of the full structure of the idiotype protein (that is, both the variable and the constant regions of the immunoglobulin) and (b) the idiotype of the vaccine matches the idiotype of the patient's own tumor. These unique features allowed Biovest to be the first to investigate the clinical efficacy implications of the two tumor isotypes. The prior Phase 3 clinical trials of follicular lymphoma idiotype vaccines conducted by Genitope Corporation ("Genitope") and Favrille, Inc. ("Favrille") used a manufacturing process known as recombinant manufacturing that universally linked the patient's variable region of the idiotype into an IgG isotype without regard to the actual isotype of each patient's tumor. There are two implications of the

manufacturing processes used by these prior clinical trials: (1) clinical efficacy cannot be compared by isotype group and (2) the lack of clinical efficacy observed in these clinical trials may be due to the tolerogenic effect of the universal IgG isotype used in the vaccine manufacturing.  As such, Biovest believes that its analysis by tumor isotype may provide profound insight into the efficacy of BiovaxID and may also suggest methods by which cancer vaccines in general could be developed in the future.

### *BiovaxID Regulatory and Marketing Status*

Under Biovest's IND for BiovaxID, two Phase 2 clinical trials and one Phase 3 clinical trial have been completed studying BiovaxID for the indications of follicular lymphoma and mantle cell lymphoma. BiovaxID has demonstrated statistically significant Phase 3 clinical benefit by prolonging disease-free survival in follicular lymphoma patients treated with BiovaxID compared to vaccinated controls.  Biovest believes that these clinical trials demonstrate the safety and efficacy of BiovaxID and Biovest has presented comprehensive summaries of the clinical development and clinical data to regulatory authorities in the EU, Canada and the United States.

Based on Biovest's scientific advice meetings with multiple EU-Member national medicines agencies, on June 13, 2012, Biovest filed its formal notice of intent to file a MAA with the EMA, which begins the EU marketing approval application process. In response to Biovest's notice of intent to file for marketing approval, the EMA notified Biovest that Biovest is eligible to submit its planned MAA for BiovaxID under the EMA's centralized procedure, as an orphan medicinal product for the treatment of follicular lymphoma.  Under the EMA centralized procedure, the marketing approval of BiovaxID can be simultaneously obtained throughout all EU-member countries with a single MAA.  Also, as part of the EMA's centralized procedure, Biovest's planned MAA for BiovaxID will be assessed by the EMA's Committee for Medicinal Products for Human Use ("CHMP"), which designates from within its membership, a Rapporteur and Co-Rapporteur, as well as a Pharmacovigilance Risk Assessment Committee ("PRAC") Rapporteur and Co-Rapporteur.  The Rapporteur and Co-Rapporteur are assigned with the primary responsibility of preparing and delivering an approvability evaluation report, supported by a team of assessors from their National Authority.  In 2012, the PRAC Rapporteur and Co-Rapporteur was implemented, after the latest revisions to the EMA safety requirements on Pharmacovigilance and Risk Assessment Plan, with the primary responsibility of preparing and delivering an approvability evaluation report specifically with regards to safety.  The EMA has also notified Biovest regarding the EMA's official designation of the Rapporteur and Co-Rapporteur, and PRAC Rapporteur and Co-Rapporteur to Biovest's planned MAA for BiovaxID. Biovest conducted its EMA Pre-submission Meeting for the MAA on September 12, 2012, during which Biovest's planned application dossier was validated.  Biovest could receive a decision regarding EU marketing approval for BiovaxID within twelve (12) months after the submission of its MAA, assuming that the rigorous review process advances forward in a timely and positive manner and no substantial regulatory issues or problems are encountered.  Based upon recent meetings with the Rapporteur and Co-Rapporteur agencies, Biovest is required to submit its completed MAA to those agencies in October 2013.

Additionally, based on a scientific advice meeting conducted with Health Canada, Biovest has announced plans to file a NDS seeking regulatory approval for BiovaxID in Canada.

Biovest could receive a decision regarding Canadian regulatory approval for BiovaxID within twelve (12) months after the submission of its NDS, assuming that the rigorous review process advances forward in a timely and positive manner and no substantial regulatory issues or problems are encountered. Biovest currently anticipates that its NDS will be filed with Health Canada roughly contemporaneously with its planned MAA submission to EMA.

Biovest conducted a formal guidance meeting with the FDA in order to define the potential regulatory path to seek United States regulatory/marketing approval. In its guidance, the FDA required that Biovest conduct a second Phase 3 clinical trial to complete the clinical data gained through Biovest's first Phase 3 clinical trial and Biovest's BiovaxID development program to support its filing of the BLA for BiovaxID. Subject to required funding and regulatory requirements, Biovest anticipates initiating this second Phase 3 clinical trial to advance BiovaxID toward the United States market. Concurrent with complying with the FDA's guidance, Biovest plans to continue to advance marketing and regulatory approvals for BiovaxID in the EU and Canada with filings of a MAA and NDS, respectively, supported by evidence of clinical benefit from the three clinical trials conducted to date in collaboration with the NCI.

As Biovest continues to advance its efforts to comply with various regulatory validations and comparability requirements related to Biovest's manufacturing process and facility, no assurances can be given that substantial additional requirements will not be imposed by any regulatory agency, including the EMA, Health Canada, and the FDA for the regulatory/marketing approval of BiovaxID.

Subsequent regulatory/marketing approval of BiovaxID, if any, may require Biovest to perform additional clinical studies as a condition to approval or continued marketing of BiovaxID, which may result in additional clinical trial expenses. Once received, there can be no assurances that Biovest will receive continued regulatory/marketing approval. Biovest's ability to timely access required financing will continue to be essential to support the ongoing efforts to pursue the development and potential regulatory/marketing approval and commercialization efforts of BiovaxID.

### *Proprietary Rights to BiovaxID*

As a result of the FDA's Orphan Drug designation of BiovaxID for the treatment of follicular lymphoma, mantle cell lymphoma and Waldenstrom's Macroglobulinemia, a rare B-cell subtype of NHL, Biovest has seven (7) years of market exclusivity in the United States from the date of the FDA's marketing approval for these three B-cell subtypes of NHL. Biovest also has ten (10) years of market exclusivity in the EU as a result of the EMA's Orphan Medicinal Product designation of BiovaxID for the treatment of follicular lymphoma and mantle cell lymphoma.

In addition, the regulations adopted in both the United States and the EU governing "biosimilar" products (the term adopted to describe generic biologic pharmaceutical products) provide Biovest with "data exclusivity" (i.e., no biosimilar product could reference the BiovaxID clinical data) for twelve (12) years in the United States and eight (8) years in the EU. Those same biosimilar regulations make it extremely difficult to qualify as a "biosimilar" and, even for

those products which can clear that hurdle, independent clinical data is required prior to licensure.

In addition to market exclusivity based on governmental regulation, Biovest relies on proprietary rights provided by a combination of an exclusive world-wide license to the cell line that is used in the production of BiovaxID, patent protection, trade secret protection, and Biovest's ongoing innovation. Although the composition of BiovaxID, in its current form, is not patentable, Biovest has filed United States and foreign patent applications relating to methods of treatment using BiovaxID. Biovest has also filed an international patent application ("PCT") and a provisional application relating to methods for producing and selecting idiotype vaccines for treatment of B-cell cancers. Also, Biovest has filed a provisional application covering the use of a biomarker for predicting cancer vaccine effectiveness and patient outcomes. In addition, Biovest has filed United States and foreign patent applications relating to certain features of the AutovaxID instrument used in the production of BiovaxID. The AutovaxID instrument is Biovest's proprietary production system which is fully enclosed, automated and has disposable components for each patient's personalized vaccine. Biovest believes that, without the availability of an automated production system, the methods used to produce a patient-specific immunotherapy are time-consuming and labor-intensive, resulting in a very expensive process that would be difficult to scale up. Following the findings related to the apparent role of the IgM isotype in clinical benefit from the vaccine, Biovest filed a broad range of patent applications covering various applications of these findings. Biovest has re-filed for United States registration of the trademark *BiovaxID*™ and has registered *BiovaxID*® as a Community Trademark in the EU. BiovaxID is manufactured with a proprietary cell line, which Biovest has licensed on a worldwide exclusive basis from Stanford University. Biovest believes that the use of any cell line other than its exclusively licensed cell line in the production of a similar idiotype vaccine would require filing a separate IND application and undergoing clinical testing evaluation by the FDA.

### *BiovaxID Manufacturing Process and Facility*

*Manufacturing Process*

The BiovaxID manufacturing production process begins when a sample of the patient's tumor is extracted by a biopsy and the sample is shipped refrigerated to Biovest's facility in Minneapolis (Coon Rapids), Minnesota. At Biovest's facility, Biovest identifies the idiotype that is expressed on the surface of the patient's tumor cells through laboratory analysis. Additionally, Biovest identifies whether the isotype is IgM or IgG. In NHL, the tumor B-cells bear the surface idiotype (immunoglobulin or antibody) derived from the original transformed malignant B-cell, but do not typically secrete it in an amount suitable for vaccine production. In order to make sufficient quantities of idiotype for vaccination, the patient's tumor cells are then fused with an exclusively licensed cell line (mouse/human heterohybridoma cell line, K6H6) from Stanford University to create a hybridoma or hybrid cell.

After the creation of the hybridoma, Biovest determines which hybridoma cells display the same antigen idiotype as the patient's tumor cells, and those cells are selected to produce the vaccine. The selected hybridoma cells are then seeded into Biovest's proprietary hollow fiber bioreactors, where they are cultured and where they secrete or produce idiotype antigen. The

secreted idiotype is then collected from the cells growing in the hollow fiber bioreactor. After a sufficient amount of idiotype is collected for the production of an appropriate amount of the vaccine, the patient's idiotype is purified using multi-step purification processes (see Figure 10a below).



Figure 10a. Individualized Manufacturing Process for BiovaxID Immunotherapy: (Clockwise) Beginning with an excisional (>2cm) lymph node biopsy, tumor cells are fused with Biovest's proprietary mouse/human heterohybridoma in order to induce secretion of normally surface-bound tumor immunoglobulin (idiotype). Id-secreting clones are identified by comparing their unique idiotype sequence to the tumor's after which they are cultured (expanded) in a proprietary hollow fiber bioreactor system (not shown). During culture, supernatant (containing idiotype) is collected until sufficient amounts have been produced to yield adequate dosage of vaccine. This supernatant is purified by affinity chromatography and conjugated (bonded) to KLH carrier protein, resulting in a finished vaccine that can be shipped and administered to patients. In Biovest's Phase 3 clinical trial, manufacturing success was approximately 95% of treated patients. (Fig. reprinted from Neelapu, et al. *Exp. Opin Biol Ther* 2007).



Figure 10b. Hollow fiber perfusion to produce the cell cultures used in the manufacture of BiovaxID.

Biovest uses a method known as "hollow fiber perfusion" to produce the cell cultures used in the manufacture of BiovaxID (see Figure 10b above). Hollow fiber perfusion, as compared to other cell culture methods, seeks to grow cells to higher densities more closely approaching the density of cells naturally occurring in body tissue. The hollow fiber perfusion method involves using hair-like plastic fibers with hollow centers which are intended to simulate human capillaries. Thousands of these fibers are inserted in a cartridge, which Biovest refers to as a bioreactor. The cells are grown on the outside of the hollow fibers while nutrient media used to support cell growth is delivered through the hollow centers of the fibers. The fiber walls have small pores, allowing nutrients to pass from the hollow center to the cells. The fibers act as filters and yield concentrated secreted products. Because the cells are immobilized in the bioreactor, the concentrated product can be harvested during the ongoing cell growth process. Biovest believes that hollow fiber technology permits the harvest of cell culture products with generally higher purities than stirred-tank fermentation, a common alternative cell culture method, thereby reducing the cost of purification as compared to stirred tank fermentation. Additionally, the technology associated with the hollow fiber process generally minimizes the amount of costly nutrient media required for cell growth as opposed to other cell culturing techniques.

After manufacture and purification, the resulting purified idiotype is then conjugated, or joined together, with KLH, to create the vaccine. KLH is a foreign carrier protein that is used to improve the immunogenicity, or ability to evoke an immune response, of the tumor-specific idiotype. The BiovaxID vaccine is then frozen and shipped to the treating physician. At the treating physician's office, the vaccine is thawed and injected into the patient.

BiovaxID is administered in conjunction with GM-CSF, a natural immune system growth factor that is administered with the idiotype vaccine to stimulate the immune system and increase the response to the idiotype vaccine. In the Phase 2 and Phase 3 clinical trials, follicular lymphoma patients were administered five (5) monthly BiovaxID injections in the amount of 0.5 milligram of idiotype per injection, with the injections being given over a 6-month period of time in which the fifth month is skipped. Through this process, the patient-specific idiotype is used to stimulate the patient's immune system into targeting and destroying malignant B-cells bearing the same idiotype.

Biovest estimates that an average of 2 to 3 months is required to manufacture each vaccine, which for most patients may overlap the time period when induction chemotherapy is being administered. While the manufacturing process for BiovaxID is highly personalized to each patient, Biovest considers it to be highly controlled and predictable. The most common reason for a failure to successfully produce a patient's vaccine was the presence of rare idiotype variants as opposed to the failure of a step in the manufacturing process. During the Phase 3 clinical trial, Biovest experienced approximately 95% success rate in manufacturing its BiovaxID vaccines.

*Manufacturing Facility*

BiovaxID is a personalized medicine which is produced separately for each individual patient through a laboratory-type process based on the patient's own tumor cells derived by biopsy. Following regulatory/marketing approval of BiovaxID, Biovest plans to initially produce BiovaxID in its existing leased space in Minneapolis (Coon Rapids), Minnesota. In

order to facilitate the regulatory/marketing approval process, Biovest has completed a dedicated pilot scale suite of laboratory clean rooms especially designed to produce BiovaxID. As the regulatory/marketing approval process advances toward completion and subject to availability of funding, Biovest anticipates expanding its current leased space or adding new manufacturing facilities as required in order to meet the anticipated commercialization requirements. During Biovest's Phase 3 clinical trial, BiovaxID was produced at its facility in Worcester, Massachusetts. Because Biovest has relocated the site of the manufacturing process to its Minneapolis (Coon Rapids), Minnesota facility following the Phase 3 clinical trial and because it is expanding this facility, Biovest is currently in the process of demonstrating to the national and/or international regulatory agencies that the BiovaxID vaccine produced under these new conditions is comparable to the BiovaxID vaccine that was the produced subject of earlier clinical testing. This requirement will also apply to future expansions of the facility, such as the possible expansion to additional facilities that may be required for successful commercialization of BiovaxID. There is also a requirement for validation of the manufacturing process for BiovaxID utilizing Biovest's AutovaxID instrument. A showing of comparability requires data demonstrating that the BiovaxID vaccine produced continues to be safe, pure, and potent and may be based on chemical, physical, and biological assays and, in some cases, other non-clinical data.

**Instruments and Disposables**

Biovest provides a range of cell culture systems that are used to produce small, research and development-scale through large, production-scale quantities of cell culture products. Biovest's cell culture systems all incorporate perfusion technology and hollow fiber cartridges. Because of these shared characteristics, all of Biovest's cell culture systems listed below can be used to culture a variety of cell lines (hybridomas, CHO, MDCK, BHK and others) to produce a range of cell-based products, such as monoclonal antibodies, other secreted proteins, virus, virus-like particles, vaccines, and whole cells. Biovest's smaller cell culture systems can be scaled-up to any of its larger cell culture systems. Biovest utilizes scaled-up methods in its hollow fiber systems because they are linear and predictable, which is not true of competing technologies. Biovest's cell culture system product line in order of increasing capacity includes:

### *HF PRIMER*™

The HF Primer is a low-cost cell culture system capable of producing small, research and development quantities of cell culture products from mammalian cell lines. The HF Primer also provides a relatively inexpensive option to evaluate the efficacy of new cell lines or applications in perfusion technology that can then be scaled-up to any of Biovest's larger cell culture systems. The HF Primer is a single-use, fully disposable product that requires no investment in custom equipment.

### *MULTI-6*™

The Multi-6 is a low-cost cell culture system capable of simultaneously producing small, research and development-scale quantities of six different cell culture products. Optionally, the Multi-6 can be used to produce one cell culture product at a rate that is six-fold higher than the HF Primer. This flexibility allows a researcher to operate one Multi-6 instead of managing six

separate HF Primer systems running side-by-side. Multi-6 applications can be scaled-up to Biovest's larger AutovaxID or its other cell culture systems, if the need arises. Multi-6 is a single-use, fully disposable product that requires no investment in custom equipment.

### *AUTOVAXID*

AutovaxID is Biovest's most advanced, fully automated cell culture system. Its setup and operation requires very little technician expertise and labor in comparison to competing cell culture system technologies and even Biovest's other cell culture systems listed below. AutovaxID was designed from the beginning to enable multi-product facilities, capture most all production information into its CFR 21 Part 11-compliant electronic records system, and operate as a fully closed-system biologics-manufacturing platform. AutovaxID allows supervisors to implement built-in software controls to ensure technicians adhere to strictly defined production protocols for cGMP environments or remove this feature when it is not needed, such as in research and development operations. There are four single-use AutovaxID disposables to provide researchers the needed flexibility to go from research and development through pilot-scale production. One of the disposable options even allows the simultaneous culturing of three different cell lines to produce three different products in small quantities. When needed, one cell line can then be scaled-up to AutovaxID's larger-capacity disposables. Biovest plans to utilize AutovaxID's advanced capabilities to streamline commercial manufacture of BiovaxID. AutovaxID is the first cell culture system that enables production of personalized cell-based treatments economically and in compliance with cGMP standards. Additionally, Biovest has contracted with the DOD and others to further develop AutovaxID and related hollow fiber bioreactor systems to explore potential production of additional vaccines, including vaccines for viral indications such as influenza and other contagious diseases.

### *ACUSYST-MINIMAX*™

The AcuSyst-miniMAX is an economical system that provides the flexibility and technology needed to support optimization studies and research-through pilot-scale production of the cell culture products listed above. The AcuSyst-miniMAX is a tabletop instrument that uses simple, but robust, microprocessors to automatically control pH, incubator temperature, fluid-flow dynamics, and seven process pumps. This system offers two single-use disposables options to meet varying production requirements. Optimization results determined in the AcuSyst-miniMAX can be transferred to Biovest's larger systems. The production capacity is equivalent to AutovaxID, but the AcuSyst-miniMAX does not have the advanced features, controls, simpler setup and ease of operation available through AutovaxID.

### *ACUSYST-MAXIMIZER*®

The AcuSyst-Maximizer is an economical system with a design that is similar to the AcuSyst-miniMAX system. This system has all of the features of AcuSyst-miniMAX, using single-use disposables that either match or double the production capacity of the AcuSyst-miniMAX system. The AcuSyst-Maximizer is an economical system for process development and routine productions. The AcuSyst-Maximizer offers the flexibility of four single-use disposables to meet varying production requirements. Production processes determined in the

AcuSyst-Maximizer can be scaled-up to Biovest's largest cell culture system, AcuSyst-Xcellerator™.

### *ACUSYST-XCELLERATOR*™

The AcuSyst-Xcellerator is a freestanding, production-scale cell culture system that has been used for production of a FDA-licensed biologic. The AcuSyst-Xcellerator contains an incubator, a refrigerator, a built-in computer that has a CFR 21 Part 11-compliant electronic records system, numerous process pumps, and a touch screen for local control. The AcuSyst-Xcellerator supports remote monitoring and/or control via standard web browsers. The system supports two independent single-use disposables and, therefore, can simultaneously culture two different cell lines to produce two products. The AcuSyst-Xcellerator has a production capacity that is equivalent to a 20x scale-up of AutovaxID's capacity.

In addition to instrument and disposables sales, Biovest has recurring revenue from the sale of hollow fiber bioreactors, cultureware, tubing sets and other disposable products and supplies for use with Biovest's cell culture system instrument product line.

Currently, Biovest assembles, validates and packages the instruments and disposables, cell culture products and services which it sells. Customers for Biovest's instruments and disposables are the same potential customers targeted for its contract cell culture products and services which include biopharmaceutical and biotechnology companies, medical schools, universities, research facilities, hospitals and public and private laboratories.

### *Proprietary Rights to Instruments and Disposables*

Biovest owns several patents covering various aspects of its hollow fiber perfusion process, instruments and proprietary cell culturing methods. Biovest owns U.S. Patent No. 6,001,585, which protects the HF Primer cell culture system and its use in screening cell lines and process conditions. Although the HF Primer is impractical for large-scale vaccine production, it may be used as an efficient screening tool to cost-effectively determine how well a cell line will perform in a hollow fiber system, such as the AutovaxID instrument, which is used in the production of BiovaxID. U.S. Patent No. 6,001,585 will expire in November 2017.

Biovest has also filed United States and foreign patent applications relating to certain features of the AutovaxID instrument. Several patents have been granted in the EU covering the AutovaxID's extra-capillary fluid cycling system, which enables control of fluid volumes in the hollow fiber bioreactor during manufacture of BiovaxID in a closed, contamination-free environment. These EU patents will remain in force until 2027.

Biovest has filed (a) a PCT application covering the use of AutovaxID instrumentation for rapid, large-scale production of virus, virus-like particles, and viral vaccines at a high yield, (b) a PCT application concerning an integrated apparatus and method for production and purification of antibodies, and (c) a provisional application concerning cultureware modules and biomanufacturing suites for large-scale production of cells and cell-derived products such as antibodies, proteins, virus, and virus-like particles.

**Cell Culture Products and Services**

Biovest manufactures mammalian cell culture products such as whole cells, recombinant and secreted proteins, and monoclonal antibodies.   Additionally, Biovest provides related services as a contract resource to assist its customers in developing cell production process protocols, cell line optimization, cell culture production optimization, media evaluation and other related services.

With Biovest's focus on pre-launch therapeutics and marketed diagnostics production, Biovest serves all the manufacturing needs of its customers.  From process development to regulatory support, Biovest's one-stop comprehensive approach provides solutions for clients that have chosen to temporarily or permanently outsource any or all stages of drug development. If needed, commercial production capacity for product launch is seamless as Biovest provides all the required regulatory support, including biocompatibility studies.

With nearly thirty (30) years of expert experience in cell culture, Biovest formulates the optimal strategy for its customers' biologics manufacturing.  By accurately matching the level of hollow fiber bioreactor production technology to Biovest's customers' phase of product development, its customers can manage their overall investment risk. Only as products advance to the next stage of development does Biovest scale to higher-output production systems. Customers of Biovest's cell culture products and services are biopharmaceutical and biotechnology companies, medical schools, universities, research facilities, hospitals and public and private laboratories.  Biovest generally produces cell culture products pursuant to contracts which specify the customer's requirements for the cell culture products to be produced or the services to be performed.

There are various processes commonly used to expand mammalian cells generally used for the production of antibodies.  These may include hollow fiber bioreactor perfusion, stirred tank fermentation, roller bottle and other processes. Biovest primarily uses hollow fiber bioreactor technology to expand customer provided cell lines and produce the respective monoclonal antibodies.  This technology grows cells to higher densities which more closely mimics mammalian physiology. Biovest has significant expertise with in vitro (outside the living body) cell culture methods for a wide variety of mammalian cells. Mammalian cells are complicated and dynamic, with constantly changing needs.  A primary component of hollow fiber bioreactors is fibers made of plastic polymers. The fibers are hair-like with hollow centers which simulate human capillaries.  Thousands of these fibers are inserted in a cartridge, which Biovest refers to as a bioreactor.  The cells are grown on the outside of the hollow fibers while nutrient media used to support cell growth is perfused through the lumen of the fibers.  The fiber walls have small pores, allowing nutrients to pass from the hollow center to the cells.  The fibers act as filters and yield concentrated secreted products.  Because the cells are immobilized in the bioreactor, the concentrated product can be harvested during the ongoing cell growth process. Hollow fiber technology permits harvests of cell culture products with generally higher purities thereby reducing the cost of downstream purification processes.  This technology generally minimizes the amount of costly nutrient media required for cell growth.

The most generally used process for mammalian cell production is stirred tank fermentation. Hollow fiber bioreactor technology can be contrasted with the competitive stirred

tank fermentation process which takes place in tanks of various sizes. Cells are grown inside the tanks in culture medium which is maintained under controlled conditions and continuously stirred to stimulate growth. At the end of the growing process, as opposed to incrementally during the growth process, cells are separated from the medium and the protein of interest is isolated through a series of complex purification processes. The size of the tanks generally result in stirred tank fermentation facilities requiring significantly more start-up costs, space and infrastructure than comparable production facilities using hollow fiber technology. While stirred tank fermentation and hollow fiber technology are both used for cell production of various quantities, Biovest believes that the stirred tank fermentation process is currently more commonly used for larger scale commercial production requirements. Biovest believes that hollow fiber technology has advantages in scalability, start-up time and cost in the early development of antibody production.

Biovest's patented hollow fiber technology is the key to optimizing its customers' biologics manufacturing. For Phase I, Phase II and Phase III cGMP production, Biovest's hollow fiber bioreactor perfusion technology provides economic advantages through largely automated culture of a relatively large, densely packed population of cells in a small space. Additionally, the low molecular weight cut-off of the fiber membrane allows more expensive media components to be conserved, while less expensive basal media is continuously perfused through the bioreactor. As a result, this automated approach can be more cost-effective than conventional platforms generally used for maintenance of large cell populations. In the expanding field of personalized medicine where patient specific drugs and therapeutics are frequently envisioned, such as BiovaxID, Biovest believes that hollow fiber technology may be the appropriate cell culture production technology.

**Competition**

*Competition for BiovaxID*

Biotechnology has experienced, and is expected to continue to experience, rapid and significant change. The use of monoclonal antibodies as initial or induction therapy, and increasingly for maintenance therapy, has become well-established and generally accepted. Products that are well-established or accepted, including monoclonal antibodies such as Rituxan®, may constitute significant barriers to market penetration and regulatory approval which may be expensive, difficult or even impossible to overcome. New developments in biotechnological processes are expected to continue at a rapid pace in both industry and academia, and these developments are likely to result in commercial applications competitive with BiovaxID. Biovest expects to encounter intense competition from a number of companies that offer products in Biovest's targeted application area. Biovest anticipates that its competitors in these areas will consist of both well-established and development-stage companies and will include:

- healthcare companies;
- chemical and biotechnology companies;
- biopharmaceutical companies; and
- companies developing drug discovery technologies.

64

Biovest expects to compete on, among other things, the safety and efficacy of its product candidates and more desirable treatment regimens, combined with the effectiveness of its experienced management team. Competing successfully will depend on Biovest's continued ability to attract and retain skilled and experienced personnel, to identify and secure the rights to and develop pharmaceutical products and compounds and to exploit these pharmaceutical products and compounds commercially before others are able to develop competitive products.

The use of monoclonal antibodies as initial or induction therapy, and increasingly for maintenance therapy, has become well-established and generally accepted. Products that are well-established or accepted, including monoclonal antibodies such as Rituxan®, may constitute significant barriers to market penetration and regulatory approval which may be expensive, difficult or even impossible to overcome. New developments in biotechnological processes are expected to continue at a rapid pace in both industry and academia, and these developments are likely to result in commercial applications competitive with BiovaxID.

If approved, BiovaxID will be required to compete with currently approved therapies, as well as therapies which may be approved in the future. There are currently no approved active immunotherapeutic drugs which seek to induce an adaptive, specific and durable immune response to identify and eradicate the residual lymphoma cells remaining after a patient achieves remission in an effort to extend that remission or avoid relapse. BiovaxID is a therapy designed to be administered to lymphoma patients who have achieved complete remission after initial chemotherapy treatment. If approved, BiovaxID would represent a new class of drugs available to treat follicular lymphoma and potentially offering a new treatment option for follicular lymphoma patients.

BiovaxID is the only personalized cancer vaccine for treatment of follicular lymphoma that has demonstrated significant clinical benefit in a Phase 3 clinical trial. Two other vaccines, MyVax™ developed by Genitope and Specifid™ developed by Favrille, which were studied in Phase 3 clinical trials in follicular lymphoma patients, did not report statistically significant clinical benefit and Biovest believe they are no longer under development. There are fundamental structural differences between BiovaxID and the cancer vaccines developed by Genitope and Favrille. Genitope and Favrille manufactured their respective vaccines with IgG isotypes without regard to the patient's actual isotype and their clinical trial designs under which the clinical efficacy of these vaccines were tested were different, which Biovest believes explains why BiovaxID achieved significant clinical benefit while Genitope and Favrille's vaccines did not.

Chemotherapy and monoclonal antibodies are widely used for the treatment of follicular lymphoma. Although chemotherapy and monoclonal antibodies can substantially reduce the tumor mass and, in most instances, achieve clinical remission, the remission is generally of limited duration. Follicular lymphoma patients generally relapse and the cancer usually becomes increasingly resistant to further chemotherapy treatments. The patient's response to therapy becomes briefer and weaker with each additional course of therapy, such that eventually further chemotherapy would offer no clinical benefit.

A number of passive immunotherapies, such as rituximab and radioimmunotherapeutic agents (radioisotopes linked to monoclonal antibodies), are approved by the FDA for the

treatment of follicular lymphoma. A monoclonal antibody is a type of antibody produced in large quantity that is specific to an antigen that is expressed by tumor cells and also by some normal cells. These therapies have been used as primary treatment and also as part of combination induction therapy and, including chemotherapy and rituximab based therapy, are considered to be the standard of care to treat follicular lymphoma. In an effort to prolong the duration of the clinical remission, monoclonal antibodies have increasingly been used as maintenance therapies.

If approved to treat follicular lymphoma, BiovaxID will face competition from other approved drugs, including rituximab maintenance. Penetrating a market and achieving usage by physicians and patients in the face of an established standard of care is anticipated to represent a significant marketing challenge.

If approved to treat mantle cell lymphoma, BiovaxID will be required to compete with other approved and/or development therapies for the treatment of mantle cell lymphoma. There is currently no consensus standard of care for the first line treatment of mantle cell lymphoma; however, there are a number of FDA-approved agents used for the treatment of mantle cell lymphoma both in first line settings and in patients in relapse.

### *Competition for Instruments and Disposables*

There are many kinds of technologies for the manufacture of cell-based products. The technology relied upon by Biovest's instruments and disposables referred to as hollow fiber perfusion is not widely accepted for large-scale manufacturing and, notwithstanding its development efforts, may not become widely accepted in the future. Biovest's hollow fiber bioreactors must compete with many other kinds of cell-based manufacturing instruments including, but not limited to, stirred-tank reactors, airlift fermentors, roller bottles, packed bed reactors, two-chamber reactors, ceramic matrix systems, batch fermentation techniques, and WAVE bioreactors. There can be no assurance that Biovest's hollow fiber systems will gain widespread acceptance competing with other established technologies marketed by industry leaders such as General Electric, Lonza, 3M, Sartorius Stedim, Thermo Scientific and Sandoz Biopharmaceuticals.

Competition for cell-based instruments is intense. Most of the developers, manufacturers and marketers of cell-based manufacturing instruments are much larger, more entrenched with potential customers and better financed than Biovest, which places it at a competitive disadvantage.

### Patents, Trademarks and Protection of Proprietary Technology

Biovest is pursuing a number of methods to establish and maintain market exclusivity for Biovest's product candidates to the greatest extent possible, including seeking patent protection, the use of statutory market exclusivity provisions, and otherwise protecting its intellectual property.

Biovest's success depends in part on its ability to obtain and maintain proprietary protection for Biovest's product candidates, technology, and know-how, to operate without infringing the proprietary rights of others, and to prevent others from infringing on its proprietary rights. Biovest's policy is to seek to protect its proprietary position by, among other methods, filing United States and foreign patent applications when possible relating to its proprietary technology, inventions, and improvements that are important to its business. Biovest also relies on trade secrets, know-how, continuing technological innovation, and in-licensing opportunities to develop and maintain its proprietary position.

Biovest owns several patents covering various aspects of its hollow fiber perfusion process, instruments and proprietary cell culturing methods. Biovest's patents also cover aspects of its therapeutic vaccine production process. Biovest plans to continue pursuing patent and other proprietary protection for its product candidates, its technology and know-how. Currently, Biovest has two issued United States patents. Additionally, Biovest has several patent applications that are pending. Biovest's presently issued United States patents will expire in July 2013 and November 2017. A list of Biovest's United States and foreign patents and published patent applications that it considers material to its business are as follows:

| Patent No. | Title and Inventor(s) | Filing Date/Issue Date | Expiration Date |
|---|---|---|---|
| 5,541,105 | METHOD OF CULTURING LEUKOCYTES by Georgiann B. Melink | Apr. 26, 1994/Jul. 30, 1996 | July 30, 2013 |
| 6,001,585 | MICRO HOLLOW FIBER BIOREACTOR by Michael J. Gramer | Nov. 14, 1997/Dec 14, 1999 | Nov. 14, 2017 |

| Foreign Patent No. | Title and Inventor(s) | Filing Date/Issue Date | Expiration Date |
|---|---|---|---|
| EP 2027247 (UK) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Jan. 26, 2011 | May 21, 2027 |
| DE602007012238D (Germany) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Jan. 26, 2011 | May 21, 2027 |
| AT2027247 (Austria) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Jan. 26, 2011 | May 21, 2027 |
| P2027247 (Switzerland) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Jan. 26, 2011 | May 21, 2027 |

| Foreign Patent No. | Title and Inventor(s) | Filing Date/Issue Date | Expiration Date |
|---|---|---|---|
| FR2027247 (France) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Jan. 26, 2011 | May 21, 2027 |
| GB2027247 (Great Britain) | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | May 21, 2007/Jan. 26, 2011 | May 21, 2027 |

| Application Publication No. | Title and Inventor(s) | Filing Date/Publication Date | Countries/ Regions |
|---|---|---|---|
| US 2009/0215022 | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | Nov. 20, 2008/Aug. 27, 2009 | United States |
| US 2009/0269841 | METHOD AND SYSTEM FOR THE PRODUCTION OF CELLS AND CELL PRODUCTS AND APPLICATIONS THEREOF by Robert J. Wojciechowski *et al.* | Nov. 20, 2008/Oct. 29, 2009 | United States |
| EP 2029722 | METHOD AND SYSTEM FOR THE PRODUCTION OF CELLS AND CELL PRODUCTS AND APPLICATIONS THEREOF by Robert J. Wojciechowski *et al.* | May 21, 2007/Mar. 4, 2009 | Europe |
| EP240991 | METHOD AND SYSTEM FOR THE PRODUCTION OF CELLS AND CELL PRODUCTS AND APPLICATIONS THEREOF by Robert J. Wojciechowski *et al.* | May 21, 2007/Dec. 6, 2007 | Europe |
| US 2012/0114634 | METHODS FOR INDUCING A SUSTAINED IMMUNE RESPONSE AGAINST A B-CELL IDIOTYPE USING AUTOLOGOUS ANTI-IDIOTYPIC VACCINES THEREOF by Angelos M. Stergiou *et al.* | Nov. 21, 2011/May 10, 2012 | United States |
| CA 2,739,918 | METHODS FOR INDUCING A SUSTAINED IMMUNE RESPONSE AGAINST A B-CELL IDIOTYPE USING AUTOLOGOUS ANTI-IDIOTYPIC VACCINES THEREOF by Angelos M. Stergiou *et al.* | Oct. 7, 2009/Apr. 15, 2010 | Canada |

| Application Publication No. | Title and Inventor(s) | Filing Date/Publication Date | Countries/ Regions |
|---|---|---|---|
| EP 2344184 | METHODS FOR INDUCING A SUSTAINED IMMUNE RESPONSE AGAINST A B-CELL IDIOTYPE USING AUTOLOGOUS ANTI-IDIOTYPIC VACCINES THEREOF by Angelos M. Stergiou *et al.* | Oct. 7, 2009/Jul. 20, 2011 | Europe |
| JP 2012-505229 | METHODS FOR INDUCING A SUSTAINED IMMUNE RESPONSE AGAINST A B-CELL IDIOTYPE USING AUTOLOGOUS ANTI-IDIOTYPIC VACCINES THEREOF by Angelos M. Stergiou *et al.* | Oct. 7, 2009/Mar. 1, 2012 | Japan |
| US 2011/0212493 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel et al. | Apr. 22, 2011/Sept. 1, 2011 | United States |
| AU 2009308354 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Apr. 29, 2009 | Australia |
| CA 2,741,481 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Apr. 29, 2009 | Canada |
| EP 2346984 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Jul. 27, 2011 | Europe |
| IL 212387 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Apr. 29, 2009 | Israel |
| JP 2012-506257 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL-DERIVED PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Mar. 15, 2012 | Japan |

| Application Publication No. | Title and Inventor(s) | Filing Date/Publication Date | Countries/ Regions |
|---|---|---|---|
| WO 2012/021840 | MATERIALS AND METHODS FOR DESIGNING AUTOLOGOUS IDIOTYPE VACCINES AND TREATMENT OF B-CELL MALIGNANCIES by Carlos Santos *et al.* | Aug. 12, 2011/Feb. 16, 2012 | International |
| WO 2012/064760 | MATERIALS AND METHODS FOR DIRECTING AN IMMUNE RESPONSE AGAINST AN EPITOPE by Carlos Santos *et al.* | Nov. 9, 2011/May 18, 2012 | International |

Biovest has filed PCT applications based on or related to various aspects of its analyses of clinical benefit based on isotype, to sequencing results matching vaccine to antigen coverage for the development of a companion diagnostic, and to use of the AutovaxID instrument for the production of viruses, virus-like particles, and antiviral vaccines such as those targeting influenza and other contagious diseases. In addition to Biovest's independent research and development programs, it is anticipated that Biovest's collaborations with industry and research partners will generate additional valuable intellectual property, which will be wholly-owned, jointly owned and/or licensed to Biovest.

Biovest also possesses licensed intellectual property used in the development and manufacture of BiovaxID. BiovaxID is manufactured with a proprietary cell line, which Biovest has licensed on a world-wide exclusive basis from Stanford University. This is significant because Biovest believes that, the use of any cell line other than its exclusively licensed cell line in the production of a similar idiotype vaccine, would require filing a separate IND application and undergoing clinical testing evaluation by the FDA.

Additionally, Biovest considers trademarks to be important to Biovest's business. Biovest has established trademarks covering various aspects of its hollow fiber perfusion process, instruments and proprietary cell culturing methods (*AutovaxID®* and *Acusyst-Maximizer®*). Biovest has applied for the United States and foreign registration of the trademarks *BiovaxID™* and *Biovax™* in connection with its therapeutic cancer vaccine and *Autovax™* in connection with its instrument used in the manufacture of BiovaxID. Biovest plans to continue aggressively pursuing trademark and other proprietary protection for its therapeutic vaccine technology and instrumentation, both nationally and internationally.

Biovest's ability to maintain and solidify its proprietary position for its technology will depend on Biovest's success in obtaining effective claims and enforcing those claims once granted. Biovest does not know whether any of its patent applications or those patent applications that Biovest licenses will result in the issuance of any patents. Biovest's issued patents and those that may issue in the future, or those licensed to Biovest, may be challenged, invalidated, or circumvented, which could limit its ability to stop competitors from marketing related products or the length of term of patent protection that Biovest may have for its product candidates. In addition, the rights granted under any issued patents may not provide Biovest with proprietary protection or competitive advantages against competitors with similar

technology.  Furthermore, Biovest's competitors may independently develop similar technologies or duplicate any technology developed by Biovest.  Because of the extensive time required for development, testing and regulatory review of a potential product, it is possible that, before any of Biovest's product candidates can be commercialized, any related patent may expire or remain in force for only a short period following commercialization, thereby reducing any advantage of the patent.

Biovest relies in some circumstances on trade secrets to protect its technology, particularly with respect to certain aspects of Biovest's BiovaxID manufacturing process.  However, trade secrets are difficult to protect. Biovest seeks to protect its proprietary technology and processes, in part, by confidentiality agreements with its employees, consultants, scientific advisors, and other contractors.  These agreements may be breached, and Biovest may not have adequate remedies for any breach.  In addition, Biovest's trade secrets may otherwise become known or be independently discovered by competitors.  To the extent that Biovest's employees, consultants, or contractors use intellectual property owned by others in their work for Biovest, disputes may arise as to the rights in related or resulting know-how and inventions.

**Government Regulation**

Government authorities in the United States at the federal, state and local levels and in foreign countries extensively regulate, among other things, the research, development, testing, manufacture, labeling, promotion, advertising, distribution, sampling, marketing, and import and export of pharmaceutical products, biologics, and medical devices.  All of Biovest's product candidates in development will require regulatory and/or marketing approval by government agencies prior to commercialization.  In particular, human therapeutic products are subject to rigorous preclinical and clinical trials and other approval procedures of the FDA and similar regulatory authorities in foreign countries.  Various federal, state, local, and foreign statutes and regulations also govern testing, manufacturing, safety, labeling, storage, and record-keeping related to such products and their marketing.  The process of obtaining these approvals and the subsequent process of maintaining substantial compliance with appropriate federal, state, local, and foreign statutes and regulations require the expenditure of substantial time and financial resources.  The FDA regulates drugs and well-characterized biologics under the Federal Food, Drug, and Cosmetic Act ("FDCA") and implementing regulations that are adopted under the FDCA.  In the case of biologics, the FDA regulates such products under the Public Health Service Act.  If Biovest fails to comply with the applicable requirements under these laws and regulations at any time during the product development process, approval process, or after approval, Biovest may become subject to administrative or judicial sanctions.  These sanctions could include the FDA's refusal to approve pending applications, withdrawals of approvals, clinical holds, warning letters, product recalls, product seizures, total or partial suspension of its operations, injunctions, fines, civil penalties or criminal prosecution.  Any agency enforcement action could have a material adverse effect on Biovest.  The FDA also administers certain controls over the export of drugs and biologics from the United States.  Any failure by Biovest, its suppliers of manufactured drug product, collaborators or licensees to obtain or maintain, or any delay in obtaining, regulatory approvals could adversely affect the marketing of Biovest's product candidates and Biovest's ability to receive product revenue, license revenue or profit sharing payments.  In addition, statutes, rules, regulations, and policies may change and new legislation or regulations may be issued that could delay such approvals.

The FDA has extensive regulatory authority over biopharmaceutical products (drugs and diagnostic products produced from biologic processes). The principal FDA regulations that pertain to Biovest's cell production activity include, but are not limited to 21CFR Parts 600 and 610 – *General Biological Products and Standards*; 21 CFR Parts 210 and 211 – *current Good Manufacturing Practices for Finished Pharmaceuticals*; 21 CFR Part 820 – *Quality System Regulations (medical devices)*; and 21 CFR Part 58 – *Good Laboratory Practice for Non-Clinical Laboratory Studies*. The FDA's guidelines include controls over procedures and systems related to the production of mammalian proteins and quality control testing of any new biological drug or product intended for use in humans (including, to a somewhat lesser degree, in vivo biodiagnostic products). The FDA guidelines are intended to assure that the biological drug or product meets the requirements through rigorous testing with respect to safety, efficacy, and meet the purity characteristics for identity and strength. FDA approvals for the use of new biological drugs or products (that can never be assured) require several rounds of extensive preclinical testing and clinical investigations conducted by the sponsoring pharmaceutical company prior to sale and use of the product. At each stage, the approvals granted by the FDA include the manufacturing process utilized to produce the product. Accordingly, Biovest's cell culture systems used for the production of therapeutic or biotherapeutic products (biological drug or product) are subject to significant regulation by the FDA under the FDCA.

Biovest's cell culture systems used to produce cells for diagnostic uses are regulated under the FDCA as Class I medical devices. Medical devices are classified by the FDA into three classes (Class I, Class II and Class III) based upon the potential risk to the consumer posed by the medical device (Class I medical devices pose the least amount of risk, while Class III medical devices and "new" devices are presumed to inherently pose the greatest amount of risk). As Class I medical devices, Biovest's systems must be manufactured in accordance with cGMP guidelines. Sales of such systems to customers using them to manufacture materials for clinical studies and licensure do not require prior FDA approval.

The process of complying with FDA guidelines and obtaining approvals from the FDA of applications to market biopharmaceutical drugs and products is costly, time consuming and subject to unanticipated delays. There is no assurance that Biovest's customers will be able to obtain FDA approval for biological drugs and products produced with its systems, and failure to receive such approvals may adversely affect the demand for Biovest's services.

Under the FDCA, Biovest's customers must establish and validate standard operating procedures ("SOPs") utilizing Biovest's cell culture technologies in their drug master files. Biovest provides assistance in operational, validation, calibration and preventive maintenance SOPs to customers, as needed, to support their product development and commercialization processes. For example, Biovest will typically provide existing and prospective customers who are utilizing Biovest's contract production services or constructing production facilities based on Biovest's cell culture technologies with information to enable such customers to comply with the FDA's guidelines required for facility layout and design. This information may be provided either in a drug/biologic master file that Biovest gives permission to customers to cross reference in their submission to the FDA, or provided to customers to include in their FDA submissions.

As Biovest currently does business in a significant number of countries, in addition to the requirements of the FDA, Biovest is subject to the regulations of other countries and their governmental agencies which apply to Biovest's goods and services when sold in their jurisdiction.

Biovest is subject to various regulations regarding handling and disposal of potentially hazardous materials, wastes and chemicals such as cells and their secreted waste products, including those enforced by the United States Environmental Protection Agency ("EPA") and various state and local agencies.

**Pharmaceutical Product Regulation**

Regulation by governmental authorities in the United States and other countries is a significant factor in the manufacture and marketing of pharmaceuticals and in Biovest's ongoing research and development activities. Most, if not all, of Biovest's product candidates require regulatory approval by governmental agencies prior to commercialization.   In the case of biologics, they are subject to rigorous preclinical testing and clinical trials and other pre-marketing approval requirements by the FDA and foreign regulatory authorities.

Each of these three phases is discussed further below.

*Preclinical Phase*

The activities required before a product may be marketed in the United States and other countries begin with preclinical testing not involving human subjects.  The development of a new pharmaceutical agent begins with the discovery or synthesis of a new molecule or well-characterized biologic.  These agents are screened for pharmacological activity using various animal and tissue models, with the goal of selecting a lead agent for further development. Additional studies are conducted to confirm pharmacological activity, to generate safety data, and to evaluate prototype dosage forms for appropriate release and activity characteristics. Once the pharmaceutically active molecule is fully characterized, an initial purity profile of the agent is established.  During this and subsequent stages of development, the agent is analyzed to confirm the integrity and quality of material produced. In addition, development and optimization of the initial dosage forms to be used in clinical trials are completed, together with analytical models to determine product stability and degradation.  A bulk supply of the active ingredient to support the necessary dosing in initial clinical trials must be secured.  Upon successful completion of preclinical safety and efficacy studies in animals, an IND submission is prepared and provided to the FDA for review prior to commencement of human clinical trials. The IND consists of the initial chemistry, analytical, formulation, and animal testing data generated during the preclinical phase.  In general, the review period for an IND submission is thirty (30) days, after which, if no comments are made by the FDA, the product candidate can be studied in Phase 1 clinical trials.

*Clinical Phase*

Following successful submission of an IND, the sponsor is permitted to conduct clinical trials involving the administration of the investigational product candidate to human subjects

under the supervision of qualified investigators in accordance with good clinical practice. Typically, clinical evaluation involves the following time-consuming and costly three-phase sequential process:

- *Phase 1.* Phase 1 clinical trials are conducted in a limited number of healthy individuals to determine the drug or biologics' safety and tolerability and include biological analyses to determine the availability and metabolization of the active ingredient following administration. The total number of subjects and patients included in Phase 1 clinical trials varies, but are generally in the range of 20 to 80 people.

- *Phase 2.* Phase 2 clinical trials involve administering the drug to individuals who suffer from the target disease or condition to determine the drug or biologics' potential efficacy and ideal dose. These clinical trials are typically well controlled, closely monitored, and conducted in a relatively small number of patients, usually involving no more than several hundred subjects. These clinical trials require scale up for manufacture of increasingly larger batches of bulk chemical. These batches require validation analysis to confirm the consistent composition of the drug or biologics.

- *Phase 3.* Phase 3 clinical trials are performed after preliminary evidence suggesting effectiveness of a drug or biologics has been obtained and safety (toxicity), tolerability, and an ideal dosing regimen have been established. Phase 3 clinical trials are intended to gather additional information about the effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug or biologics and to complete the information needed to provide adequate instructions for the use of the drug or biologics, also referred to as the Official Product Information. Phase 3 clinical trials usually include from several hundred to several thousand subjects.

Throughout the clinical phase, samples of the product made in different batches are tested for stability to establish shelf life constraints. In addition, large-scale production protocols and written standard operating procedures for each aspect of commercial manufacture and testing must be developed.

Phase 1, 2, and 3 testing may not be completed successfully within any specified time period, if at all. The FDA closely monitors the progress of each of the three phases of clinical trials that are conducted under an IND and may, at its discretion, reevaluate, alter, suspend, or terminate the testing based upon the data accumulated to that point and the FDA's assessment of the risk/benefit ratio to the patient. The FDA may suspend or terminate clinical trials at any time for various reasons, including a finding that the subjects or patients are being exposed to an unacceptable health risk. The FDA can also request additional clinical trials be conducted as a condition to product approval. Additionally, new government requirements may be established that could delay or prevent regulatory and marketing approval of Biovest's product candidates under development. Furthermore, institutional review boards, which are independent entities constituted to protect human subjects in the institutions in which clinical trials are being conducted, have the authority to suspend clinical trials at any time for a variety of reasons, including safety issues.

### *New Drug Application or Biologics License Application*

After the successful completion of Phase 3 clinical trials, the sponsor of the new drug submits a NDA or BLA, in the case of biologics, to the FDA requesting approval to market the product for one or more indications. A NDA, or BLA, is a comprehensive, multi-volume application that includes, among other things, the results of all preclinical and clinical studies, information about the drug's composition, and the sponsor's plans for producing, packaging, and labeling the drug. Under the Pediatric Research Equity Act of 2003, an application also is required to include an assessment, generally based on clinical study data, on the safety and efficacy of drugs for all relevant pediatric populations before the NDA is submitted. The statute provides for waivers or deferrals in certain situations. In most cases, the NDA or BLA must be accompanied by a substantial user fee. In return, the FDA assigns a goal of ten (10) months from acceptance of the NDA or BLA to return of a first "complete response", in which the FDA may approve the product or request additional information.

The submission of the application is no guarantee that the FDA will find it complete and accept it for filing. The FDA reviews all NDAs and BLAs submitted before it accepts them for filing. It may refuse to file the application and request additional information rather than accept the application for filing, in which case the application must be resubmitted with the supplemental information. After an application is deemed filed by the FDA, the FDA reviews an NDA or BLA to determine, among other things, whether a product is safe and effective for its intended use. The FDA has substantial discretion in the approval process and may disagree with an applicant's interpretation of the data submitted in its NDA or BLA. Drugs that successfully complete NDA or BLA review may be marketed in the United States, subject to all conditions imposed by the FDA. Prior to granting approval, the FDA generally conducts an inspection of the facilities, including outsourced facilities, which will be involved in the manufacture, production, packaging, testing and control of the drug product for cGMP compliance. The FDA will not approve the application unless cGMP compliance is satisfactory. If the FDA determines that the marketing application, manufacturing process, or manufacturing facilities are not acceptable, it will outline the deficiencies in the submission and will often request additional testing or information. Notwithstanding the submission of any requested additional information, the FDA ultimately may decide that the marketing application does not satisfy the regulatory criteria for approval and refuse to approve the application by issuing a "not approvable" letter or a "complete response" letter requiring additional steps to be completed before approval.

Biologics (such as BiovaxID) differ from other drugs for human use in that they must include more detailed chemistry and manufacturing information. This is necessary to help ensure the purity and quality of the product, for example to help ensure that it is not contaminated by an undesired microorganism or by another contaminant. The sponsoring company's manufacturing facility must also supply product specific facility information that outlines the method of manufacture of the biologic in significant detail, since slight variations can result in a different final product. Further, an inspection of the manufacturing facility is completed to assess the production process and facility since these aspects also have a significant impact on the safety and efficacy of the product.

*Post-Approval Phase*

If the FDA approves the NDA or BLA, as applicable, the pharmaceutical product becomes available for physicians to prescribe in the United States. After approval, the product is still subject to continuing regulation by the FDA, including record keeping requirements, submitting periodic reports to the FDA, reporting of any adverse experiences with the product, and complying with drug sampling and distribution requirements. In addition, the sponsor is required to maintain and provide updated safety and efficacy information to the FDA. The sponsor is also required to comply with requirements concerning advertising and promotional labeling. In that regard, advertising and promotional materials must be truthful and not misleading. The sponsor is also prohibited from promoting any non-FDA approved or "off-label" indications of products. Failure to comply with those requirements could result in significant enforcement action by the FDA, including warning letters, orders to pull the promotional materials, and substantial fines. Also, quality control and manufacturing procedures must continue to conform to cGMP after approval.

Drug and biologics manufacturers and their subcontractors are required to register their facilities and products manufactured annually with the FDA and certain state agencies and are subject to periodic unannounced inspections by the FDA to assess compliance with cGMP regulations. Facilities may also be subject to inspections by other federal, foreign, state, or local agencies. In addition, approved biological drug products may be subject to lot-by-lot release testing by the FDA before these products can be commercially distributed. Accordingly, manufacturers must continue to expend time, money, and effort in the area of production and quality control to maintain compliance with cGMP and other aspects of regulatory compliance.

In addition, following FDA approval of a product, discovery of problems with a product or the failure to comply with requirements may result in restrictions on a product, manufacturer, or holder of an approved marketing application, including withdrawal or recall of the product from the market or other voluntary or FDA-initiated action that could delay further marketing. Newly discovered or developed safety or effectiveness data may require changes to a product's approved labeling, including the addition of new warnings and contra-indications. Also, the FDA may require post-market testing and surveillance to monitor the product's safety or efficacy, including additional clinical studies, known as Phase 4 clinical trials, to evaluate long-term effects.

*Orphan Drug Designation and Exclusivity*

Pursuant to the United States Orphan Drug Act, a sponsor may request that the FDA designate a drug intended to treat a "rare disease or condition" as an "orphan drug." The term "orphan drug" can refer to either a drug or biologic. A rare disease or condition is defined as one which affects less than 200,000 people in the United States, or which affects more than 200,000 people, but for which the cost of developing and making available the product is not expected to be recovered from sales of the product in the United States. In the United States, orphan drug designation must be requested before submitting an NDA or BLA. Upon the approval of the first NDA or BLA for a drug designated as an orphan drug for a specified indication, the sponsor of that NDA or BLA is entitled to seven (7) years of exclusive marketing rights in the United States

for the orphan drug for the same indication unless the sponsor cannot assure the availability of sufficient quantities of the drug to meet the needs of persons with the disease. However, orphan drug status is particular to the approved indication and does not prevent another company from seeking approval of an off-patent drug that has other labeled indications that are not under orphan or other exclusivities. The period of orphan drug exclusivity is concurrent with any patent or other exclusivity that relates to the drug or biologic. Orphan drugs may also be eligible for federal income tax credits for costs associated with the drugs' development. In order to increase the development and marketing of drugs for rare disorders, regulatory agencies outside the United States, such as the EU (which has a ten year exclusivity marketing period), have enacted regulations similar to the Orphan Drug Act.

Orphan drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process. If a product which has an orphan drug designation subsequently receives the first FDA approval for the indication for which it has such designation, the product is entitled to a marketing exclusivity. For seven (7) years, the FDA may not approve any other application, including NDAs or BLAs, to market the "same drug" for the same indication. The only exceptions are (i) where the second product is shown to be "clinically superior" to the product with orphan drug exclusivity, as that phrase is defined by the FDA, and (ii) if there is an inadequate supply.

### *Manufacturing*

Among the conditions for regulatory/marketing approval that the regulatory agency, such as the FDA, the EMA and Health Canada, requires is that the prospective manufacturer's quality control and manufacturing procedures continually conform to cGMP regulations (which are regulations governing the manufacture, processing, packing, storage and testing of drugs and biologics intended for human use). In complying with cGMP, manufacturers must devote extensive time, money and effort in the area of production and quality control and quality assurance to maintain full technical compliance. Manufacturing facilities and company records are subject to periodic inspections by the regulatory agency to ensure compliance. If a manufacturing facility is not in substantial compliance with these requirements, regulatory enforcement action may be taken by the regulatory agency, which may include seeking an injunction against shipment of products from the facility and recall of products previously shipped from the facility. Changes to the manufacturing process or site during or following the completion of clinical trials requires sponsors to demonstrate to the regulatory agency that the product under new conditions is comparable to the product that was the subject of earlier clinical testing. This requirement applies to relocations or expansions of manufacturing facilities, or additional facilities that may be required upon successful commercialization of the product. A showing of comparability requires data demonstrating that the product continues to be safe, pure, and potent and may be based on chemical, physical, and biological assays and, in some cases, other non-clinical data.

### *Medical Device Regulation*

New medical devices are also subject to FDA approval and extensive regulation under the FDCA. Under the FDCA, medical devices are classified into one of three classes: Class I, Class II, or Class III. The classification of a device into one of these three classes generally

depends on the degree of risk associated with the medical device and the extent of control needed to ensure safety and effectiveness.

Class I devices are those for which safety and effectiveness can be assured by adherence to a set of general controls. These general controls include compliance with the applicable portions of the FDA's Quality System Regulation ("QSR"), which sets forth good manufacturing practice requirements, facility registration and product reporting of adverse medical events listing, truthful and non-misleading labeling, and promotion of the device only for its cleared or approved intended uses. Class II devices are also subject to these general controls, and any other special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device. Review and clearance by the FDA for these devices is typically accomplished through the so-called 510(k) pre-market notification procedure. A Class III device requires approval of a premarket application ("PMA"), an expensive, lengthy and uncertain process requiring many years to complete.

When 510(k) clearance is sought, a sponsor must submit a pre-market notification demonstrating that the proposed device is substantially equivalent to a previously approved device. If the FDA agrees that the proposed device is substantially equivalent to the predicate device, then 510(k) clearance to market will be granted. After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use, requires a new 510(k) clearance or could require pre-market approval. Biovest's instruments and disposables used for the production of cell cultures are generally regulated as Class I devices exempt from the 510(k) clearance process.

Clinical trials are almost always required to support a PMA and are sometimes required for a 510(k) pre-market notification. These clinical trials generally require submission of an application for an investigational device exemption ("IDE"). An IDE must be supported by pre-clinical data, such as animal and laboratory testing results, which show that the device is safe to test in humans and that the study protocols are scientifically sound. The IDE must be approved in advance by the FDA for a specified number of patients, unless the product is deemed a non-significant risk device and is eligible for more abbreviated IDE requirements.

Both before and after a medical device is commercially distributed, manufacturers and marketers of the device have ongoing responsibilities under FDA regulations. The FDA reviews design and manufacturing practices, labeling and record keeping, and manufacturers' required reports of adverse experiences and other information to identify potential problems with marketed medical devices. Device manufacturers are subject to periodic and unannounced inspection by the FDA for compliance with the QSR, cGMP requirements that govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, servicing, labeling, storage, installation, and distribution of all finished medical devices intended for human use.

If the FDA finds that a manufacturer has failed to comply or that a medical device is ineffective or poses an unreasonable health risk, it can institute or seek a wide variety of enforcement actions and remedies, ranging from a public warning letter to more severe actions such as fines, injunctions, and civil penalties, recall or seizure of products, operating restrictions, partial suspension or total shutdown of production, refusing requests for 510(k) clearance or

PMA approval of new products, withdrawing 510(k) clearance or PMA approvals already granted, and criminal prosecution.

The FDA also has the authority to require repair, replacement or refund of the cost of any medical device. The FDA also administers certain controls over the export of medical devices from the United States, as international sales of medical devices that have not received FDA approval are subject to FDA export requirements. Additionally, each foreign country subjects such medical devices to its own regulatory requirements. In the EU, a single regulatory approval process has been created, and approval is represented by the "CE" Mark.

### Other Regulation in the United States

The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act (2010) (collectively, the "PPACA"). Enacted in March 2010, the PPACA makes changes that could significantly impact the development and commercialization of Biovest's product candidates. Significant measures contained in the PPACA include, for example, coordination and promotion of research on comparative clinical effectiveness of different technologies and procedures, initiatives to revise Medicare payment methodologies, such as bundling of payments across the continuum of care by providers and physicians, and initiatives to promote quality indicators in payment methodologies. The PPACA also includes significant new fraud and abuse measures, including required disclosures of financial arrangements with physician customers, lower thresholds for violations and increasing potential penalties for such violations. In addition, the PPACA establishes an Independent Payment Advisory Board ("IPAB") to reduce the per capita rate of growth in Medicare spending. The IPAB has broad discretion to propose policies to reduce expenditures, which may have a negative impact on payment rates for services or therapeutics, including therapeutics like BiovaxID. In addition to the PPACA, the effect of which cannot presently be fully quantified given its relatively recent enactment, various healthcare reform proposals have also emerged from federal and state governments. Changes in healthcare policy could substantially impact the development and commercialization of BiovaxID. Biovest cannot predict whether future healthcare initiatives will be implemented at the federal or state level or in countries outside of the United States in which it may do business, or the effect any future legislation or regulation will have on Biovest. The taxes imposed by the new federal legislation and the expansion in government's role in the United States healthcare industry may result in decreased profits to Biovest, lower reimbursements by payers for Biovest's product candidates or reduced medical procedure volumes, all of which may adversely affect Biovest's business, financial condition and results of operations, possibly materially.

The Biologics Price Competition and Innovation Act (2010). The Biologics Price Competition and Innovation Act establishes an abbreviated approval pathway for "biosimilar" biological products. Among the provisions potentially applicable to Biovest's product candidates are (i) innovator manufacturers of reference biological products (such as BiovaxID) are granted 12 years of exclusive use before biosimilars can be approved for marketing in the United States, and (ii) an application for a biosimilar product may not be submitted to the FDA until four (4) years after the date on which the BLA for the reference product was first approved. The FDA is still early in the process of developing regulations to implement the provisions of this legislation.

*Toxic Substances Control Act.* The EPA has promulgated regulations under Section 5 of the Toxic Substances Control Act ("TSCA"), which require notification procedures for review of certain so-called intergeneric microorganisms before they are introduced into commerce. Intergeneric microorganisms are those formed by deliberate combinations of genetic material from organisms classified in different taxonomic genera, which are types of animal or plant groups. The regulations provide exemptions from the reporting requirements for new microorganisms used for research and development when the researcher or institution is in mandatory compliance with the National Institutes of Health Guidelines for Research Involving Recombinant DNA Molecules ("NIH Guidelines"). Those researchers voluntarily following the NIH Guidelines can, by documenting their use of the NIH Guidelines, satisfy the EPA's requirements for testing in contained structures. The EPA may enforce the TSCA through enforcement actions such as seizing noncompliant substances, seeking injunctive relief, and assessing civil or criminal penalties. Biovest believe that its research and development activities involving intergeneric microorganisms comply with the TSCA, but there can be no assurance that restrictions, fines or penalties will not be imposed on Biovest in the future.

*Health Care Coverage and Reimbursement.* Commercial success in marketing and selling Biovest's product candidates depends, in part, on the availability of adequate coverage and reimbursement from third-party health care payers, such as government and private health insurers and managed care organizations. Third-party payers are increasingly challenging the pricing of medical products and services. Government and private sector initiatives to limit the growth of health care costs, including price regulation, competitive pricing, coverage and payment policies, and managed-care arrangements, are continuing in many countries where Biovest does business, including the United States. These changes are causing the marketplace to put increased emphasis on the delivery of more cost-effective medical products.

Government programs, including Medicare and Medicaid, private health care insurance and managed-care plans have attempted to control costs by limiting the amount of reimbursement they will pay for particular procedures or treatments. This has created an increasing level of price sensitivity among customers for Biovest's product candidates. Examples of how limits on drug coverage and reimbursement in the United States may cause drug price sensitivity include the growth of managed care, changing Medicare reimbursement methodologies, and drug rebates and price controls. Some third-party payers must also approve coverage for new or innovative devices or therapies before they will reimburse health care providers who use the medical devices or therapies. Even though a new medical product may have been cleared for commercial distribution, Biovest may find limited demand for the product until reimbursement approval has been obtained from governmental and private third-party payers.

*Anti-Kickback Laws.* In the United States, there are federal and state anti-kickback laws that prohibit the payment or receipt of kickbacks, bribes or other remuneration to induce the purchase, order or recommendation of health care products and services. These laws constrain the sales, marketing and other promotional activities of pharmaceutical companies, such as Biovest, by limiting the kinds of financial arrangements Biovest may have with prescribers, purchasers, dispensers and users of drugs and biologics. The United States Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") has issued "Compliance

Guidance" for pharmaceutical manufacturers which, among other things, identifies manufacturer practices implicating the federal anti-kickback law (42 U.S.C. §1320a-7b(b)) and describes elements of an effective compliance program. The OIG Compliance Guidance is voluntary, and Biovest has not adopted a formal compliance program modeled after the one described in the OIG Compliance Guidance. Although none of Biovest's practices have been subject to challenge under any anti-kickback laws, due to the breadth of the statutory provisions of some of these laws, it is possible that some of Biovest's practices might be challenged under one or more of these laws in the future. Violations of these laws can lead to civil and criminal penalties, including imprisonment, fines and exclusion from participation in federal health care programs. Any such violations could have a material adverse effect on Biovest's business, financial condition, results of operations or cash flows.

*Health Information Privacy and Security.* Individually identifiable health information is subject to an array of federal and state regulation. Federal rules promulgated pursuant to the Health Information Portability and Accountability Act of 1996 ("HIPAA") regulate the use and disclosure of health information by "covered entities" (which includes individual and institutional providers from which Biovest may receive individually identifiable health information). These regulations govern, among other things, the use and disclosure of health information for research purposes, and require the covered entity to obtain the written authorization of the individual before using or disclosing health information for research. Failure of the covered entity to obtain such authorization (absent obtaining a waiver of the authorization requirement from an Institutional Review Board) could subject the covered entity to civil and criminal penalties. As the implementation of this regulation is still in its early phases, Biovest may experience delays and complex negotiations as Biovest deals with each entity's differing interpretation of the regulations and what is required for compliance. Further, HIPAA's criminal provisions are not limited in their applicability to "covered persons," but apply to any "person" that knowingly and in violation of the statute obtains or discloses individually identifiable health information. Also, where its customers or contractors are covered entities, including hospitals, universities, physicians or clinics, Biovest may be required by the HIPAA regulations to enter into "business associate" agreements that subject Biovest to certain privacy and security requirements, including making its books and records available for audit and inspection by HHS and implementing certain health information privacy and security safeguards. In addition, many states have laws that apply to the use and disclosure of health information, and these laws could also affect the manner in which Biovest conducts its research and other aspects of its business. Such state laws are not preempted by the federal privacy law where they afford greater privacy protection to the individual. While activities to assure compliance with health information privacy laws are a routine business practice, Biovest is unable to predict the extent to which its resources may be diverted in the event of an investigation or enforcement action with respect to such laws.

### Foreign Regulation

Whether or not Biovest obtains FDA approval for a product, Biovest may choose to seek approval of Biovest's product candidates by the comparable regulatory authorities of foreign countries. Like in the United States, before Biovest can commence clinical trials or marketing of its product candidates in a foreign country, Biovest must submit a new drug application in that country. The requirements governing the conduct of clinical trials, product licensing, pricing,

and reimbursement vary greatly from country to country. Although governed by the applicable country, clinical trials conducted outside of the United States typically are administered under a three-phase sequential process similar to that discussed above for pharmaceutical products. Clinical trials conducted in the EU must comply with the EU Clinical Trial Regulations and are monitored and inspected by each EU Member State. Clinical trials conducted in Canada must comply with the Health Canada Regulations and are approved and monitored by an independent committee of doctors, scientists, advocates and others to ensure safety and ethical standards. In addition, regulatory approval of pricing/marketing of the product candidate is required in most countries other than the United States.

Biovest faces the risk that the pricing, which results from the regulatory/marketing approval process, would be insufficient to generate an acceptable return to Biovest or Biovest's collaborators.

The regulatory/marketing approval process varies from country to country, and the approval time may be longer or shorter than that required for FDA approval. However, foreign countries are similar in that they generally require, as part of any new drug submission/application process, sufficient evidence to support the safety, efficacy and quality of the product candidate.

Under EU regulatory systems, the manufacture and sale of new drugs are controlled by the EMA. MAAs are submitted under either a centralized or decentralized procedure for most products. The centralized procedure, which is the pathway for BiovaxID, is available for medicines produced by biotechnology or which are highly innovative and provides single marketing authorization that is valid for all EU member states. Under European Commission Regulation 726/2004, the centralized authorization procedure is required for all biotechnology-derived medicinal products developed through recombinant DNA technology, controlled expression of genes coding for biologically active proteins, and hybridoma and monoclonal antibody methods. It is also required for designated orphan medicinal products and all new active substances indicated for the treatment of AIDS, cancer, neurodegenerative disorder, or diabetes. Under the EMA centralized procedure, the marketing approval of BiovaxID can be simultaneously obtained throughout all EU-member countries with a single MAA. As part of the EMA's centralized procedure, the MAA is assessed by the EMA's CHMP, which designates from within its membership, a Rapporteur and Co-Rapporteur, as well as a PRAC Rapporteur and Co-Rapporteur. The Rapporteurs and Co-Rapporteurs are assigned with the primary responsibility of preparing and delivering an approvability evaluation report, supported by a team of assessors from their National Authority.

Under Canadian regulatory systems, the manufacture and sale of new drugs are controlled by Health Canada. NDSs are required to be submitted for regulatory approval in Canada. Upon sufficient evidence to support safety, efficacy or quality claims for a NDS, a product is issued a Notice of Compliance ("NOC") and a Drug Identification Number ("DIN") indicating that the biologic is approved for sale in Canada. All drugs that are marketed in Canada are subject to the Food and Drugs Act and Regulations. The Biologics and Genetic Therapies Directorate is responsible for the review and approval of all types of drug submissions for Biological (Schedule D) and Radiopharmaceutical (Schedule C) drug products, including, but not limited to NDSs. For the regulatory requirements specific to Biological (Schedule D to the

Act) drugs, please refer to Divisions 4, of Part C of the Regulations. For general regulatory requirements concerning all drugs, including Good Manufacturing Practices, please refer to Divisions 1, 1a, 2, 5 and 8 of Part C of the Regulations.

### *Third-Party Reimbursement and Pricing Controls*

In the United States and in international markets, sales of pharmaceutical products depend in significant part on the availability of reimbursement to the consumer from third-party payers, such as government and private insurance plans. Third-party payers are increasingly challenging the prices charged for medical products and services. It will be time-consuming and expensive for Biovest to go through the process of seeking reimbursement from Medicare and private payers. Biovest's product candidates may not be considered cost effective, and coverage and reimbursement may not be available or sufficient to allow Biovest to sell its product candidates on a competitive and profitable basis. The passage of the Medicare Prescription Drug and Modernization Act of 2003 imposes new requirements for the distribution and pricing of prescription drugs which may affect the marketing of Biovest's product candidates.

In many foreign markets, including the member states of the EU, pricing of pharmaceutical products is subject to governmental control. In the United States, there have been, and Biovest expects that there will continue to be, a number of federal and state proposals to implement similar governmental pricing control. While Biovest cannot predict whether such legislative or regulatory proposals will be adopted, the adoption of such proposals could have a material adverse effect on Biovest's business, financial condition and profitability.

### *Liability Insurance*

Biovest may be exposed to potential product liability claims by users of its product candidates. Biovest's business segments may expose Biovest to potential risk of liability. Biovest seeks to obtain agreements from contract production customers to mitigate such potential liability and to indemnify Biovest under certain circumstances. The terms and conditions of Biovest's sales and instruments include provisions which are intended to limit Biovest's liability for indirect, special, incidental or consequential damages. There can be no assurance, however, that Biovest will be successful in obtaining such agreements or that such indemnification, if obtained, will adequately protect Biovest against potential claims. The terms and conditions of Biovest's sales and instruments include provisions which are intended to limit its liability for indirect, special, incidental or consequential damages. Biovest presently maintains product liability insurance coverage in the aggregate and per occurrence of $2 million in connection with its product candidates and its products and services, amounts which Biovest believes to be adequate and on acceptable terms.

Although, Biovest believes that its current level of coverage is adequate to protect its business from foreseeable product liability claims, Biovest may seek to increase its insurance coverage in the future in the event that Biovest significantly increases its level of contract product and services and/or the initiation of any clinical trial program. There can be no assurance, however, that Biovest will be able to maintain its existing coverage or obtain additional coverage on acceptable terms, or that such insurance will provide adequate coverage

against all potential claims to which it may be exposed. A successful partially or completely uninsured claim against Biovest could have a material adverse effect on Biovest's operations.

**Employees**

As of the Petition Date, Biovest had 48 employees (4 of whom are part time employees, and 44 of whom are full time employees). Advanced degrees and certifications of its staff include five Ph.D.s, one M.D., Ph.D., one CPA, and three JDs. From time to time, Biovest employs and supplements its staff with temporary employees and consultants, as required. Biovest believe that its relations with employees are satisfactory. None of Biovest's employees is covered by a collective bargaining agreement. Each of Biovest's employees has entered into confidentiality and intellectual property assignment agreements with Biovest. Biovest's ability to continue to develop and improve marketable products and to establish and maintain its competitive position in light of technological developments will depend, in part, upon Biovest's ability to attract and retain qualified technical personnel.

**Leased Properties**

Biovest leases approximately 35,000 square feet in Minneapolis (Coon Rapids), Minnesota, which Biovest uses for office, laboratory, manufacturing, and warehousing facility space to support (i) Biovest's development, potential commercialization, and production of BiovaxID, (ii) the production of Biovest's instruments and disposables, and (iii) Biovest's contract cell culture products and services. The lease expires on December 31, 2020. Biovest has the right to extend the term of the lease for two additional five year periods at the greater of (a) the base rent in effect at the end of the initial ten year lease term, or (b) market rates in effect at the end of the initial ten year lease term. The lease contains provisions regarding a strategic collaboration whereby the landlord agreed to construct certain capital improvements to the leased premises to allow Biovest to perform cGMP manufacturing of biologic products in the facility, including the manufacture of BiovaxID and for potential future expansion to the facility to permit additional BiovaxID production capacity when required. The $1.5 million in improvements were completed in September 2011. These improvements were financed by Biovest through a combination of cash on hand (approximately $175,000), loans from the City of Coon Rapids, Minnesota and The Economic Development Authority in and for The City of Coon Rapids in the aggregate amount of $353,000 (as described below), and an increase to the base rent charged in order to recoup the costs of construction incurred by the landlord (approximately $1.0 million) over the initial term of the lease. Biovest anticipates that, as Biovest's development and commercialization of its product candidates advances and as Biovest prepares for the future commercialization of its product candidates, Biovest's facilities requirements will increase.

As of the Petition Date, Biovest subleased its principal corporate, executive and administrative office space (approximately 7,400 square feet) in Tampa, Florida. The main lease expires on December 31, 2014 and is cancelable by either party with 120 days prior notice.

**Market for Biovest Common Stock**

The following table sets forth the range of high and low bid quotations for Biovest's common stock for each of the quarterly periods indicated and as reported by the OTCQB Market.

Bid quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not represent actual transactions. As of December 31, 2012, the closing sale price for Biovest's common stock was $0.13.

|  | High | Low |
|---|---|---|
| **Year Ended September 30, 2012:** | | |
| First Quarter | $0.46 | $0.32 |
| Second Quarter | $0.77 | $0.32 |
| Third Quarter | $0.60 | $0.37 |
| Fourth Quarter | $0.43 | $0.11 |
| **Year Ended September 30, 2011:** | | |
| First Quarter | $2.05 | $0.62 |
| Second Quarter | $0.94 | $0.51 |
| Third Quarter | $0.63 | $0.41 |
| Fourth Quarter | $0.52 | $0.37 |

**Prepetition Secured Obligations**

*Corps Real, LLC.* In connection with the confirmation of the Biovest 2010 Plan (as hereinafter defined), Biovest and Corps Real, LLC entered into various loan documents evidencing the allowed administrative expense claims and the allowed secured claims of Corps Real, LLC against Biovest in the original principal amount of $3,169,223.44 (the "Corps Real Secured Plan Claims"). As of the Petition Date, the outstanding balance of the Corps Real Secured Plan Claims, including principal, interest, fees, and charges, was approximately $3,551,981.00. The obligations of Biovest as to the Corps Real Secured Plan Claims matured on November 17, 2012. On December 3, 2012, Biovest executed an additional secured promissory note in favor of Corps Real, LLC, pursuant to which Corps Real, LLC provided Biovest with a revolving line of credit facility in the principal amount of $1,500,000.00 (the "Corps Real Line of Credit" and, together with the Corps Real Secured Plan Claims, the "Corps Real Senior Secured Debt"). As of the Petition Date, the outstanding balance of the Corps Real Line of Credit, including principal, interest, fees, and charges, was approximately $1,541,513.00. The Corps Real Senior Secured Debt is secured by first priority liens on and security interests in all of the Debtor's assets. On March 5, 2013, Biovest executed an additional secured promissory note in favor of Corps Real, LLC, pursuant to which Corps Real, LLC advanced the sum of $325,000.00 to Biovest (the "Corps Real Additional Secured Advance" and, together with the Corps Real Senior Secured Debt, the "Corps Real Secured Claims"). The Corps Real Additional Secured Advance is secured by first priority liens on and security interests in all of the Debtor's assets. As of the Petition Date, the aggregate amount of the Corps Real Secured Claims was approximately $5,418,494.00.

*Laurus/Valens.* In addition, in connection with the confirmation of the Biovest 2010 Plan, Biovest and PSource Structured Debt Limited, Valens U.S. SPV I, LLC, Valens Offshore SPV I, Ltd., Valens Offshore SPV II, Corp., Laurus Master Fund, Ltd. (In Liquidation), Calliope Corporation (successor by merger to Erato Corp.), and LV Administrative Services, Inc. (collectively, the "Laurus/Valens Entities") entered into various loan documents evidencing the allowed secured claims of the Laurus/Valens Entities against Biovest in the original principal amount of $29,060,000.00 (collectively, the "Laurus/Valens Secured Plan Claims"). As of the

Petition Date, the outstanding balance of the Laurus/Valens Secured Plan Claims, including principal, interest, fees, and charges, was approximately $32,719,423.00 The Laurus/Valens Secured Plan Claims are secured by (i) first priority liens on and security interests in all of the Debtor's assets, junior only to the first priority liens on and security interests in all of the Debtor's assets in favor of Corps Real, LLC with respect to the Corps Real Senior Secured Debt, and (ii) a guarantee from Accentia up to a maximum amount of $4,991,360.00, which is secured by a pledge of 20,115,818 shares of Biovest Common Stock owned by Accentia. Pursuant to an Amended and Restated Subordination Agreement dated as of December 3, 2012, by and between Corps Real, LLC and LV Administrative Services, Inc. (as agent for the other Laurus/Valens Entities), the Laurus/Valens Entities have agreed that the Laurus/Valens Secured Plan Claims shall be subordinated in right of payment and priority to the payment in full of the Corps Real Senior Secured Debt. The liens on the Debtor's assets securing the Corps Real Additional Secured Advance are on a pari passu basis with the liens on the Debtor's assets securing the Laurus/Valens Secured Plan Claims.

*Coon Rapids, Minnesota Promissory Notes.* In 2010, Biovest also executed promissory notes in favor of (i) the City of Coon Rapids and (ii) The Economic Development Authority in and for the City of Coon Rapids in the amounts of $250,000.00 and $103,000.00, respectively. As of the Petition Date, the aggregate outstanding balance under those promissory notes, including principal, interest, fees, and charges, was approximately $328,000.00. Pursuant to security agreements executed by Biovest in favor of those parties, Biovest's obligations under those promissory notes are secured by liens on certain equipment of Biovest located at its Minneapolis, Minnesota manufacturing facility. The entirety of the proceeds from the transactions was used to fund capital improvements made to Biovest's existing manufacturing facility in Minneapolis (Coon Rapids), Minnesota.

*Royal Bank America Leasing, L.P.* In November 2011, Biovest entered into an equipment financing agreement with Royal Bank America Leasing, L.P. ("Royal Bank") with respect to a piece of laboratory equipment utilized in Biovest's Minneapolis, Minnesota manufacturing facility. Biovest's obligations under that agreement are secured by a lien on such equipment in favor of Royal Bank. As of the Petition Date, the aggregate outstanding balance owed to Royal Bank under that agreement, including principal, interest, fees and charges, was approximately $48,785.00.

## CERTAIN RISK FACTORS TO BE CONSIDERED

Statements in this Disclosure Statement that are not strictly historical in nature are forward-looking statements. These statements may include, but are not limited to, statements about: the timing of the commencement, enrollment, and completion of Biovest's clinical trials for Biovest's product candidates; the progress or success of Biovest's product development programs; the status of regulatory approvals for Biovest's product candidates; the timing of product launches; Biovest's ability to protect Biovest's intellectual property and operate Biovest's business without infringing upon the intellectual property rights of others; and Biovest's estimates for future performance, anticipated operating losses, future revenues, capital requirements, and Biovest's needs for additional financing. In some cases, you can identify forward-looking statements by terms such as "anticipates," "believes," "could," "estimates,"

"expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "will," "would," "goal," or other variations of these terms (including their use in the negative) or by discussions of strategies, plans or intentions. These statements are only predictions based on current information and expectations and involve a number of risks and uncertainties. The underlying information and expectations are likely to change over time.

Factors that could cause actual results to differ materially from what is expressed or forecasted in Biovest's forward-looking statements include, but are not limited to, the following:

*Biovest has a history of operating losses and expects to incur further losses.* Biovest has never been profitable and Biovest has incurred significant losses and cash flow deficits. For the years ended September 30, 2012 and 2011, Biovest reported net losses of $11.8 million and $15.3 million, respectively, and negative cash flow from operating activities of $4.3 million and $3.8 million, respectively. As of September 30, 2012, Biovest has an aggregate accumulated deficit of $173 million and an aggregate accumulated stockholders' deficit of $40 million. Biovest anticipates that operations may continue to show losses and negative cash flow, particularly with the expenses associated with Biovest's continued interim analyses and efforts to seek marketing/regulatory approval for BiovaxID. There is no assurance that the additional required funds can be obtained on terms acceptable or favorable to Biovest, if at all. The audit opinion issued by Biovest's independent auditors with respect to Biovest's consolidated financial statements for the 2012 fiscal year indicates that there is substantial doubt about Biovest's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Biovest expects to receive a similar audit opinion from Biovest's independent auditors with respect to Biovest's financial statements for the 2013 fiscal year.

Biovest's ability to achieve and sustain profitability is to a large degree dependent on obtaining regulatory approval to market BiovaxID. Biovest may not be successful in its efforts to develop and commercialize BiovaxID. Moreover, Biovest's operations may not be profitable even if BiovaxID is commercialized.

*Biovest's independent registered public accountants have expressed substantial doubt as to Biovest's ability to continue as a going concern.* As of September 30, 2012, Biovest had a working capital deficit of $40.6 million. Biovest has a significant amount of debt, approximately $27.7 million of which matured on November 17, 2012 as discussed herein. Biovest expects to continue to incur substantial net operating losses at least until BiovaxID receives regulatory/marketing approval and acceptance, which may never occur. Continued operating losses would impair Biovest's ability to continue operations. Biovest may not be able to generate sufficient product revenue to become profitable on a sustained basis, or at all. Biovest has operating and liquidity concerns due to its significant net losses and negative cash flows from operations. As a result of these and other factors, Biovest's independent registered public accountants, Cherry, Bekaert and Holland, L.L.P., have indicated, in their report to Biovest's 2012 fiscal year financial statements, that there is substantial doubt about Biovest's ability to continue as a going concern. Biovest's ability to continue as a going concern is dependent upon generating sufficient cash flow to conduct operations and obtaining additional capital and financing. Any financing activity is likely to result in significant dilution to current shareholders. Biovest's financial statements have been prepared assuming Biovest will continue as a going

concern and does not include any adjustments that might result from the outcome of this uncertainty. Biovest incurred net losses of $11.8 million and $15.3 million in the 2012 and 2011 fiscal years, respectively. Biovest has also experienced negative cash flows from operations for the past three fiscal years. In addition, Biovest's projected cash receipts from operations for the 2013 fiscal year are anticipated to be insufficient to finance operations without funding from other sources. Historically, Biovest has had difficulty in meeting its cash requirements. Biovest has, in part, met Biovest's cash requirements through proceeds from its cell culture and instrument manufacturing activities, various financing transactions, the use of cash on hand, short-term borrowings (primarily from affiliates), and by trade-vendor credit. There can be no assurances that management will obtain the necessary funding, reduce the level of historical losses or achieve successful commercialization of product candidates. Continuation as a going concern is ultimately dependent upon achieving profitable operations and positive operating cash flows sufficient to pay all obligations as they come due.

*Biovest's business could be adversely affected or Biovest could fail, if Biovest is unable to service Biovest's obligations under Biovest's incurred indebtedness.* Biovest's ability to pay interest and principal amounts when due or to comply with debt covenants will depend upon, among other things, continued commercial success of its product candidates, access to funding when required, the ability to enter into business or strategic relationships, and other factors that affect Biovest's future financial and operating performance, including, without limitation, prevailing economic conditions and financial, business, and regulatory factors, many of which are beyond Biovest's control. On November 17, 2012, approximately $27.7 million of Biovest's debt matured and accordingly Biovest is currently in default under a portion of those debt instruments.

If Biovest is unable to generate sufficient cash flow to meet the debt service requirements under its incurred indebtedness, Biovest may be forced to take actions such as:

- restructuring or refinancing Biovest's debt;
- seeking additional debt or equity capital;
- reducing or delaying Biovest's business activities, acquisitions, investments or capital expenditures, including research and development expenditures;
- selling assets, businesses, products or other potential revenue streams; or
- seeking protection(s) under United States bankruptcy laws.

Such measures might not be successful and might not enable Biovest to service its obligations under its indebtedness. In addition, any such financing, refinancing or sale of assets might not be available on economically favorable terms.

*Biovest's operating results may fluctuate widely between reporting periods.* Biovest's operating results may vary significantly from quarter-to-quarter or year-to-year, depending on factors such as timing of biopharmaceutical development and commercialization of products by Biovest's customers, the timing of increased research and development and sales and marketing expenditures, the timing and size of contracts and whether Biovest introduces to the market new products or processes. Consequently, revenues, profits or losses may vary significantly from quarter-to-quarter or year-to-year, and revenue, profits or losses in any period will not necessarily be indicative of results in subsequent periods. These period-to-period fluctuations in

financial results may have a significant impact on the market price, if any, of Biovest's securities.

*Biovest anticipates that it will need substantial additional funding in the future, and if Biovest is unable to raise capital when needed, Biovest would be forced to delay, reduce, or eliminate Biovest's product development programs or commercialization efforts.* During prior years, Biovest met its cash requirements through the use of cash on hand, the sale of common stock, and short-term loans from affiliates and third-parties. In addition, Biovest is obligated to pay royalties on certain of its biologic products which will reduce profit.

Developing biopharmaceutical products, conducting clinical trials, establishing manufacturing capabilities, and marketing developed products is expensive. Biovest anticipates that it will need to raise substantial additional capital in the future in order to complete the commercialization of Biovest's product candidates, to continue to pursue the submission of regulatory/marketing approval applications in various jurisdictions for Biovest's product candidates, and to fund the development and commercialization of Biovest's product candidates. Further, Biovest anticipates that Biovest will need to raise substantial additional capital, expected to be in a range exceeding $15 million to as much as $40 million, in order to conduct the second Phase 3 clinical trial for BiovaxID pursuant to Biovest's formal guidance meeting from the FDA. Additional sources of funding have not been established; however, additional financing is currently being sought from a number of sources, including the sale of equity or debt securities, strategic collaborations, recognized research funding programs, as well as domestic and/or foreign licensing of BiovaxID.

The capital requirements for Biovest's operations have been and will continue to be significant. Biovest's ability to generate cash from operations is dependent upon, among other things, increased demand for Biovest's product candidates and services and the successful development of direct marketing and product distribution capabilities. Biovest's ability to obtain required funding from debt or equity funding is dependent on numerous factors and is considered uncertain. There can be no assurance that Biovest will have sufficient capital resources to implement Biovest's business plan and Biovest may need additional external debt and/or equity financing to fund Biovest's future operations.

Biovest expects to seek additional financing from a number of sources, including but not limited to public or private equity offerings, debt financings, or corporate collaboration and licensing arrangements. To the extent that Biovest raises additional funds by issuing equity securities, Biovest's stockholders may experience additional dilution, and debt financing, if available, may involve restrictive covenants. If Biovest raises funds through the issuance of equity securities, Biovest's current shareholders' equity interests could be substantially diminished. If Biovest raises additional funds through collaboration and licensing arrangements, it may be necessary to relinquish some of Biovest's rights to its technologies or its product candidates or grant licenses on terms that are not favorable to Biovest. Biovest cannot be certain that additional funding will be available on acceptable terms, or at all. If adequate funds are not available from the foregoing sources, Biovest may consider additional strategic financing options, including sales of assets or business units that are non-essential to the ongoing development or future commercialization of BiovaxID, or Biovest may be required to delay,

reduce the scope of, or eliminate one or more of its research or development programs or curtail some of its commercialization efforts.

*Biovest has incurred significant costs in Biovest's development efforts to date and may never generate significant revenue from commercial sales of BiovaxID and Biovest's product candidates, if approved.* Biovest expended significant time and funds in conducting the Phase 3 clinical trial in BiovaxID and the development of its other product candidates. Biovest expects to continue to expend significant sums in its development efforts of its product candidates. Biovest expects to continue to incur significant operating expenses and capital expenditures as Biovest:

- conducts clinical trials;
- conducts research and development on existing and new product candidates;
- seeks regulatory/marketing approvals for Biovest's product candidates;
- commercializes Biovest's product candidates, if approved;
- hires additional clinical, scientific, sales and marketing and management personnel; and
- identifies and licenses additional product candidates.

If Biovest's product candidates fail in clinical trials or do not gain regulatory/marketing approval or gain regulatory/marketing approval for more restricted indications than Biovest has anticipated, Biovest may not generate significant revenues from any of its product candidates. In addition, Biovest may continue to experience net losses for the foreseeable future, in which case Biovest's accumulated deficit will continue to increase, and Biovest may exhaust its resources and be unable to complete the development of its product candidates. If Biovest is unable to fund the continuing development of its product candidates or if Biovest fails to generate significant revenues from any of its product candidates, Biovest's shareholders could lose all or part of their investment in Biovest.

*Biovest is largely dependent on the success of BiovaxID and Biovest may not be able to successfully commercialize BiovaxID.* Biovest has expended and will continue to expend significant time, money, and effort on the development of BiovaxID and its other product candidates. Biovest will incur significant costs and may never generate significant revenues from commercial sales of BiovaxID, if approved and its other product candidates. BiovaxID has not been approved for marketing in any jurisdiction and it may never be commercialized. Before Biovest can market and sell BiovaxID in the United States, Biovest will need to complete a second Phase 3 clinical trial.

If Biovest fails to successfully commercialize BiovaxID, it may be unable to generate sufficient revenue to sustain and grow its business, and Biovest's business, financial condition, and results of operations will be adversely affected.

*Before regulatory/marketing approval can be sought in the United States for BiovaxID Biovest must successfully complete additional clinical trials, outcomes of which are uncertain.* In July 2012, Biovest conducted a formal clinical meeting with the FDA in order to define the path for BiovaxID's United States regulatory approval. Further in its guidance, the FDA required that Biovest conduct a second Phase 3 clinical trial to complete the clinical data gained

through Biovest's first Phase 3 clinical trial and Biovest's BiovaxID development program to support the filing of its BLA for BiovaxID. Biovest is preparing to initiate this second Phase 3 clinical trial to advance BiovaxID toward the United States market, subject to availability of funding.

Conducting clinical trials is a lengthy, time-consuming, and expensive process, and the results of these trials are inherently uncertain. The time required to complete necessary clinical trials is often difficult, if not impossible, to predict. Biovest's commencement and rate of completion of clinical trials may be delayed by many factors, including:

- ineffectiveness of Biovest's product candidates or perceptions by physicians that the product candidates are not safe or effective for a particular indication;
- inability to manufacture sufficient quantities of the product candidates for use in clinical trials;
- delay or failure in obtaining approval of Biovest's clinical trial protocols from the FDA or institutional review boards;
- slower than expected rate of patient recruitment and enrollment;
- inability to adequately follow and monitor patients after treatment;
- difficulty in managing multiple clinical sites;
- unforeseen safety issues;
- government or regulatory delays; and
- clinical trial costs that are greater than Biovest currently anticipates.

Even if Biovest achieves positive interim results in clinical trials, these results do not necessarily predict final results, and positive results in early clinical trials may not be indicative of success in later clinical trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials, even after promising results in earlier clinical trials. Negative or inconclusive results or adverse medical events during a clinical trial could cause Biovest to repeat or terminate a clinical trial or require Biovest to conduct additional clinical trials. Biovest does not know whether any future clinical trials will demonstrate safety and efficacy sufficiently to result in marketable product candidates. Biovest's clinical trials may be suspended at any time for a variety of reasons, including if the FDA or Biovest believe the patients participating in Biovest's clinical trials are exposed to unacceptable health risks or if the FDA finds deficiencies in the conduct of these clinical trials.

Failures or perceived failures in Biovest's clinical trials will directly delay its product development and regulatory approval process, damage its business prospects, make it difficult for Biovest to establish collaboration and partnership relationships, and negatively affect Biovest's reputation and competitive position in the pharmaceutical community.

*If Biovest fails to obtain regulatory and/or marketing approval of BiovaxID or any of Biovest's product candidates, Biovest will be unable to commercialize these products.* Development, testing, manufacturing and marketing of pharmaceutical products are subject to extensive regulation by numerous governmental authorities in the United States and in other foreign countries. The process of obtaining FDA regulatory approval of pharmaceutical products is costly and time consuming. Any new pharmaceutical product must undergo rigorous preclinical and clinical testing and an extensive regulatory approval process mandated by the

FDA. Such regulatory review includes the determination of manufacturing capability and product performance.

Biovest intends to seek regulatory approval from the FDA for BiovaxID; however, Biovest does not plan on filing a BLA in the United States until after the completion of Biovest's second Phase 3 clinical trial which is expected to require a number of years to complete. In addition to seeking regulatory approval from the FDA for BiovaxID, Biovest intends to seek the regulatory and marketing approval required to market BiovaxID in the EU, Canada and potentially additional countries and territories. Biovest anticipates commencing the regulatory and marketing applications required in the EU and Canada around the same time. Marketing of BiovaxID in these countries, and in most other countries, is not permitted until Biovest has obtained required approvals or exemptions in each Member State in the EU and each province in Canada. The approval requirements and conditions (i.e., additional development and clinical trials to satisfy regulatory requirements) which each regulatory agency may require could delay or completely frustrate approval. The regulatory approval process for any new drug or biologic, particularly including BiovaxID, is considered robust, challenging and uncertain.

In addition, patient-specific active immunotherapies such as BiovaxID are complex, and regulatory agencies have limited experience with them. To date, the FDA has only approved for marketing two active immunotherapies for treating cancer. This limited precedent and experience may lengthen the regulatory review process and impede Biovest's ability to obtain timely FDA approval for BiovaxID, if it is approved at all. Even if BiovaxID is approved by the FDA, the FDA's limited precedent and experience with respect to a patient-specific active idiotype vaccine may increase Biovest's development costs and otherwise delay or prevent commercialization.

There can be no assurance that the products currently in development, or those products acquired or in-licensed by Biovest, will be approved by the FDA or any foreign regulatory agency. In addition, there can be no assurance that all necessary approvals will be granted for future products or that regulatory review or actions will not involve delays caused by such regulatory agency's request for additional information or testing that could adversely affect the time to market and sale of the products. Any delay in any approval or any failure to obtain approval of a product could delay or impair Biovest's ability to commercialize that product and to generate revenue, as well as increase costs for that product.

*If Biovest does not obtain and maintain regulatory/marketing approval of its product candidates, Biovest will be unable to sell its product candidates.* Changes in law, government regulations and/or policies can have a significant impact on Biovest's results of operations. The discovery, preclinical development, clinical trials, manufacturing, risk evaluation and mitigation strategies, marketing and labeling of pharmaceuticals and biologics are all subject to extensive laws and regulations, including without limitation, the U.S. Federal Food, Drug and Cosmetic Act, the U.S. Public Health Service Act, the Medicare Modernization Act, the Food and Drug Administration Amendments Act, the U.S. Foreign Corrupt Practices Act, the Sherman Antitrust Act, patent laws, environmental laws, privacy laws and other federal and state statutes, including anti-kickback, antitrust and false claims laws, as well as similar laws in foreign jurisdictions. Enforcement of and changes in laws, government regulations and/or policies can have a significant adverse impact on Biovest's ability to commercialize its product candidates and to

introduce new products to the market, which would adversely affect Biovest's results of operations.

If Biovest or Biovest's agents, contractors or collaborators are delayed in receiving, or are unable to obtain all, necessary governmental approvals, Biovest will be unable to effectively market its product candidates.

The testing, marketing and manufacturing of Biovest's product candidates requires regulatory/marketing approval, including approval from the FDA or other United States governmental authorities and other governmental authorities outside of the United States that perform similar roles, including the EMA, and Health Canada.

The regulatory/marketing approval process presents a number of risks to Biovest, principally:

- In general, preclinical tests and clinical trials can take many years, and require the expenditure of substantial resources, and the data obtained from these tests and trials can be susceptible to varying interpretation that could delay, limit or prevent regulatory/marketing approval;
- Delays or rejections may be encountered during any stage of the regulatory process based upon the failure of the clinical or other data to demonstrate compliance with, or upon the failure of the product to meet, a regulatory agency's requirements for safety, efficacy and quality or, in the case of a product seeking an orphan drug indication, because another designee received approval first or received approval of other labeled indications;
- Requirements for regulatory/marketing approval may become more stringent due to changes in regulatory agency policy or the adoption of new regulations or legislation;
- The scope of any regulatory/marketing approval, when obtained, may significantly limit the indicated uses for which a product may be marketed and reimbursed and may impose significant limitations in the nature of warnings, precautions and contra-indications that could materially affect the sales and profitability of the drug;
- Approved products, as well as their manufacturers, are subject to continuing and ongoing review, and discovery of previously unknown problems with these products or the failure to adhere to manufacturing or quality control requirements may result in restrictions on their manufacture, sale or use or in their withdrawal from the market;
- Regulatory authorities and agencies of the United States, the EU, Canada or other foreign governments may promulgate additional regulations restricting the sale of Biovest's product candidates, including specifically tailored risk evaluation and mitigation strategies;
- Guidelines and recommendations published by various governmental and non-governmental organizations can reduce the use of Biovest's product candidates;
- Once a product candidate receives regulatory/marketing approval, Biovest may not market that product candidate for broader or different applications, and the FDA may not grant Biovest approval with respect to separate product applications

that represent extensions of Biovest's basic technology.  In addition, the FDA may withdraw or modify existing approvals in a significant manner or promulgate additional regulations restricting the sale of Biovest's present or proposed product candidates.  The FDA may also request that Biovest perform additional clinical trials or change the labeling of product candidates if Biovest or others identify side effects after Biovest's product candidates are on the market; and

- Biovest's risk evaluation and mitigation strategies, labeling and promotional activities relating to its product candidates as well as its post-marketing activities will be regulated by the FDA, the Federal Trade Commission, the U.S. Department of Justice, the Drug Enforcement Agency, state regulatory agencies and foreign regulatory agencies and are subject to associated risks.  In addition, individual states, acting through their attorneys general, have become active as well, seeking to regulate the marketing of prescription drugs under state consumer protection and false advertising laws.  If Biovest fails to comply with regulations regarding the promotion and sale of its product candidates, appropriate distribution of its product candidates under Biovest's restricted distribution systems, prohibition on off-label promotion and the promotion of unapproved products, such agencies may bring enforcement actions against Biovest that could inhibit its commercial capabilities as well as result in significant penalties.

Other matters that may be the subject of governmental or regulatory action which could adversely affect Biovest's business include:

- changes in laws and regulations, including without limitation, patent, environmental, privacy, health care and competition laws;
- importation of prescription drugs from outside the United States at prices that are regulated by the governments of various foreign countries;
- additional restrictions on interactions with healthcare professionals; and
- privacy restrictions that may limit Biovest's ability to share data from foreign jurisdictions.

*Even if approved, BiovaxID may be subject to promotional limitations.*  Biovest may not be able to obtain the labeling claims necessary or desirable for the promotion of its product candidates.  The FDA and foreign regulatory agencies have the authority to impose significant restrictions on an approved product through the product label and allowed advertising, promotional and distribution activities.  Regulatory agencies also may approve a product for fewer or more limited indications than are requested or may condition approval on the performance of post-approval clinical studies.  Biovest may also be required to undertake pre-approval and/or post-marketing clinical trials.  There may be monetary penalties if post-approval requirements are not fulfilled.  If the results of such post-marketing studies are not satisfactory, regulatory agencies may withdraw regulatory authorization or may condition continued marketing on commitments from Biovest that may be expensive and/or time consuming to fulfill.  Even if Biovest receives FDA and/or other foreign regulatory/marketing approvals, if Biovest or others identify adverse side effects after any of its product candidates are on the market, or if manufacturing problems occur, regulatory/marketing approval may be withdrawn and reformulation of Biovest's product candidates, additional clinical trials, changes in labeling of its product candidates and additional regulatory/marketing applications may be required.

*There is a high risk of failure because Biovest are trying to develop a new anti-cancer vaccine.* Biovest is pursuing a novel patient-specific cancer therapy. Commercialization requires governmental approval, establishment of cost effective production capability, distribution capability and market acceptance. BiovaxID is subject to all of the risks of failure that are inherent in developing products based on new technologies and the risks generally associated with drug development. These risks include the possibility that:

- Biovest's technology or the product based on its technology will be ineffective or toxic, or otherwise fail to receive necessary regulatory/marketing approvals;
- future products based on Biovest's technology will be difficult to manufacture on a large scale or at all or will prove to be uneconomical to produce or market;
- proprietary rights of third parties will prevent Biovest or Biovest's collaborators from marketing products;
- third parties will market superior or equivalent products;
- technology advances will render Biovest's technology or product outdated or less attractive; and
- the products will not attain market acceptance.

Drug development, including clinical trials required for domestic and foreign governmental approval, is expensive and new drugs have a high risk of failure. Based on results at any stage of development, including later-stage clinical trials and Biovest's inability to bear the related costs associated with product development or product production or marketing, Biovest may decide to discontinue development or clinical trial at any time.

Preparing for and processing the MAA, NDS and BLA for BiovaxID will be expensive and time consuming. The regulatory agencies responses to any application are uncertain may be rejected or denied, or may impose additional requirements. Such additional requirements may be expensive and/or time consuming, and meeting these additional requirements may be difficult or impossible.

*Biovest might be unable to manufacture Biovest's drug candidates on a commercial scale, even if approved.* Assuming approval of BiovaxID, manufacturing, supply and quality control problems could arise as Biovest, either alone or with subcontractors, attempt to scale-up manufacturing capabilities for products under development. Biovest might be unable to scale-up in a timely manner or at a commercially reasonable cost. Problems could lead to delays or pose a threat to the ultimate commercialization of Biovest's product candidates and cause Biovest to fail.

Manufacturing facilities, and those of any future contract manufacturers, are or will be subject to periodic regulatory inspections by United States federal and state and foreign regulatory agencies and these facilities are subject to the particular regulatory agency's quality system standards and regulations. If Biovest or Biovest's third-party manufacturers fail to maintain facilities in accordance with the particular regulatory agency's quality system standards and regulations, then the manufacturing process could be suspended or terminated, which would harm Biovest. Biovest currently has only a pilot scale manufacturing facility. If approved in the EU and Canada, Biovest anticipates that it may need additional manufacturing capacity. Adding

manufacturing capacity will be expensive, time consuming and subject to significant regulatory requirements.

*Competing technologies may adversely affect Biovest.* Rituximab is currently part of the standard of care for the treatment of follicular lymphoma. Biovest believes that rituximab containing therapies are well accepted by both physicians and patients and may constitute a significant competitive challenge for Biovest's drug candidate if approved.

Biotechnology has experienced, and is expected to continue to experience, rapid and significant change. The use of monoclonal antibodies as initial or induction therapy, and increasingly for maintenance therapy, has become well-established and generally accepted. Products that are well-established or accepted, including monoclonal antibodies such as Rituxan®, including its expanded approval as a NHL maintenance therapy, may constitute significant barriers to market penetration and regulatory approval which may be expensive, difficult or even impossible to overcome. New developments in biotechnological processes are expected to continue at a rapid pace in both industry and academia, and these developments are likely to result in commercial applications competitive with Biovest's product candidates. Biovest expects to encounter intense competition from a number of companies that offer products in its targeted application area.

Biovest anticipates that its competitors in these areas will consist of both well-established and development-stage companies and will include:

- healthcare companies;
- chemical and biotechnology companies;
- biopharmaceutical companies; and
- companies developing drug discovery technologies.

The cell culture production and technology business is also intensely competitive and is in many areas dominated by large service providers. In many instances, Biovest's competitors have substantially greater financial, technical, research and other resources and larger, more established marketing, sales, distribution and service organizations than Biovest. Moreover, these competitors may offer broader product lines and have greater name recognition than Biovest and may offer discounts as a competitive tactic.

Competitors might succeed in developing, marketing, or obtaining regulatory/marketing approval for technologies, products, or services that are more effective or commercially attractive than those Biovest offers or is developing, or that render Biovest's product candidates or services obsolete. As these companies develop their technologies, they might develop proprietary positions, which might prevent Biovest from successfully commercializing products. Also, Biovest might not have the financial resources, technical expertise or marketing, distribution or support capabilities to compete successfully in the future.

*Biovest's competitors may develop products that are less expensive, safer, or more effective, which may diminish or eliminate the commercial success of any future products that Biovest may commercialize.* Biovest competes with several biopharmaceutical companies, and Biovest's competitors may:

- develop product candidates and market products that are less expensive or more effective than Biovest's future product;
- commercialize competing products before Biovest or Biovest's partners can launch any products developed from Biovest's product candidates;
- initiate or withstand substantial price competition more successfully than Biovest can;
- have greater success in recruiting skilled scientific workers from the limited pool of available talent;
- more effectively negotiate third-party licenses and strategic relationships; and
- take advantage of acquisition or other opportunities more readily than Biovest can.

Biovest will compete for market share against large pharmaceutical and biotechnology companies and smaller companies that are collaborating with larger pharmaceutical companies, new companies, academic institutions, government agencies and other public and private research organizations. Many of these competitors, either alone or together with their partners, may develop new product candidates that will compete with Biovest, and these competitors may, and in certain cases do, operate larger research and development programs or have substantially greater financial resources than Biovest.

If Biovest's competitors market products that are less expensive, safer or more effective than its potential products or that reach the market sooner than Biovest's potential product candidates, Biovest may not achieve commercial success. In addition, the life sciences industry is characterized by rapid technological change. Because Biovest's research approach integrates many technologies, it may be difficult for Biovest to stay abreast of the rapid changes in each technology. If Biovest fails to stay at the forefront of technological change, Biovest may be unable to compete effectively. Biovest's competitors may render Biovest's technologies obsolete by advances in existing technological approaches or the development of new or different approaches, potentially eliminating the advantages in Biovest's drug discovery process that Biovest believes it derives from its research approach and proprietary technologies.

*If Biovest fails to comply with the extensive regulations enforced by the EMA, Health Canada, the FDA and other national and international agencies, the sale of Biovest's product candidates would be prevented or delayed.* Research, pre-clinical development, clinical trials, manufacturing, and marketing of Biovest's product candidates are subject to extensive regulation by various national and international government authorities. Biovest has not received regulatory/marketing approval from any regulatory agency for BiovaxID. The process of obtaining EMA, Health Canada, FDA, and other required regulatory/marketing approvals is lengthy and expensive, and the time required for such approvals is uncertain. The regulatory/marketing approval process is affected by such factors as:

- the severity of the disease;
- the quality of submission;
- the clinical efficacy and safety;
- the strength of the chemistry and manufacturing control of the process;
- the manufacturing facility compliance;

- the availability of alternative treatments;
- the risks and benefits demonstrated in clinical trials; and
- the patent status and marketing exclusivity rights of certain innovative products.

Any regulatory/marketing approvals that Biovest or Biovest's partners receive for Biovest's product candidates may also be subject to limitations on the indicated uses for which the product candidate may be marketed or contain requirements for potentially costly pre-approval and/or post-marketing follow-up studies. The subsequent discovery of previously unknown problems with the product candidate, including adverse events of unanticipated severity or frequency, may result in restrictions on the marketing of the product candidate, and could include withdrawal of the product candidate from the market.

Biovest's United States manufacturing, labeling, storage, and distribution activities also are subject to strict regulation and licensing by all applicable regulatory agencies. Biovest's biopharmaceutical manufacturing facilities are subject to periodic inspection by the FDA, the EMA, Health Canada and the regulatory agencies of any other jurisdiction where Biovest's product candidate may in the future be marketed. Biovest may receive notices of deficiencies from these agencies as a result of such inspections. Biovest's failure or the failure of its biopharmaceutical manufacturing facilities to continue to meet regulatory standards or to remedy any deficiencies could result in corrective action regulatory agencies, including the interruption or prevention of marketing, closure of Biovest's biopharmaceutical manufacturing facilities, and fines and/or penalties.

Regulatory authorities also will require post-marketing surveillance to monitor and report to them potential adverse effects of Biovest's product candidates. The U.S. Congress or the FDA in specific situations can modify the regulatory process. Once approved, a product's failure to comply with applicable regulatory requirements could, among other things, result in warning letters, fines, suspension or revocation of regulatory approvals, product recalls or seizures, operating restrictions, injunctions, and criminal prosecutions.

The policies of all other applicable regulatory agency, may change and additional government regulations may be enacted that could prevent or delay regulatory/marketing approval of Biovest's product candidates. Biovest cannot predict the likelihood, nature or extent of adverse government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If Biovest is not able to maintain regulatory compliance, it might not be permitted to market its product candidates and its business could suffer.

Distribution of Biovest's product candidates outside the United States is subject to extensive government regulation. These regulations, including the requirements for approvals or clearance to market, the time required for regulatory review and the sanctions imposed for violations, vary from country to country. There can be no assurance that Biovest will obtain regulatory approvals in such countries or that Biovest will not be required to incur significant costs in obtaining or maintaining these regulatory approvals. In addition, the export by Biovest of certain of its product candidates that have not yet been cleared for domestic commercial distribution may be subject to FDA export restrictions. Failure to obtain necessary regulatory approvals, the restriction, suspension or revocation of existing approvals or any other failure to comply with regulatory requirements would impair Biovest's ability to generate revenue,

increase Biovest's compliance costs, and have a material adverse effect on Biovest's future business, financial condition, and results of operations.

*Biovest's clinical trials for BiovaxID were not regarded by the FDA as conclusive and the FDA has required Biovest to conduct a second Phase 3 clinical trial for BiovaxID.* In July 2012, Biovest conducted a formal clinical meeting with the FDA in order to define the path for BiovaxID's United States marketing approval. In its guidance, the FDA required that Biovest conduct a second Phase 3 clinical trial to complete the clinical data gained through Biovest's Phase 3 clinical trial and Biovest's BiovaxID development program to support the filing of the BLA for BiovaxID. Biovest is preparing to initiate this second Phase 3 clinical trial to advance BiovaxID toward the United States market, subject to availability of funding and regulatory requirements. Biovest continues to advance its efforts to comply with various regulatory validations and comparability requirements related to its manufacturing process and facility. However, no assurance can be given that substantial additional requirements will not be imposed by the FDA for the approval of BiovaxID. Biovest will experience significant additional costs and delay due to Biovest's second Phase 3 clinical trial, which may frustrate, delay, or render impossible marketing approval or commercialization.

*The NCI is not precluded from working with other companies on developing products that are competitive with BiovaxID.* BiovaxID is based on research and studies conducted at the NCI. The concept of producing a patient-specific anti-cancer vaccine through the hybridoma method from a patient's own cancer cells has been discussed in a variety of publications over a period of many years, and, accordingly, the general method and concept of such a vaccine is not eligible to be patented by Biovest, the NCI, or any other party. Until November 2006, Biovest was a party to a CRADA with the NCI for the development of a hybridoma-based patient-specific idiotypic vaccine for the treatment of indolent follicular lymphoma. Although the NCI transferred sponsorship of the IND for BiovaxID to Biovest in 2004, and although there are certain confidentiality protections for information generated pursuant to the CRADA, the CRADA does not prevent the NCI from working with other companies on other hybridoma-based idiotypic vaccines for indolent follicular lymphoma or other forms of cancer, and the NCI or its future partners may be able to utilize certain technology developed under Biovest's prior CRADA. If the NCI chooses to work with other companies in connection with the development of such a vaccine, such other companies may also develop technology and know-how that may ultimately enable such companies to develop products that compete with BiovaxID.

Additionally, through their partnership with the NCI, these companies could develop immunotherapies for other forms of cancer that may serve as barriers to any future product candidates that Biovest may develop for such indications.

*Biovest has been dependent on a sole-source supplier for KLH, a critical raw material used in the manufacture of BiovaxID, and physicians who administer BiovaxID depend on a sole-source supplier for GM-CSF, an immune system stimulant administered with BiovaxID.* Biovest has been dependent on a sole-source supplier for KLH, a critical raw material used in the manufacture of BiovaxID, and physicians who administer BiovaxID depend on a sole-source supplier for GM-CSF, an immune system stimulant administered with BiovaxID. In particular, the manufacture of BiovaxID requires KLH, a foreign carrier protein. Biovest has historically purchased KLH from BioSyn Arzneimittel GmbH ("BioSyn"), which was a single source

supplier. Biovest had entered into a supply agreement with BioSyn during its Phase 3 clinical trial of BiovaxID, pursuant to which BioSyn agreed to supply Biovest with KLH. That supply agreement has terminated, and Biovest is currently evaluating a potential agreement with BioSyn to supply Biovest with the amounts of KLH necessary for commercialization. Additionally, Biovest has become aware of alternative suppliers who now market KLH and is also currently evaluating these potential suppliers and determining the steps necessary to confirm the equivalence of their product with the KLH supplied by BioSyn. However, Biovest has not yet established a relationship with these suppliers and Biovest has not completed testing to insure that the KLH supplied by them is suitable for use in the BiovaxID production process.

When BiovaxID is administered, the administering physician uses a cytokine to enhance the patient's immune response, and this cytokine is administered concurrently with BiovaxID. The cytokine used by physicians for this purpose is GM-CSF. GM-CSF is a substance that is purchased by the administering physician and is administered with an antigen to enhance or increase the immune response to that antigen. The physicians who administer BiovaxID will rely on Genzyme Corporation ("<u>Genzyme</u>"), as a supplier of GM-CSF, and these physicians will generally not have the benefit of a long-term supply contract. Currently, GM-CSF is not commercially available from other sources in the United States. While KLH and GM-CSF are generic products, Biovest may purchase and include GM-CSF in its product packaging and if so would be responsible for regulatory compliance issues.

Establishing additional or replacement suppliers for these materials or components may require a substantial amount of time. In addition, Biovest may have difficulty obtaining similar components from other suppliers that are acceptable to the specific regulatory agencies.

If Biovest has to switch to a replacement supplier, Biovest may face additional regulatory delays and the manufacture and delivery of BiovaxID could be interrupted for an extended period of time, which may delay commercialization of BiovaxID. If, Biovest is unable to obtain adequate amounts of these components, Biovest may be required to obtain regulatory clearance from the specific regulatory agencies to use different components that may not be as safe or as effective. As a result, regulatory/marketing approval of BiovaxID may be suspended or delayed or may not be received at all. All these delays could cause delays in commercialization of BiovaxID, delays in Biovest's ability to generate revenue from BiovaxID, and increased costs.

*GM-CSF is not approved for commercial sale outside of the United States. Therefore, if foreign regulatory agencies require GM-CSF to be administered along with BiovaxID, then GM-CSF must also be approved in those particular foreign countries.* To enhance or increase a patient's immune response, GM-CSF is administered by the patient's physician concurrently with BiovaxID. If a foreign regulatory agency requires the administration of GM-CSF concurrently with BiovaxID to approve Biovest's regulatory/marketing approval application(s), then in order to achieve regulatory/marketing approval for BiovaxID in that foreign market, GM-CSF must also receive regulatory/marketing approval in that foreign market. GM-CSF is currently only approved for sale in the United States, and is currently not approved for sale in any foreign markets. As a result, foreign regulatory/marketing approval of BiovaxID may be suspended or delayed or may not be received at all. These delays could cause delays in the foreign commercialization of BiovaxID, delays in Biovest's ability to generate revenue from

BiovaxID, and increased costs. Biovest may purchase and include GM-CSF in its product packaging, and if so, would be responsible for regulatory compliance issues.

*Biovest may experience difficulties in manufacturing BiovaxID or in obtaining regulatory/marketing approval of the change in Biovest's manufacturing site or process from the FDA or international regulatory agencies, which could prevent or delay Biovest in the commercialization of BiovaxID.* Manufacturing BiovaxID is complex and requires coordination internally among Biovest's employees, as well as externally with physicians, hospitals and third-party suppliers and carriers. This process involves several risks that may lead to failures or delays in manufacturing BiovaxID, including:

- difficulties in obtaining adequate tumor samples from physicians;
- difficulties in timely shipping of tumor samples to Biovest or in the shipping of BiovaxID to the treating physicians due to errors by third-party carriers, transportation restrictions, or other reasons;
- destruction of, or damage to, tumor samples or BiovaxID during the shipping process due to the improper handling by third-party carriers, hospitals, physicians or Biovest;
- destruction of, or damage to, tumor samples or BiovaxID during storage at Biovest's facility; and
- difficulties in ensuring the availability, quality, and consistency of materials provided by Biovest's suppliers.

If Biovest experiences any difficulties in manufacturing BiovaxID, the commercialization of BiovaxID may be delayed, resulting in delays in generating revenue and increased costs. In addition, because Biovest has relocated the site of the manufacturing process to its Minneapolis (Coon Rapids), Minneapolis facility following the BiovaxID Phase 3 clinical trial, Biovest is required to demonstrate to the FDA that the product developed under new conditions is comparable to the product that was the subject of earlier clinical testing. This requirement applies to the relocation at the Minneapolis (Coon Rapids), Minneapolis facility, as well as future expansion of the manufacturing facility, such as the possible expansion to additional facilities that may be required for successful regulatory/marketing approvals or commercialization of the vaccine, resulting in increased costs. There is also a requirement for validation of the manufacturing process for BiovaxID utilizing Biovest's AutovaxID instrument.

A showing of comparability requires data demonstrating that the product is consistent with that produced for the clinical trial and continues to be safe, pure, and potent and may be based on chemical, physical, and biological assays and, in some cases, other non-clinical data. This demonstration is based on various methods, as recommended in the FDA and International Conference of Harmonisation ("ICH") regulatory guidelines. If Biovest demonstrates chemistry, manufacturing and controls ("CMC") comparability, additional clinical safety and/or efficacy trials with the new product may not be needed. Applicable regulatory agencies will determine if comparability data are sufficient to demonstrate that additional clinical studies are unnecessary. If these agencies require additional clinical safety or efficacy trials to demonstrate comparability, Biovest's clinical trials or FDA approval of BiovaxID may be delayed, which would cause delays in generating revenue and increased costs.

*The ongoing detailed analyses being performed in Biovest's clinical trials for BiovaxID may produce negative or inconclusive results and may delay its efforts to obtain regulatory/marketing approval.* Biovest is currently engaged in performing additional detailed analyses of the safety and efficacy data generated by Biovest's Phase 2 and Phase 3 clinical trials of BiovaxID in follicular lymphoma and Biovest's Phase 2 clinical trial of BiovaxID in mantle cell lymphoma. Biovest cannot predict with certainty the results of the analyses, and if the results are negative or inconclusive Biovest may decide, or regulators may require Biovest, to conduct additional clinical and/or preclinical testing for BiovaxID or cease its clinical trials. If this happens, Biovest may not be able to obtain regulatory/marketing approval for BiovaxID for follicular lymphoma, mantle cell lymphoma or both, or the anticipated time to market for this product may be substantially delayed, and Biovest may also experience significant additional development costs.

*Inability to obtain regulatory/marketing approval for Biovest's manufacturing facility or to manufacture on a commercial scale may delay or disrupt its commercialization efforts.* Before Biovest can obtain domestic or foreign regulatory/marketing approval for any new drug, the manufacturing facility for the drug must be inspected and approved by the particular regulatory agency. Biovest plans to establish a dedicated BiovaxID manufacturing facility within Biovest's existing Minneapolis (Coon Rapids), Minnesota leasehold space. Therefore, before Biovest can obtain the regulatory agency's approval necessary to allow Biovest to begin commercially manufacturing BiovaxID, Biovest must pass a pre-approval inspection of its BiovaxID manufacturing facility by the particular regulatory agency. In order to obtain approval, Biovest will need to ensure that all of its processes, methods, and equipment are compliant with the cGMP, and perform extensive audits of vendors, contract laboratories, and suppliers. The cGMP requirements govern quality control of the manufacturing process and documentation policies and procedures. Biovest has undertaken steps towards achieving compliance with these regulatory requirements required for commercialization. In complying with cGMP, Biovest will be obligated to expend time, money, and effort in production, record keeping, and quality control to assure that BiovaxID meets applicable specifications and other requirements. If Biovest fails to comply with these requirements, Biovest could experience product liability claims from patients receiving BiovaxID, Biovest might be subject to possible regulatory action and Biovest may be limited in the jurisdictions in which it is permitted to sell BiovaxID.

In order to commercialize BiovaxID, Biovest will need to develop and qualify one or more additional manufacturing facilities. Preparing a facility for commercial manufacturing may involve unanticipated delays, and the costs of complying with state, federal and foreign regulatory authorities' regulations may be higher than Biovest anticipates. In addition, any material changes Biovest makes to the manufacturing process may require approval by the state, federal, and foreign regulatory authorities. Obtaining these approvals is a lengthy, involved process, and Biovest may experience delays. Such delays could increase costs and adversely affect Biovest's business. In general, the domestic and foreign regulatory authorities view cGMP standards as being more rigorously applied as products move forward in development and commercialization. In seeking to comply with these standards, Biovest may encounter problems with, among other things, controlling costs and quality control and assurance. It may be difficult to maintain compliance with cGMP standards as the development and commercialization of BiovaxID progresses, if it progresses.

102

Biovest and its product candidates are subject to comprehensive regulation by the domestic and foreign regulatory agencies. These regulatory agencies and other federal and state entities regulate, among other things, the preclinical and clinical testing, safety, approval, manufacture, labeling, marketing, export, storage, record keeping, advertising and promotion of Biovest's product candidates. If Biovest violates regulatory requirements at any stage, whether before or after regulatory/marketing approval is obtained, Biovest may be subject to forced removal of a product from the market, product seizure, civil and criminal penalties and other adverse consequences.

*The BiovaxID clinical trials may demonstrate that certain side effects may be associated with this treatment and ongoing or future clinical trials may reveal additional unexpected or unanticipated side effects.* Biovest cannot guarantee that its current or future clinical trials for BiovaxID will not demonstrate additional adverse side effects that may delay or even preclude regulatory/marketing approval. Even if BiovaxID receives regulatory/marketing approval from any jurisdiction, if Biovest or others identify previously unknown side effects following approval, regulatory/marketing approval could be withdrawn and sales of BiovaxID could be significantly reduced.

*Biovest is not able to prevent third parties, including potential competitors, from developing and selling an anti-cancer vaccine for NHL having the same composition of matter as BiovaxID.* Biovest's BiovaxID vaccine is based on research and studies conducted the NCI. As a result of published studies, the concept of the vaccine and its composition are in the public domain and cannot be patented by Biovest, the NCI, or any other party. Biovest has filed United States and foreign patents applications on certain features of the integrated production and purification system used to produce and purify the vaccine in an automated closed system. Biovest has obtained an exclusive worldwide license from Stanford University for use of a proprietary cell line which Biovest uses to manufacture BiovaxID, but Biovest cannot be certain that Biovest will be successful in preventing others from utilizing this cell line or will be able to maintain and enforce the exclusive license in all jurisdictions. Biovest cannot prevent other companies using different manufacturing processes from developing active immunotherapies that directly compete with BiovaxID. However, as a result of the FDA's Orphan Drug designation for the treatment of follicular lymphoma, mantle cell lymphoma and WM, Biovest have seven (7) years of market exclusivity in the United States from the date of FDA marketing approval for these three subtypes of B-cell NHL. Biovest has ten (10) years of market exclusivity in the EU as a result of the EMA's Orphan Medicinal Product designation for the treatment of follicular lymphoma and mantle cell lymphoma.

Several companies, such as Spectrum Pharmaceutical, Inc., GlaxoSmithKline, Genentech, Inc., Corixa Corporation, Biogen Idec, and Immunomedics, Inc., are involved in the development of passive immunotherapies for NHL. These passive immunotherapies include Rituxan®, a monoclonal antibody, and Zevalin®, which are passive radioimmunotherapy products. Passive immunotherapies, particularly Rituxan, are well accepted and established in the treatment of NHL and as such will impact both regulatory considerations and market penetration.

*Biovest is developing cell-based manufacturing instruments. The development of such instruments is subject to numerous risks and uncertainties.* Biovest is developing cell-based manufacturing instruments. The development of such instruments is subject to numerous risks and uncertainties including the availability of funds required to support ongoing engineering, development and marketing; the ability of Biovest's instruments to meet the requirements or expectations of potential customers; Biovest's ability to meet the requirements of agencies of the DOD that currently support ongoing development efforts; the acceptance of Biovest's instruments by potential customers and various risks associated with engineering and developing new instruments. In Biovest's efforts to develop cell-based instruments, Biovest has to a large degree relied upon contracts and CRADAs with various agencies of the DOD. Biovest's ability to obtain additional contracts and or agreements from such agencies and/or its ability to perform existing and future arrangements to the satisfaction of such agencies is uncertain and therefore represents a risk associated with its development efforts.

There are many kinds of technologies for the manufacture of cell-based products. The technology relied upon by Biovest's instruments and development efforts is referred to as hollow fiber perfusion which is not widely accepted for large-scale manufacturing and, notwithstanding Biovest's development efforts, may not become widely accepted in the future. Biovest's hollow fiber bioreactors must compete with many other kinds of cell-based manufacturing instruments including, but not limited to, stirred-tank reactors; airlift fermentors; roller bottles; packed bed reactors; two-chamber reactors; ceramic matrix systems; batch fermentation techniques; and WAVE bioreactors. There can be no assurance that Biovest's hollow fiber systems will gain widespread acceptance competing with these other established technologies marketed by industry leaders such as General Electric, Lonza, 3M, Sartorius Stedim, Thermo Scientific and Sandoz Biopharmaceuticals.

Competition for cell-based instruments is intense. Most of the developers, manufacturers and marketers of cell-based manufacturing instruments are much larger, more entrenched with potential customers and better financed than Biovest which places Biovest at a competitive disadvantage.

*Biovest's contract cell production services are subject to the potential of product liability claims.* The contract production services for therapeutic products that Biovest offers exposes Biovest to a potential risk of liability as the proteins or other substances manufactured by Biovest, at the request of and to the specifications of Biovest's customers, could potentially cause adverse effects. Biovest generally obtains agreements from its contract production customers indemnifying and defending Biovest from any potential liability arising from such risk. There can be no assurance, however, that Biovest will be successful in obtaining such agreements in the future or, that such indemnification agreements will adequately protect Biovest against potential claims relating to such contract production services. Biovest may also be exposed to potential product liability claims by users of its product candidates. Biovest may seek to increase its liability insurance coverage in the future in the event of any significant increases in its level of contract production services. There can be no assurance that Biovest will be able to maintain its existing coverage or obtain additional coverage on commercially reasonable terms, or at all, or that such insurance will provide adequate coverage against all potential claims to which Biovest might be exposed. A successful partially or completely uninsured claim against Biovest would have a material adverse effect on its operations.

*Biovest's contract cell production business is subject to intense competition.* The contract cell production business is highly competitive. Customers can select other cell production facilities, other cell production methods and other cell production instruments. Biovest considers its business environment to be competitive. Many of Biovest's competitors are better established with greater capital resources. Historically, Biovest's cell production facilities, method and equipment have been primarily used to produce relatively small batches, such as those used in research and development. While Biovest is seeking broader acceptance of its cell production facilities, method and equipment for larger and commercial scale production, Biovest may not be successful in cost effectively penetrating these larger markets.

*Biovest uses hazardous materials in its business. Any claims relating to improper handling, storage or disposal of these materials could be costly and time consuming.* Biovest's manufacturing, clinical laboratory, and research and development processes involve the storage, use and disposal of hazardous substances, including hazardous chemicals and biological hazardous materials. Because Biovest handles bio-hazardous waste with respect to its contract production services, Biovest is required to conform to its customers' procedures and processes to the standards set by the EPA, as well as those of local environmental protection authorities. Accordingly, Biovest is subject to federal, state and local regulations governing the use, manufacture, storage, handling and disposal of materials and waste products. Although Biovest believes that its safety and environmental management practices and procedures for handling and disposing of these hazardous materials are in accordance with good industry practice and comply with applicable laws, permits, licenses and regulations, the risk of accidental environmental or human contamination or injury from the release or exposure of hazardous materials cannot be completely eliminated. In the event of an accident, Biovest could be held liable for any damages that result, including environmental clean-up or decontamination costs, and any such liability could exceed the limits of, or fall outside the coverage of, its insurance. Biovest may not be able to maintain insurance on acceptable terms, or at all. Biovest could be required to incur significant costs to comply with current or future environmental and public and workplace safety and health laws and regulations.

*The success of Biovest's instruments and disposables business may be dependent in large part upon the continued provision of development services to governmental agencies.* Biovest is collaborating with government agencies to further develop Biovest's AutovaxID system and explore the potential production of additional vaccines, including vaccines for viral indications such as influenza. These development activities are being undertaken pursuant to contracts, such as a CRADA, with government agencies. Accordingly, these development activities are subject to the inherent risks associated with government contracts, including complying with the government contracting process and the government budgeting process. The success of Biovest's instruments and disposables business for the foreseeable future may depend in large part on continued development activities and contracts with government agencies.

*Biovest's proprietary rights may not adequately protect Biovest's technologies and product candidates.* Biovest's commercial success will depend in part on obtaining and maintaining patent protection and trade secret protection of Biovest's technologies and product candidates as well as successfully defending these patents against third-party challenges. Biovest will only be able to protect Biovest's technologies and product candidates from

unauthorized use by third parties to the extent that valid and enforceable patents or trade secrets cover them. Furthermore, the degree of future protection of Biovest's proprietary rights is uncertain because legal means afford only limited protection and may not adequately protect Biovest's rights or permit it to gain or keep its competitive advantage.

For BiovaxID, Biovest holds the patent relating to the method of producing BiovaxID and Biovest has filed additional patent applications for BiovaxID. There are filed patent applications for AutovaxID as well.

The patent positions of life sciences companies can be highly uncertain and involve complex legal and factual questions for which important legal principles remain unresolved. No consistent policy regarding the breadth of claims allowed in such companies' patents has emerged to date in the United States. The patent situation outside the United States is even more uncertain. Changes in either the patent laws or in interpretations of patent laws in the United States or other countries may diminish the value of Biovest's intellectual property. Accordingly, Biovest cannot predict the breadth of claims that may be allowed or enforced in its patents or in third-party patents. For example:

- Biovest or its licensors might not have been the first to make the inventions covered by each of its pending patent applications and issued patents;
- Biovest or its licensors might not have been the first to file patent applications for these inventions;
- others may independently develop similar or alternative technologies or duplicate any of Biovest's technologies;
- it is possible that none of Biovest's pending patent applications or the pending patent applications of Biovest's licensors will result in issued patents;
- Biovest's issued patents and the issued patents of its licensors may not provide a basis for commercially viable products, or may not provide Biovest with any competitive advantages, or may be challenged and invalidated by third parties;
- Biovest may not develop additional proprietary technologies or product candidates that are patentable; or
- the patents of others may have an adverse effect on Biovest's business.

Biovest also relies on trade secrets to protect its technology, especially where Biovest does not believe patent protection is appropriate or obtainable. However, trade secrets are difficult to protect. While Biovest uses reasonable efforts to protect its trade secrets, its strategic partners' employees, consultants, contractors, or scientific and other advisors may unintentionally or willfully disclose its information to competitors. If Biovest were to enforce a claim that a third party had illegally obtained (misappropriated) and was using its trade secrets, it would be expensive and time consuming, and the outcome would be unpredictable. In addition, courts outside the United States are sometimes less willing to protect trade secrets. Moreover, if Biovest's competitors independently develop equivalent knowledge, methods, and know-how, it will be more difficult for Biovest to enforce its patent rights and Biovest's business could be harmed.

If Biovest is not able to defend the patent or trade secret protection position of its technologies and product candidates, then Biovest will not be able to exclude competitors from

developing or marketing competing products, and Biovest may not generate enough revenue from product sales to justify the cost of development of its product candidates and to achieve or maintain profitability.

*If Biovest is unable to adequately protect or enforce its rights to intellectual property or secure rights to third-party patents, Biovest may lose valuable rights, experience reduced market share, assuming any, or incur costly litigation to, enforce, maintain or protect such rights.* Biovest's success depends, in part, on its ability to obtain and enforce patents, protect trade secrets, obtain licenses to technology owned by third parties and conduct its business without infringing upon the proprietary rights of others. The patent positions of pharmaceutical and biopharmaceutical companies, including Biovest's, can be uncertain and involve complex legal and factual questions including those related to its risk evaluation and mitigation strategies. In addition, the coverage sought in a patent application can be significantly reduced before the patent is issued.

Consequently, Biovest does not know whether any of its owned or licensed pending patent applications, which have not already been allowed, will result in the issuance of patents or, if any patents are issued, whether they will be dominated by third-party patent rights, whether they will provide significant proprietary protection or commercial advantage or whether they will be circumvented, opposed, invalidated, rendered unenforceable or infringed by others. Further, Biovest is aware of third-party United States patents that relate to, for example, the use of certain technologies and cannot be assured as to any impact to Biovest's potential products, or guarantee that Biovest's patents or pending applications will not be involved in, or be defeated as a result of, opposition proceedings before a foreign patent office or any interference proceedings before the U.S. Patent & Trademark Office ("USPTO").

With respect to patents and patent applications Biovest has in-licensed, there can be no assurance that additional patents will be issued to any of the third parties from whom Biovest has licensed patent rights, or that, if any new patents are issued, such patents will not be opposed, challenged, invalidated, infringed or dominated or provide Biovest with significant proprietary protection or commercial advantage. Moreover, there can be no assurance that any of the existing licensed patents will provide Biovest with proprietary protection or commercial advantage. Nor can Biovest guarantee that these licensed patents will not be infringed, invalidated or circumvented by others, or that the relevant agreements will not be terminated. Any termination of material licenses granted to Biovest could have a material adverse effect on its business, financial condition and results of operations.

Because (1) patent applications filed in the United States on or before November 28, 2000 are maintained in secrecy until patents issue, (2) patent applications filed in the United States on or after November 29, 2000 are not published until approximately 18 months after their earliest claimed priority date, (3) United States patent applications that are not filed outside the United States may not publish at all until issued and (4) publication of discoveries in the scientific or patent literature often lag behind actual discoveries, Biovest cannot be certain that Biovest, or its licensors, were the first to make the inventions covered by each of the issued patents or pending patent applications or that Biovest, or its licensors, were the first to file patent applications for such inventions. In the event a third party has also filed a patent for any of Biovest's inventions, Biovest, or its licensors, may have to participate in interference proceedings before the USPTO

to determine priority of invention, which could result in the loss of a United States patent or loss of any opportunity to secure United States patent protection for the invention. Even if the eventual outcome is favorable to Biovest, such interference proceedings could result in substantial cost to Biovest.

Competitors have chosen and in the future may choose to file oppositions to patent applications, which have been deemed allowable by foreign patent examiners. Furthermore, even if Biovest's owned or licensed patents are determined to be valid and enforceable, there can be no assurance that competitors will not be able to challenge the validity or Biovest's patent claims in post-grant proceedings, or to design around such patents and compete with Biovest using the resulting alternative technology. Additionally, for these same reasons, Biovest cannot be sure that patents of a broader scope than ours may be issued and thereby create freedom to operate issues. If this occurs Biovest may need to reevaluate pursuing such technology, which is dominated by others' patent rights, or alternatively, seek a license to practice its own invention, whether or not patented.

*Biovest's intellectual property rights will further be affected in ways that are difficult to anticipate by the provisions of the America Invents Act (2011).* Enacted in September 2011, the America Invents Act is the first major overhaul of the United States patent system since 1952, and includes a number of changes to established practices. The most significant changes include the transition to a modified first-to-file system, the availability of new post-grant review for issued patents, various procedural changes including the third-party submission of prior art and the availability of derivation proceedings and supplemental examination, and an expanded prior commercial user rights defense to a claim of patent infringement. The scope of these changes and the lack of experience with their practical implementation, suggest a transitional period with some uncertainty over the next few years. For example, while some provisions have already taken effect, others will take effect up to 18 months from enactment. The USPTO is still in the process of publishing regulations concerning the implementation of the America Invents Act. Several provisions of the America Invents Act will likely be tested in United States federal courts over time.

The changes to the United States patent system in the America Invents Act will have an impact on Biovest's intellectual property rights and how business is conducted in general. For example, the modified first-to-file system places premium on filing as early as possible and appears to increase what is available as prior art, by changing the applicable definitions. In the future, in addition to patents and printed publications, Biovest may be required to deal with unfamiliar prior art categories such as art that is "otherwise available to the public". For patent applications filed on or after March 16, 2013, Biovest may expect post-grant review challenges initiated up to nine months after the corresponding patent issues.

While the America Invents Act was intended to make the resolution of intellectual property disputes easier and less expensive, Biovest may in the future have to prove that Biovest is not infringing patents or Biovest may be required to obtain licenses to such patents. However, Biovest does not know whether such licenses will be available on commercially reasonable terms, or at all. Prosecution of patent applications, post-grant opposition proceedings, and litigation to establish the validity and scope of patents, to assert patent infringement claims against others and to defend against patent infringement claims by others will be expensive and

time-consuming. There can be no assurance that, in the event that claims of any of Biovest's owned or licensed patents are challenged by one or more third parties, any court or patent authority ruling on such challenge will determine that such patent claims are valid and enforceable. An adverse outcome in such litigation or post grant proceeding could cause Biovest to lose exclusivity relating to the subject matter delineated by such patent claims and may have a material adverse effect on its business. If a third party is found to have rights covering products or processes used by Biovest, Biovest could be forced to cease using the products or processes covered by the disputed rights, be subject to significant liabilities to such third party and/or be required to license technologies from such third party.

*Biovest's intellectual property rights will further be affected in ways that are difficult to anticipate by the procedures of the foreign countries in which Biovest seek patent protection.* Different countries have different procedures for obtaining patents, and patents issued by different countries provide different degrees of protection against the use of a patented invention by others. There can be no assurance, therefore, that the issuance to Biovest in one country of a patent covering an invention will be followed by the issuance in other countries of patents covering the same invention or that any judicial interpretation of the validity, enforceability or scope of the claims in a patent issued in one country will be similar to the judicial interpretation given to a corresponding patent issued in another country.

*The uncertainty of patent and proprietary technology protection and Biovest's potential inability to license technology from third parties may adversely affect Biovest.* Biovest's success will depend in part on obtaining and maintaining meaningful patent protection on its inventions, technologies and discoveries. The patent position of biotechnology and pharmaceutical firms is highly uncertain and involves many complex legal and technical issues. There is no clear policy involving the breadth of claims allowed, or the degree of protection afforded, under patents in this area. Biovest's ability to compete effectively will depend on its ability to develop and maintain proprietary aspects of its technology, as well as to operate without infringing, or, if necessary, to obtain rights to, the proprietary rights of others. Biovest's pending patent applications might not result in the issuance of patents. Biovest's patent applications might not have priority over others' applications and, even if issued, its patents might not offer protection against competitors with similar technologies. Any patents issued to Biovest might be challenged, invalidated or circumvented and the rights created thereunder may not afford it a competitive advantage. Furthermore, patents that Biovest owns or licenses may not enable Biovest to preclude competitors from commercializing products, and consequently may not provide Biovest with any meaningful competitive advantage.

Biovest's commercial success also depend in part on, either infringing patents or proprietary rights of third parties nor breaching any licenses that Biovest has obtained from third parties permitting Biovest to incorporate technology into its product candidates. It is possible that Biovest might infringe these patents or other patents or proprietary rights of third parties. In the future Biovest might receive notices claiming infringement from third parties. Any legal action against Biovest or its collaborative partners claiming infringement and damages or seeking to enjoin commercial activities relating to Biovest's product candidates and processes may require Biovest or its collaborative partners to alter its product candidates, cease certain activities and/or obtain licenses in order to continue to manufacture or market the affected products and processes. In addition, these actions may subject Biovest to potential liability for

damages. Biovest or its collaborative partners might not prevail in an action, and any license required under a patent might not be made available on commercially acceptable terms, or at all.

There are many United States and foreign patents and patent applications held by third parties in Biovest's areas of interest, and Biovest believes that there may be significant litigation in the industry regarding patent and other intellectual property rights. Potential future litigation could result in substantial costs and the diversion of management's efforts regardless of the merits or result of the litigation. Additionally, from time to time Biovest may engage in the defense and prosecution of interference proceedings before the USPTO, and related administrative proceedings that can result in Biovest's patent position being limited or in substantial expense to Biovest and significant diversion of effort by its technical and management personnel. In addition, laws of some foreign countries do not protect intellectual property to the same extent as do laws in the United States, which could subject Biovest to additional difficulties in protecting its intellectual property in those countries.

Biovest also relies on unpatented technology, trade secrets, technical know-how, confidential information and continuing inventions to develop and maintain Biovest's competitive position. Others might independently develop substantially equivalent proprietary information and techniques or otherwise gain access to Biovest's trade secrets or disclose Biovest's technology, and Biovest may not be able to protect its rights to its trade secrets. Biovest seeks to protect its technology and patents, in part, by confidentiality agreements with its employees and contractors. Biovest's employees might breach their existing proprietary information, inventions and dispute resolution agreements. Accordingly, these agreements may not protect Biovest's intellectual property, and its employees' breaches of those agreements could have a material adverse effect on Biovest.

*If Biovest are sued for infringing intellectual property rights of third parties, such litigation will be costly and time consuming, and an unfavorable outcome would have a significant adverse effect on its business.* Biovest's ability to commercialize its product candidates depends on Biovest's ability to sell such products without infringing the patents or other proprietary rights of third parties. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the various areas in which Biovest has products or are seeking to create products, including patents relating to specific antifungal formulations and methods of using the formulations to treat infections, as well as patents relating to serum-based vaccines and methods for detection of cancer. The interpretation of patent claims is complex and uncertain. The legal standards governing claim interpretations are evolving and changing. Thus, any significant changes in the legal standards would impact the way that Biovest interprets the claims of third-party patents in its product candidate areas. In addition, because patent applications can take several years to issue, there may be currently pending applications, unknown to Biovest, which may later result in issued patents that its product candidates may infringe. There could also be existing patents of which Biovest is not aware that its product candidates may inadvertently infringe.

If a third party claims that Biovest infringes on their patents or other proprietary rights, Biovest could face a number of issues that could seriously harm its competitive position, including:

- infringement and other intellectual property claims which, with or without merit, can be costly and time consuming to litigate and can delay the regulatory approval process and divert management's attention from Biovest's core business strategy;
- substantial damages for past infringement which Biovest may have to pay if a court determines that its product candidates or technologies infringe upon a competitor's patent or other proprietary rights;
- a court prohibiting Biovest from selling or licensing its product candidates or technologies unless the holder licenses the patent or other proprietary rights to Biovest, which it is not required to do;
- if a license is available from a holder, Biovest may have to pay substantial royalties or grant cross licenses to its patents or other proprietary rights; and
- redesigning Biovest's process so that it does not infringe, which may not be possible or may require substantial time and expense.

Such actions could harm Biovest's competitive position and Biovest's ability to generate revenue and could result in increased costs.

*Biovest may not be able to maintain sufficient product liability insurance to cover claims against Biovest.* Product liability insurance for the biopharmaceutical industry is generally expensive to the extent it is available at all. There can be no assurance that Biovest will be able to maintain such insurance on acceptable terms, or that Biovest will be able to secure increased coverage if the commercialization of its product candidates' progress, or that existing or future claims against Biovest will be covered by its product liability insurance. Moreover, there can be no assurance that the existing coverage of Biovest's liability insurance policy and/or any rights of indemnification and contribution that Biovest may have will offset existing or future claims. Biovest maintains product liability insurance in the aggregate of $2.0 million per occurrence. Biovest believes that this coverage is currently adequate based on current and projected business activities and the associated risk exposure, although Biovest expects to increase this coverage as its business activities and associated risk grow. A successful claim against Biovest with respect to uninsured liabilities or in excess of insurance coverage and not subject to any indemnification or contribution could have a material adverse effect on Biovest's future business, financial condition, and results of operations.

*The market may not be receptive to Biovest's product candidates upon their introduction.* The biopharmaceutical products that Biovest may develop may not achieve market acceptance among physicians, patients, health care payers, and the medical community. The degree of market acceptance will depend upon a number of factors, including

- the receipt of regulatory/marketing approvals;
- limited indications of regulatory/marketing approvals;
- the establishment and demonstration in the medical community of the clinical efficacy and safety of Biovest's product candidates and their potential advantages over existing treatment methods;
- the prices of such products;
- reimbursement policies of government and third-party payers;

111

- market acceptance of patient-specific active immunotherapies, in the case of BiovaxID;
- the prevalence and severity of any side effects;
- potential advantages over alternative treatments;
- ability to produce Biovest's product candidates at a competitive price;
- stocking and distribution;
- relative convenience and ease of administration;
- the strength of marketing and distribution support; and
- sufficient third-party coverage or reimbursement.

The failure of Biovest's product candidates to gain market acceptance could impair Biovest's ability to generate revenue, which could have a material adverse effect on Biovest's future business, financial condition and results of operations.

*Health care policy changes, including recently enacted legislation reforming the United States healthcare system, may have material adverse effects on Biovest's commercialization of its product candidates.* The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act, (collectively, the "PPACA") enacted in March 2010 makes changes that could significantly impact the development and commercialization of Biovest's product candidates.  Significant measures contained in the PPACA include, for example, coordination and promotion of research on comparative clinical effectiveness of different technologies and procedures, initiatives to revise Medicare payment methodologies, such as bundling of payments across the continuum of care by providers and physicians, and initiatives to promote quality indicators in payment methodologies. The PPACA also includes significant new fraud and abuse measures, including required disclosures of financial arrangements with physician customers, lower thresholds for violations and increasing potential penalties for such violations.  In addition, the PPACA establishes an IPAB, to reduce the per capita rate of growth in Medicare spending.  The IPAB has broad discretion to propose policies to reduce expenditures, which may have a negative impact on payment rates for services or therapeutics, including therapeutics like BiovaxID and/or any of Biovest's product candidates. In addition to the PPACA, the effect of which cannot presently be fully quantified given its relatively recent enactment, various healthcare reform proposals have also emerged from federal and state governments. Changes in healthcare policy could substantially impact the development and commercialization of Biovest's product candidates.  Biovest cannot predict whether future healthcare initiatives will be implemented at the federal or state level or in countries outside of the U.S., in which Biovest may do business, or the effect any future legislation or regulation will have on Biovest.  The taxes imposed by the new federal legislation and the expansion in government's role in the United States healthcare industry may result in decreased profits to Biovest, lower reimbursements by payers for Biovest's product candidates or reduced medical procedure volumes, all of which may adversely affect its business, financial condition and results of operations, possibly materially.

*The insurance coverage and reimbursement status of newly approved products is uncertain and failure to obtain or maintain adequate coverage and reimbursement for new or current products could limit Biovest's ability to market those products and decrease Biovest's ability to generate revenue.*  There is significant uncertainty related to the insurance coverage and reimbursement of newly approved products.  The commercial success of Biovest's product

candidates in both domestic and international markets is substantially dependent on whether third-party coverage and reimbursement is available for the ordering of Biovest's product candidates by the medical profession for use by their patients. Medicare, Medicaid, health maintenance organizations, and other third-party payers are increasingly attempting to contain healthcare costs by limiting both coverage and the level of reimbursement of new products, and, as a result, they may not cover or provide adequate payment for Biovest's product candidates. Biovest's product candidates could, if approved, face declining revenues if competitor products are perceived as providing a substantially equivalent therapeutic effect at a lower cost to the payer. They may not view Biovest's product candidates as cost-effective and reimbursement may not be available to consumers or may not be sufficient to allow Biovest's product candidates to be marketed on a competitive basis. Likewise, legislative or regulatory efforts to control or reduce healthcare costs or reform government healthcare programs could result in lower prices or rejection of Biovest's product candidates. Changes in coverage and reimbursement policies or healthcare cost containment initiatives that limit or restrict reimbursement for Biovest's product candidates may cause Biovest's revenue to decline.

*Sales of Biovest's products candidates will be significantly reduced if access to and reimbursement for its products candidates by governmental and other third-party payers is reduced or terminated.* Sales of Biovest's product candidates will depend, in part, on the extent to which the costs of Biovest's product candidates will be paid by health maintenance, managed care, pharmacy benefit and similar health care management organizations, or reimbursed by government health administration authorities, private health coverage insurers and other third-party payers. Generally, in the EU, Canada and other countries outside the United States, the government-sponsored healthcare system is the primary payer of healthcare costs of patients. These health care management organizations and third-party payers are increasingly challenging the prices charged for medical products and services. Additionally, the Health Care Reform Act of 2010 ("Health Care Reform Act"), which became effective in January 2011, has provided sweeping health care reform in the U.S., which may impact the prices of drugs. In addition to the federal legislation, state legislatures and foreign governments have also shown significant interest in implementing cost-containment programs, including price controls, restrictions on reimbursement and requirements for substitution of generic products. The establishment of limitations on patient access to Biovest's product candidates, adoption of price controls and cost-containment measures in new jurisdictions or programs, and adoption of more restrictive policies in jurisdictions with existing controls and measures, including the impact of the Health Care Reform Act, could adversely impact Biovest's business and future results. If these organizations and third-party payers do not consider Biovest's product candidates to be cost-effective compared to other available therapies, they may not reimburse providers or consumers of Biovest's product candidates or, if they do, the level of reimbursement may not be sufficient to allow Biovest to sell Biovest's product candidates on a profitable basis.

Reimbursement in the EU and Canada involves decisions, applications and compliance with various Member States in the instance of the EU and various provinces in the instance of Canada. Such non-centralized reimbursement requirements may result in delays, added expense and limitations on marketing access. Outside the United States, international operations are generally subject to extensive governmental price controls and other market regulations, and Biovest believes the increasing emphasis on cost-containment initiatives in the EU, Canada, and other countries has and will continue to put pressure on the pricing and usage of its product

candidates. Although Biovest cannot predict the extent to which its business may be affected by future cost-containment measures or other potential legislative or regulatory developments, additional foreign price controls or other changes in pricing regulation could restrict the amount that Biovest is able to charge for its product candidates, which could adversely affect Biovest's revenue and results of operations.

*The availability and amount of reimbursement for Biovest's products candidates and the manner in which government and private payers may reimburse for its products candidates is uncertain.* In many of the markets where Biovest may do business in the future, the prices of pharmaceutical products are subject to direct price controls pursuant to applicable law or regulation and to drug reimbursement programs with varying price control mechanisms.

Biovest expects that many of the patients who seek treatment with its product candidates, if approved for marketing will be eligible for Medicare benefits. Other patients may be covered by private health plans or uninsured. The Medicare program is administered by the CMS, an agency within the HSS. Coverage and reimbursement for products and services under Medicare are determined pursuant to regulations promulgated by CMS and pursuant to CMS's subregulatory coverage and reimbursement determinations. It is difficult to predict how CMS may apply those regulations and subregulatory determinations to newly approved products, especially novel products such as Biovest's product candidates, and those regulations and interpretive determinations are subject to change.

Moreover, the methodology under which CMS makes coverage and reimbursement determinations is subject to change, particularly because of budgetary pressures facing the Medicare program. For example, the Medicare Modernization Act, enacted in December 2003, provides for a change in reimbursement methodology that reduces the Medicare reimbursement rates for many drugs, including oncology therapeutics, which may adversely affect reimbursement for Biovest's product candidates, if it is approved for sale. If Biovest is unable to obtain or retain adequate levels of reimbursement from Medicare or from private health plans, Biovest's ability to profitably sell its product candidates will be adversely affected. Medicare regulations and interpretive determinations also may determine who may be reimbursed for certain services. This may adversely affect Biovest's ability to profitably market or sell its product candidates, if approved.

In addition, government and private health plans persistently challenge the price and cost-effectiveness of therapeutic products. Accordingly, these third parties may ultimately not consider Biovest's product candidates to be cost-effective, which could result in products not being covered under their health plans or covered only at a lower price. Any of these initiatives or developments could prevent Biovest from successfully marketing and selling any of its potential products on a profitable basis. Biovest is unable to predict what impact the Medicare Modernization Act or other future regulation or third party payer initiatives, if any, relating to reimbursement for Biovest's product candidates will have on sales of Biovest's product candidates, if approved for sale.

In the EU, each Member State influences the price of pharmaceutical products through their pricing and reimbursement rules and control of national health care systems that fund a large part of the cost of such products to consumers. The approach taken varies from Member

State to Member State. Some jurisdictions operate positive and/or negative list systems under which products may only be marketed once a reimbursement price has been agreed. Other EU Member States allow companies to fix their own prices for medicines, but monitor and control company profits.   The downward pressure on health care costs in general, particularly prescription drugs, has become very intense.   As a result, increasingly high barriers are being erected to the entry of new products, as exemplified by the role of the National Institute for Health and Clinical Excellence in the United Kingdom which evaluates the data supporting new medicines and passes reimbursement recommendations to the government.  In addition, in some countries cross-border imports from low-priced markets (parallel imports) exert commercial pressure on pricing within a country. All of these factors could adversely impact Biovest's ability to successfully commercialize Biovest's product candidates in these jurisdictions.

*Biovest could be negatively impacted by the application or enforcement of federal and state fraud and abuse laws, including anti-kickback laws and other federal and state anti-referral laws.*  Biovest is subject to various federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback laws and physician self-referral laws.  Violations of these laws are punishable by criminal and civil sanctions, including, in some instances, imprisonment and exclusion from participation in federal and state healthcare programs, including the Medicare, Medicaid and Veterans Administration health programs.  Because of the far-reaching nature of these laws, Biovest may be required to alter or discontinue one or more of its practices to be in compliance with these laws.  Healthcare fraud and abuse regulations are complex, and even minor irregularities can potentially give rise to claims that a statute or prohibition has been violated.  Any violations of these laws, or any action against Biovest for violation of these laws, even if Biovest successfully defend against it, could result in a material adverse effect on its business, financial condition and results of operations.  If there is a change in law, regulation or administrative or judicial interpretations, Biovest may have to change or discontinue its business practices or its existing business practices could be challenged as unlawful, which could have a material adverse effect on Biovest's business, financial condition and results of operations.  In addition, Biovest could become subject to false claims litigation under federal statutes, which can lead to treble damages based on the reimbursements by federal health care programs, civil money penalties (including penalties levied on a per false claim basis), restitution, criminal fines and imprisonment, and exclusion from participation in Medicare, Medicaid and other federal and state healthcare programs.  These false claims statutes include the False Claims Act, which allows any person to bring suit on behalf of the federal government alleging the submission of false or fraudulent claims, or causing to present such false or fraudulent claims, under federal programs or contracts claims or other violations of the statute and to share in any amounts paid by the entity to the government in fines or settlement.  These suits against biotechnology companies have increased significantly in recent years and have increased the risk that a healthcare company will have to defend a false claim action, pay fines or restitution, or be excluded from the Medicare, Medicaid or other federal and state healthcare programs as a result of an investigation arising out of such action.  Biovest cannot assure that it will not become subject to such litigation or, if Biovest are not successful in defending against such actions, that such actions will not have a material adverse effect on Biovest's business, financial condition and results of operations.  In addition, Biovest cannot assure that the costs of defending claims or allegations under the False Claims Act will not have a material adverse effect on Biovest's business, financial condition and results of operations.

*The failure to attract and retain skilled personnel could impair Biovest's product development and commercialization efforts.* The success of Biovest's business depends, in large part, on the performance of its senior management and key scientific, manufacturing and technical personnel. The loss of the services of any member of its senior management, or its scientific, manufacturing or technical staff, may significantly delay or prevent the achievement of product development and other business objectives by diverting management's attention to transition matters and identification of suitable replacements, and could have a material adverse effect on Biovest's business, operating results, and financial condition. Biovest does not maintain key man life insurance for any of its senior management and key scientific, manufacturing and technical personnel. Biovest is not aware of any plans by its senior management and key scientific, manufacturing and technical personnel to retire or leave Biovest in the near future.

Biovest also relies on consultants and advisors to assist it in formulating its research and development strategy. All of Biovest's consultants and advisors are either self-employed or employed by other organizations, and they may have conflicts of interest or other commitments, such as consulting or advisory contracts with other organizations, that may affect their ability to contribute to Biovest.

In addition, Biovest believes that it will need to recruit additional senior management and scientific, manufacturing, and technical personnel. There is currently intense competition for skilled executives and employees with relevant scientific, manufacturing and technical expertise, and this competition is likely to continue. The inability to attract and retain sufficient scientific, manufacturing, technical, and managerial personnel could limit or delay Biovest's product development efforts, which would adversely affect the development of its product candidates and the commercialization of its potential products and the growth of Biovest's business.

*Biovest expects to expand its development, clinical research, and marketing capabilities, and as a result, Biovest may encounter difficulties in managing its growth, which could disrupt its operations.* Biovest expects to have significant growth in its expenditures, the number of its employees and the scope of its operations, in particular with respect to those product candidates that Biovest elects to commercialize independently or together with a partner. To manage Biovest's anticipated future growth, Biovest must continue to implement and improve its managerial, operational, and financial systems, expand its facilities, and continue to recruit and train additional qualified personnel. Due to Biovest's limited resources, Biovest may not be able to effectively manage the expansion of its operations or recruit and train additional qualified personnel. The physical expansion of Biovest's operations may lead to significant costs and may divert its management and business development resources. Any inability to manage growth could delay the execution of Biovest's business plans or disrupt Biovest's operations.

*Biovest occasionally become subject to commercial disputes that could harm its business by distracting its management from the operation of Biovest's business, by increasing its expenses and, if Biovest does not prevail, by subjecting Biovest to potential monetary damages and other remedies.* From time to time Biovest is engaged in disputes regarding its commercial transactions. These disputes could result in monetary damages or other remedies that could adversely impact Biovest's financial position or operations. Even if Biovest prevails in these disputes, they may distract its management from operating its business and the cost of defending

116

these disputes would reduce Biovest's operating results. If Biovest does not prevail in these litigation matters or if Biovest is required to expend a significant amount of resources defending such claims, Biovest's operating results, financial position, and cash flows could be adversely impacted.

*A breakdown or breach of Biovest's information technology systems could subject Biovest to liability or interrupt the operation of Biovest's business.* Biovest relies upon its information technology systems and infrastructure for its business. The size and complexity of Biovest's computer systems make them potentially vulnerable to breakdown, malicious intrusion and random attack. Likewise, data privacy breaches by employees and others who access Biovest's systems may pose a risk that sensitive data may be exposed to unauthorized persons or to the public. While Biovest believes that Biovest have taken appropriate security measures to protect its data and information technology systems, there can be no assurance that Biovest's efforts will prevent breakdowns or breaches in its systems that could adversely affect Biovest's business.

*Biovest's common stock is quoted on the Over-the-Counter Market.* As opposed to a larger or better accepted market, Biovest's common stock is quoted on the OTCQB™, which is the middle tier of the Over-the-Counter Market (the "OTC Market"), reserved for companies that are registered and reporting with the SEC or a United States banking regulator. There are no financial or qualitative standards to be in this tier. The OTCQB was launched in April 2010, by OTC Markets, Inc. to better distinguish OTC securities. Thus, an investor might find it more difficult than it would be on a national exchange to dispose of, or to obtain accurate quotations as to the market value of, Biovest's securities.

Biovest cannot be certain that an active trading market will develop or, if developed, be sustained. Biovest also cannot be certain that purchasers of Biovest's common stock will be able to resell their common stock at prices equal to or greater than their purchase price. The development of a public market having the desirable characteristics of depth, liquidity and orderliness depends upon the presence in the marketplace of a sufficient number of willing buyers and sellers at any given time. Biovest does not have any control over whether there will be sufficient numbers of buyers and sellers. Accordingly, Biovest cannot be certain that an established and liquid market for its common stock will develop or be maintained. The market price of Biovest's common stock could experience significant fluctuations in response to its operating results and other factors. In addition, the stock market in recent years has experienced extreme price and volume fluctuations that often have been unrelated or disproportionate to the operating performance of individual companies. These fluctuations, and general economic and market conditions, may hurt the market price of Biovest's common stock.

Biovest is also subject to a SEC rule that, if Biovest fails to meet certain criteria set forth in such rule, imposes various sales practice requirements on broker-dealers who sell securities governed by the rule to persons other than established customers and accredited investors. For these types of transactions, the broker-dealer must make a special suitability determination for the purchaser and have received the purchaser's written consent to the transaction prior to sale. Consequently, the rule may have an adverse effect on the ability of broker-dealers to sell Biovest's securities and may affect the ability of Biovest's stockholders to buy and sell Biovest's securities in the secondary market. The additional burdens imposed upon broker-dealers may discourage broker-dealers from effecting transactions in penny stocks, which could reduce the

liquidity of its common stock and have a material adverse effect on the trading market for Biovest's securities.

Biovest believes that Biovest is eligible to upgrade its stock listing to the OTCQX™, which is the top tier of the OTC Market. The OTCQX is reserved exclusively for companies that meet the highest financial standards and undergo a qualitative review, as determined by the OTC Markets. However, there can be no assurance that an OTCQX application, if submitted, will be approved.

*The price of Biovest's common stock may be highly volatile.* The market price for Biovest's common stock is likely to fluctuate due to factors unique to Biovest or arising out of the highly volatile market prices of securities of biotechnology companies. Purchasers of Biovest's common stock may not be able to resell shares of Biovest common stock following periods of volatility. In addition, purchasers of Biovest's common stock may not be able to resell shares at or above their purchase price.

Biovest's stock price may be affected by many factors, many of which are outside of Biovest's control, which may include:

- actual or anticipated variations in quarterly operating results;
- the results of clinical trials and preclinical studies involving Biovest's product candidates or those of its competitors;
- changes in the status of any of Biovest's drug development programs, including delays in clinical trials or program terminations;
- developments in Biovest's relationships with other collaborative partners;
- developments in patent or other proprietary rights;
- governmental regulation;
- public concern as to the safety and efficacy of products developed by Biovest, its collaborators or its competitors;
- Biovest's ability to fund on-going operations;
- Biovest's inability to repay its debt obligations and defaulting on such debt obligations;
- announcements of technological innovations or new products or services by Biovest or its competitors;
- changes in financial estimates by securities analysts;
- conditions or trends in the biotechnology industry; and
- changes in the economic performance or market valuations of other biotechnology companies.

*Biovest's principal stockholder and/or certain of its secured creditors are able to exert significant influence over Biovest and matters submitted to stockholders for approval.* As of December 31, 2012, Accentia owned a majority of Biovest's outstanding shares of common stock. This control could have the effect of delaying or preventing a change in control of Biovest and, consequently, could adversely affect the market price of Biovest's common stock. The outcome of the restructuring of Biovest's matured obligations under the Plan may negatively affect Accentia's ownership interest in Biovest and cause Accentia's potential deconsolidation/loss of control in Biovest.

*There may not be a market for Biovest's common stock.* Biovest common stock shares are quoted on the OTCQB. The OTCQB is the middle tier of the OTC Market. OTCQB companies are registered and reporting with the SEC or a U.S. banking regulator, making it easier for investors to identify companies that are current in their reporting obligations. There are no financial or qualitative standards to be in this tier. The OTCQB marketplace was launched in April 2010, by OTC Markets, Inc. to better distinguish OTC securities that are registered and reporting with United States regulators. However, no assurance can be given that a holder of Biovest common stock will be able to sell such securities in the future or as to the price at which such securities might trade. The liquidity of the market for such securities and the prices at which such securities trade will depend upon the number of holders thereof, the interest of securities dealers in maintaining a market in such securities and other factors beyond Biovest's control.

*Penny stock regulations may impose certain restrictions on the marketability of Biovest's securities.* The SEC has adopted regulations which generally define a "penny stock" to be any equity security that has a market price of less than $5.00 per share or an exercise price of less than $5.00 per share, subject to certain exceptions. As a result, Biovest's common stock is subject to rules that impose additional sales practice requirements on broker dealers who sell such securities to persons other than established customers and accredited investors (generally those with assets in excess of $1.0 million or annual income exceeding $0.2 million or $0.3 million together with their spouse). For transactions covered by such rules, the broker dealer must make a special suitability determination for the purchase of such securities and have received the purchaser's written consent to the transaction prior to the purchase. Additionally, for any transaction involving a penny stock, unless exempt, the rules require the delivery, prior to the transaction, of a risk disclosure document mandated by the SEC relating to the penny stock market. The broker dealer must also disclose the commission payable to both the broker dealer and the registered representative, current quotations for the securities and, if the broker dealer is the sole market maker, the broker dealer must disclose this fact and the broker dealer's presumed control over the market. Finally, monthly statements must be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Broker-dealers must wait two business days after providing buyers with disclosure materials regarding a security before effecting a transaction in such security. Consequently, the "penny stock" rules restrict the ability of broker dealers to sell Biovest's securities and affect the ability of investors to sell Biovest's securities in the secondary market and the price at which such purchasers can sell any such securities, thereby affecting the liquidity of the market for Biovest's common stock.

Stockholders should be aware that, according to the SEC, the market for penny stocks has suffered in recent years from patterns of fraud and abuse.  Such patterns include:

- control of the market for the security by one or more broker-dealers that are often related to the promoter or issuer;
- manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases;
- "boiler room" practices involving high pressure sales tactics and unrealistic price projections by inexperienced sales persons;
- excessive and undisclosed bid-ask differentials and markups by selling broker-dealers; and
- the wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, along with the inevitable collapse of those prices with consequent investor losses.

Biovest's management is aware of the abuses that have occurred historically in the penny stock market.

*The further issuances of additional authorized shares of Biovest common stock and preferred stock may adversely affect the market for Biovest's common stock.*  As of December 31, 2012, there were 146,510,818 shares of common stock outstanding.  The Certificate of Amendment to Biovest's Amended and Restated Certificate of Incorporation, which was filed on March 7, 2012, authorizes Biovest to issue up to 500 million shares of common stock with a par value $0.01 per share.  The number of authorized shares of common stock provides Biovest with the flexibility to issue more shares in the future, which might cause dilution to Biovest's shareholders.  In addition, the total number of shares of Biovest common stock issued and outstanding does not include common stock shares reserved in anticipation of the exercise of stock options.  To the extent such stock options are exercised, the holders of Biovest common stock may experience further dilution.

Moreover, in the event that any future financing should be in the form of, be convertible into or exchangeable for, equity securities, and upon the exercise of stock options and common stock purchase warrants, investors would experience additional dilution. Finally, in addition to the above referenced shares of authorized common stock which may be issued without shareholder approval, Biovest has 50 million authorized but undesignated shares of preferred stock, the terms of which may be fixed by Biovest's Board of Directors.

*Biovest has not been the subject of an independent valuation.*  No investment banker or underwriter has been retained to value Biovest's common stock. Biovest has not attempted to make any estimate of the prices at which Biovest common stock may trade in the market. Moreover, there can be no assurance given as to the market prices that will prevail.

*Common stock shares eligible for future sale may adversely affect the market.*  From time to time, certain of Biovest's shareholders may be eligible to sell some or all of their shares of Biovest common stock by means of ordinary brokerage transactions in the open market pursuant to Rule 144, promulgated under the Securities Act of 1933, as amended, subject to certain limitations. In general, pursuant to Rule 144, a shareholder (or shareholders whose shares are

aggregated) who has satisfied a six-month holding period may, under certain circumstances, sell within any three month period a number of securities which does not exceed the greater of 1% of the then outstanding shares of common stock or the average weekly trading volume of the class during the four calendar weeks prior to such sale. Rule 144 also permits, under certain circumstances, the sale of securities, without any limitation, by Biovest's shareholders that are non-affiliates that have satisfied a one-year holding period. Any substantial sale of Biovest common stock pursuant to Rule 144 or pursuant to any resale prospectus may have a material adverse effect on the market price of Biovest's common stock.

*The financial and operational projections that Biovest may make from time to time are subject to inherent risks.* The projections that Biovest's management may provide from time to time (including, but not limited to, those relating to potential peak sales amounts, product approval, production and supply dates, commercial launch dates, and other financial or operational matters) reflect numerous assumptions made by management, including assumptions with respect to Biovest's specific as well as general business, economic, market and financial conditions and other matters, all of which are difficult to predict and many of which are beyond Biovest's control. Accordingly, there is a risk that the assumptions made in preparing the projections, or the projections themselves, will prove inaccurate. There will be differences between actual and projected results, and actual results may be materially different from than those contained in the projections. The inclusion (or incorporation by reference) of the projections in Biovest's Annual Report on Form 10-K for the year ended September 30, 2012 should not be regarded as an indication that Biovest or its management or representatives considered or consider the projections to be a reliable prediction of future events, and the projections should not be relied upon as such.

*Biovest does not expect to pay any dividends.* Biovest has not declared or paid cash dividends since Biovest's inception. Biovest currently intends to retain all of its earnings to finance future growth and therefore, does not expect to declare or pay cash dividends in the foreseeable future.

*Biovest's tax-loss carryforwards are subject to restrictions.* As of September 30, 2012, Biovest had substantial net operating loss ("NOLs") carry-forwards for federal income tax purposes of approximately $98.7 million (expiring beginning in 2020) which will be available to offset future taxable income. As a result of certain changes in ownership and pursuant to Section 382 of the Internal Revenue Code of 1986, as amended, utilization of NOLs is limited after an ownership change, as defined in Section 392, to an annual amount equal to the value of the loss corporation's outstanding stock immediately before the date of the ownership change multiplied by the federal long-term exempt tax rate. Due to the various changes in Biovest's ownership, and as a result of its Chapter 11 proceeding, a significant portion of these carry-forwards are subject to significant restrictions with respect to Biovest's ability to use those amounts to offset future taxable income. Use of Biovest's NOLs may be further limited as a result of future equity transactions.

*No Independent Valuation.* No investment banker or underwriter has been retained to value Biovest Common Stock. Biovest has not attempted to make any estimate of the prices at which Biovest Common Stock may trade in the market. Moreover, there can be no assurance given as to the market prices that will prevail.

*Dilution.* It is possible that Biovest will need to issue additional shares of common stock or securities or warrants convertible into such shares in order to raise additional equity. In such event, Biovest's stockholders could suffer significant dilution.

*Biovest may not be able to obtain confirmation of the Plan.* Biovest's ability to continue as a going concern is dependent upon, among other things, its ability to successfully restructure its indebtedness and to emerge from bankruptcy with a viable plan of reorganization and with adequate liquidity. Biovest cannot be certain that the Plan will be confirmed by the Bankruptcy Court or successfully implemented by Biovest. If the Plan is not confirmed by the Bankruptcy Court: (a) Biovest may not be able to reorganize its businesses; (b) the distributions that Holders of Claims and Equity Interests ultimately would receive, if any, with respect to their Claims and Equity Interests are uncertain; and (c) there is no assurance that Biovest will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only Biovest may propose and confirm a plan of reorganization.

*Biovest's emergence from Chapter 11 of the Bankruptcy Code is not assured.* While Biovest expects to emerge from Chapter 11, there can be no assurance that Biovest will successfully reorganize or when this reorganization will occur, irrespective of Biovest's obtaining confirmation of the Plan.

*The conditions precedent to the Effective Date of the Plan may not occur.* As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

## EVENTS LEADING TO THE CHAPTER 11 FILING

**Biovest's Prior Chapter 11 Case**

In 2008, the world-wide financial markets were under significant stress as evidenced by the collapse of various financial and banking companies. Financing for small biotechnology companies, such as Biovest, was unavailable. As a result, on November 10, 2008, Biovest and its wholly-owned subsidiaries, Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC (collectively, the "Biovest Subsidiaries"), filed with the Bankruptcy Court their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "2008 Biovest Cases"). The prior Chapter 11 case filed by Biovest was assigned Case No. 8:08-bk-17796-KRM (the "Prior Biovest Case"). Pursuant to an order of the Bankruptcy Court, the 2008 Biovest Cases (including the Prior Biovest Case) were jointly administered with the Chapter 11 case of Accentia, Case No. 8:08-bk-17795-KRM (the "Accentia Case").

On August 16, 2010, Biovest and the Biovest Subsidiaries filed with the Bankruptcy Court their First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC Under Chapter 11 of Title 11, United States Code dated as of August 16, 2010 [Doc. No. 906 in the Accentia Case] (the

"Biovest Joint Plan"). On October 25, 2010, Biovest and the Biovest Subsidiaries filed with the Bankruptcy Court their First Modification to First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC Under Chapter 11 of Title 11, United States Code dated as of October 25, 2010 [Doc. No. 1408 in the Accentia Case] (the "Biovest First Plan Modification" and, together with the Biovest Joint Plan, the "Biovest 2010 Plan").

On November 2, 2010, the Bankruptcy Court entered its Order Confirming First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC Under Chapter 11 of Title 11, United States Code Dated as of August 16, 2010, as Modified, Pursuant to 11 U.S.C. § 1129 [Doc. No. 1546 in the Accentia Case] (the "Biovest Confirmation Order"). The Biovest Confirmation Order confirmed the Biovest 2010 Plan in all respects. The effective date of the Biovest 2010 Plan occurred on November 17, 2010 (the "Biovest Plan Effective Date").

Pursuant to the terms of the Biovest 2010 Plan and the Biovest Confirmation Order, the Chapter 11 cases of Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC were substantively consolidated into the Prior Biovest Case as a single consolidated case. On March 19, 2012, the Bankruptcy Court entered a Final Decree in the Prior Biovest Case and closed the Prior Biovest Case [Doc. No. 69 in the Prior Biovest Case].

The Biovest 2010 Plan established a maturity date of November 17, 2012 (i.e., two (2) years after the Biovest Plan Effective Date) for Biovest's approximately $28 million in allowed secured debt owed to its then sole secured creditors, Corps Real, LLC and certain of the Laurus/Valens Entities, which management of Biovest believed would provide Biovest with the necessary time and opportunity to further develop its BiovaxID cancer vaccine and to advance its mission of seeking regulatory/marketing approvals of its BiovaxID cancer vaccine in the United States, the European Union, Canada, and other foreign markets.

**Recent Developments**

Following the Biovest Plan Effective Date, Biovest significantly advanced its business plan and products including by, among other things:

- Establishing that in the Phase 2 clinical trial in follicular lymphoma patients previously untreated, at a median follow-up of 14 years, 32% of the patients vaccinated with BiovaxID remained in continuous first clinical remission and 77% of the patients were alive, representing a significant stride forward in the development of BiovaxID. This finding represents a significant demonstration of the importance of BiovaxID in the treatment of NHL.

- Publishing in the peer-reviewed Journal of Clinical Oncology the clinical results from Biovest's randomized, double-blinded Phase 3 clinical trial demonstrating that follicular lymphoma patients vaccinated with BiovaxID remained in remission an average of approximately 13.6 months longer than patients vaccinated with the control drug. This publication represented an important milestone event in the development of BiovaxID and, to this day, represents the only peer-reviewed

publication of a lymphoma cancer vaccine providing clinical benefit in a randomized Phase 3 clinical trial.

- Advancing the development of BiovaxID by working with the NCI to present long-term follow-up data from the BiovaxID Phase 2 clinical trial in mantle cell lymphoma patients previously untreated. These findings significantly advanced BiovaxID by demonstrating that patients that achieved a high T-cell immune response to vaccination with BiovaxID had a significant advantage in the time to next treatment (approximately 51.9 months vs. approximately 5.5 months) and in overall survival (median overall survival not reached vs. 81.4 months at 11-year follow-up) as compared to patients with lower levels of T-cell immune responses. The NCI investigators on this study presented these results at the annual meetings of the American Society of Clinical Oncology (2012) and at the American Society of Hematology (2011).

- Constructing the initial commercial BiovaxID manufacturing facility with financial support from the State of Minnesota and the City of Coon Rapids, Minnesota. This manufacturing facility represents a major and essential development because planned applications seeking regulatory/marketing approval for BiovaxID require a manufacturing facility that complies with regulatory requirements.

- Advancing the manufacturing, validation and controls process and procedure for the commercial manufacturing of BiovaxID, representing an essential step in the development of BiovaxID that is required in order to seek regulatory/marketing approval for BiovaxID.

- Completing the clinical review and compiling the regulatory human clinical data required to support the safety and efficacy of BiovaxID, representing a critical step in seeking regulatory/marketing approval for BiovaxID.

- Conducting formal regulatory meetings with international and domestic drug regulatory agencies in preparation for the submission of applications for regulatory/marketing approval of BiovaxID in Canada and the 27 countries of the European Union, representing an essential step in seeking regulatory/marketing approvals for BiovaxID in those countries.

- Establishing and confirming support from regulatory agencies in Canada and the European Union for Biovest to submit formal regulatory/marketing applications seeking regulatory/marketing approval of BiovaxID in Canada and the European Union, representing an essential milestone.

- Commencing the formal process seeking regulatory/marketing approval for BiovaxID in the European Union with marketing approval in Canada and the European Union anticipated in late 2014, assuming a consistent and successful prosecution of the marketing applications.

- Establishing and performing a $1.6 million contract and CRADA with the Navy Health Research Center, a division of the DOD, to advance the development and

124

commercialization of the AutovaxID instrument. The contract resulted in a publication on Genetic Engineering reporting on the efficiency of the AutovaxID instrument in producing influenza virus.

- Establishing a CRADA with the United States Army Medical Research Institute for Infectious Disease, a division of the DOD, to demonstrate that the AutovaxID instrument is effective at producing the Ebola virus.

- Establishing an approximately $5 million strategic contract with the Defense Threat Reduction Agency, a division of the DOD, to advance commercial applications for the AutovaxID instrument. The finalization of this contract is pending a formal DOD review of Biovest's financial condition and its ability to perform the contract and the potential for Biovest to improve its financial position.

- Advancing strategic relationships with the Texas A&M Center for Innovation in Advanced Development and Manufacturing ("BioDefense"), as designated by the United States Department of Health and Human Services, to further their manufacturing capability and state of readiness to produce various vaccines of biodefense interest.

- Advancing the regulatory/marketing approval process in the European Union by conducting formal meetings with the reviewing European regulatory agencies regarding manufacturing and manufacturing quality and control to facilitate formal filing.

Notwithstanding the significant progress made by Biovest since November 2010 as highlighted above, at a meeting with the FDA held on November 2, 2012, the FDA informed Biovest that it would require an additional Phase 3 clinical trial before accepting a BLA seeking regulatory/marketing approval of BiovaxID in the United States. The position taken by the FDA at that meeting was in stark contrast with the positions previously taken by the regulatory authorities in Canada and Europe, which support Biovest's efforts to obtain regulatory/marketing approval for BiovaxID, and, thus, the FDA's position was not anticipated by Biovest. The FDA decision requires Biovest to conduct an additional Phase 3 clinical trial that will be both time-consuming and expensive. While this result was unexpected, Biovest has taken the steps necessary to persevere in advancing the United States regulatory process. Soon after being informed of the FDA's requirement, Biovest conducted formal meetings with the FDA to jointly plan and design the required additional Phase 3 clinical trial. The FDA has recommended that Biovest apply for a Special Protocol Assessment ("SPA") which, in essence, will provide that if the additional Phase 3 clinical trial meets its primary end point, the FDA will be required to approve Biovest's BLA for BiovaxID.

The information from the FDA that an additional Phase 3 clinical trial is required before Biovest can seek marketing approval for BiovaxID in the United States represented a significant and unexpected blow to Biovest's drug development program, delaying marketing approval in the United States. The FDA decision resulted in a significant decline in the market value of Biovest's publicly traded stock and confusion among potential partnering candidates. The impact of the FDA decision on Biovest's publicly traded stock and access to the stock market for an additional capital raise was exacerbated by the November 17, 2012 maturity date on

approximately $28 million in secured debt owed by Biovest to Corps Real, LLC and certain of the Laurus/Valens Entities and Biovest's lack of the necessary capital resources required to fund and support an additional Phase 3 clinical trial for BiovaxID and its ongoing operations.

**Reasons for Filing Chapter 11**

Although Biovest has made significant progress in advancing its businesses and products over the past two (2) years as noted above, Biovest is filing for reorganization under Chapter 11 of the Bankruptcy Code primarily due to (i) the FDA's unexpected requirement that Biovest conduct a second Phase 3 clinical trial for BiovaxID before filing for marketing approval in the United States, and (ii) the maturity on November 17, 2012 of approximately $28 million of secured debt owed by Biovest to Corps Real, LLC and certain of the Laurus/Valens Entities. The FDA's decision to require an additional Phase 3 clinical trial for BiovaxID will require access to significant new funding, likely from a strategic partner, and the prospect of these new funding requirements in light of Biovest's current matured secured debt of approximately $28 million has further restricted realistic access to the capital markets. Biovest also needs additional time to complete the process to obtain regulatory/marketing approval for BiovaxID in Canada and in the European Union, complete the development of the AutovaxID instrument with the DOD and its divisions, continue to further the development of the AutovaxID instrument and related hollow fiber systems with its BioDefense relationships, complete ongoing discussions with potential pharmaceutical company partnering candidates regarding the potential of a commercial licensing agreement (which traditionally take the form of a license agreement whereby the license partner assumes sales and distribution of the drug product for a combination of upfront and milestone cash payments and a future royalty to support a company's ongoing development), and establish access to capital from the equity market to support ongoing development.

**SIGNIFICANT EVENTS IN THE
CHAPTER 11 BANKRUPTCY CASE**

**Introduction**

On March 6, 2013, Biovest filed a voluntary petition under Chapter 11 of the Bankruptcy Code, which case is designated as Case Number 8:13-bk-02892-KRM. The Debtor remains in possession of its properties and continues to manage its assets as debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Set forth below is a brief summary of significant matters or events which have occurred to date in the Bankruptcy Case. The description of such matters or events is qualified in its entirety by the actual pleadings filed in the Bankruptcy Case and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, such pleadings shall control. All of such pleadings are on file with, and may be obtained from, the Bankruptcy Court.

**Payment of Prepetition Employee Obligations**

At a hearing held on March 19, 2013, the Bankruptcy Court granted the Debtor's motion for an order authorizing the Debtor to pay (i) Prepetition accrued, unpaid employee wages and

related taxes, benefits and business expenses, (ii) all Prepetition premiums and contributions on policies and plans of insurance for the benefit of its employees, including, without limitation, policies and plans pertaining to health, medical, dental, disability and accidental death and dismemberment claims, together with all costs and expenses incurred in connection with the servicing and processing of such claims and such other amounts as may be required to keep such policies and plans in full force and effect, and (iii) all payments for employee 401(k) and health savings account plans. Pursuant to the terms of that ruling, the Debtor has made all such payments, none of which exceeded the allowed statutory priority claims under Sections 507(a)(4) and (5) of the Bankruptcy Code.

**Adequate Assurance as to Utility Companies**

At the Petition Date, the Debtor used electricity, water, telephone, and other utility services provided by numerous utility companies. It was necessary for the Debtor to seek an immediate order from the Bankruptcy Court which prohibited any such utility company from altering, refusing, or discontinuing utility services on account of a Prepetition amount owed to such utility company or the Debtor's failure to furnish a Postpetition deposit to such utility company. On March 26, 2013, the Bankruptcy Court entered an order (i) prohibiting any such utility company from altering, refusing, or discontinuing utility services to the Debtor on account of the filing of the Bankruptcy Case or a Prepetition amount owed to such utility company, and (ii) finding that all utility companies were adequately assured of future performance due to the Debtor's agreement to provide a cash deposit equal to two weeks' worth of utility services based on the Debtor's anticipated Postpetition usage, coupled with the Debtor's ability to pay for Postpetition utility services.

**Retention of Professionals by the Debtor**

The Debtor has retained the law firm of Stichter, Riedel, Blain & Prosser, P.A. ("Stichter, Riedel") as its general bankruptcy counsel in the Bankruptcy Case. On April 4, 2013, the Bankruptcy Court entered a final order approving the application by the Debtor to employ Stichter, Riedel as its general bankruptcy counsel in the Bankruptcy Case.

**Appointment of Unsecured Creditors Committee**

On March 19, 2013, the United States Trustee appointed a committee of Creditors holding Unsecured Claims in the Bankruptcy Case (the "Creditors' Committee"). The members of the Creditors' Committee are Whitebox Multi-Strategy Partners, LP, Donald Ferguson c/o Land Dynamics, Inc., and Spruce LLC.

**Retention of Professionals by the Committee**

The Bankruptcy Court has entered orders approving the retention of Olshan Frome Wolosky, LLP and Genovese Joblove & Battista, P.A. as counsel to the Creditors' Committee.

**Appointment of Equity Security Holders Committee**

On March 19, 2013, the United States Trustee appointed a committee of Holders of Equity Interests in the Bankruptcy Case (the "Equity Committee"). The members of the Equity Committee are ASM Capital Advisors, LLC, Michael Hill, James W. Hill, MD, and John D. Scelsi, and Andrew Zawacki.

**Retention of Professionals by the Committee**

The Bankruptcy Court has entered orders approving the retention of Trenam, Kemker, Scharf, Barkin, Frye, O'Neil & Mullis, P.A. as counsel to the Equity Committee, who originally made an appearance in the Bankruptcy Case on behalf of ASM Capital Advisors, LLC, but subsequently withdrew that notice.

**Schedules and Statements of Financial Affairs**

On March 19, 2013, the Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court.

**Section 341 Meeting of Creditors**

On April 8, 2013, the United States Trustee convened a meeting of Creditors in the Bankruptcy Case pursuant to Section 341 of the Bankruptcy Code. The meeting of Creditors was concluded on the same date.

**List of Equity Security Holders**

On March 26, 2013, the Bankruptcy Court entered an order denying the Debtor's motion for entry of an order by the Court waiving (i) the requirement in Bankruptcy Rule 1007(a)(3) that the Debtor file "a list of the debtor's equity security holders of each class showing the number and kind of interests registered in the name of each holder, and the last known address or place of business of each holder", and (ii) the requirement in Bankruptcy Rule 2002(d) that the Debtor give notice to all of its equity security holders of the order for relief in the Bankruptcy Case. On March 19, 2013, based on the latest information from its transfer agent, the Debtor filed its list of equity security holders with the Bankruptcy Court.

**Debtor in Possession Financing**

On March 8, 2013, the Debtor filed its Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing the Debtor to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Senior Secured Creditors; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014 (the "DIP Financing Motion"). In the DIP Financing Motion, the Debtor requested authority to obtain postpetition loans, advances, and other financial accommodations from the Prepetition Senior Secured Creditors (in their capacity as lenders under the DIP Financing Motion, the "DIP Lenders", and collectively, the "Lenders") in an amount of up to $5,675,000.00, secured by a security interest in and lien on all assets and properties of the Debtor which will be senior to any

existing prepetition and postpetition liens, including any and all liens held by the Prepetition Senior Secured Creditors.

The post-petition financing was approved by the Bankruptcy Court on an interim basis pursuant to (i) that certain Interim Order Granting Debtor's Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing the Debtor to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Senior Secured Creditors; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014, dated March 14, 2013, (ii) that certain Second Interim Order Granting Debtor's Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing the Debtor to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Senior Secured Creditors; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014, dated March 29, 2013.

Objections to the DIP Financing Motion were filed by the UST, the Equity Committee, and the Creditors' Committee. The Creditors' Committee Objection was resolved based upon the treatment of Allowed Unsecured Claims contained in the Amended Plan, and the agreement of the Debtor to seek approval of, and the Lenders to support, the Bidding Procedures. At a final hearing conducted on April 8, 2013, the Court overruled the objection by the Equity Committee and the UST, granted the DIP Financing Motion on a final basis, and entered its Final Order Granting Debtor's Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing the Debtor to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Senior Secured Creditors; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014 entered by the Bankruptcy Court on April 10, 2013 (the "Final DIP Financing Order").

Pursuant to the Final DIP Financing Order, Biovest is authorized and empowered to (i) use cash collateral subject to the amended twelve week budget for the period from April 8, 2013 to June 30, 2013 attached as Exhibit A to the Final Financing Order, (ii) borrow up to $6,000,000.00 (inclusive of the advances made under the Interim Financing Orders, and inclusive of the March 5, 2013 $325,000.00 advance made by Corps Real to the Debtor) from the DIP Lenders, on the terms and conditions set forth in the DIP Loan Documents (as defined in the Final DIP Financing Order, including the form of the Debtor-in-Possession Credit and Security Agreement in the form filed with the Court on April 8, 2013.

Pursuant to the Final Financing Order, Biovest (i) granted the DIP Lenders a first priority priming Lien on and security interest in all of Biovest's Property, senior to all Prepetition and Postpetition Liens on any of Biovest's Property but subject to a carve-out for budgeted fees of Professionals and the fees to the United States Trustee, and (ii) granted the DIP Lender a Superpriority Claim against Biovest subject to such carve-out. The Final Financing Order provided that the DIP Lender would not have any Lien on any claims, causes of action or rights

129

of Biovest arising under Chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, and all proceeds or recoveries therefrom.

Pursuant to the Final Financing Order and the Final Credit Agreement, the Debtor on its own behalf and on behalf of the estate, including the Committees or other parties, stipulated to the validity of the Corps Real Prepetition Claim and the LV Lenders Prepetition Claims, subject to a challenge, if any, to be filed with the Bankruptcy Court by way of an adversary proceeding by no later than April 15, 2013 (the "Lien Challenge Deadline"). No adversary proceeding was filed by the Lien Challenge Deadline.

As approved, the Final Order and the Final Credit Agreement contemplate the filing of the Sale Motion and the request for the Bidding Procedures (both as discussed below), as well as the Plan, as well as the agreement reached with the Creditors' Committee with respect to treatment under the Sale Motion and the Plan.

On April 11, 2013, the Equity Committee filed a notice of appeal, appealing the Final DIP Financing Order to the United States District Court for the Middle District of Florida. As of the date of the Disclosure Statement, the appeal remains pending, but no action has been taken with respect to the appeal.

**Accentia's Disputed Ownership Claim for Intellectual Property**

On April 3, 2013, Accentia sent a letter to Corps Real and its counsel, asserting ownership of certain of the intellectual property and/or inventions owned by the Debtor, based upon the fact that certain employees of Biovest were also employees of Accentia. The Debtor disputes the ownership claim, and anticipates that it will be filing an adversary proceeding against Accentia with respect to the disputed claim of ownership.

**Sale Motion and Bidding Procedures**

On April 17, 2013, the Debtor filed its Emergency Motion for Entry of an Order (I) Approving the Sale of, and Bidding Procedures in Connection With the Sale of, Substantially All of the Assets of the Debtor or the Rights Under the Debtor's Amended Plan of Reorganization, (II) Establishing Procedures for the Assumption and/or Assignment by the Debtor of Certain Executory Contracts and Unexpired Leases, (III) Approving Initial Overbid Amount and Subsequent Overbid Amounts, (IV) Approving Form and Manner of Notice of the Sale and Bidding Procedures, and (V) Setting Objection Deadlines (the "Sale Motion"). The Sale Motion seeks, including related relief as set forth in the Sale Motion, approval of the process and procedures for (i) a transaction for the sale of substantially all of the Debtor's assets outside the ordinary course of business pursuant to Sections 363 and 365 of the Bankruptcy Code, and/or (ii) a transaction for the funding of an alternative plan of reorganization under the Plan, which, at a minimum, shall provide for (a) payment in full of the Prepetition and Postpetition Secured Claims (inclusive of all fees, costs, interest and other amounts owed to the Senior Secured Creditors) of the Senior Secured Creditors and (b) higher or better treatment than that proposed in the Plan for the Holders of other Claims against, and Equity Interests in, the Debtor.

A stalking horse asset purchase agreement, dated as of April 17, 2013 (including all

schedules attached thereto, and as it may be amended, the "Asset Purchase Agreement"), has been entered into, subject to higher or better offers, by and between the Debtor, as seller, and Corps Real, LLC and LV Administrative Services, Inc. (as agent for certain of the Lenders), as purchaser (the "Stalking Horse Purchasers"), which Asset Purchase Agreement contemplates a Sale Transaction. An executed copy of the Asset Purchase Agreement is attached as Exhibit A to the Sale Motion. Prior to the closing under the Asset Purchase Agreement, the Stalking Horse Purchasers will assign all of their rights and obligations thereunder to their designee (the "Purchaser").

In the event there are no Qualified Bidders (as defined in the Sale Motion) other than the Stalking Horse Purchasers, and the Auction (as defined in the Sale Motion) does not occur, the Asset Purchase Agreement will be consummated with the Purchaser unless the Plan is confirmed by the Bankruptcy Court at the Confirmation Hearing, in which event the Asset Purchase Agreement will be deemed terminated. The total purchase price to be paid by the Purchaser under the Asset Purchase Agreement in a Sale Transaction consists of (i) a credit bid of all or a portion of the Lenders Allowed Secured Claims (as defined below) owed, as of the date of the Auction, by the Debtor to Corps Real or the Laurus/Valens Lenders, (ii) the assumption of certain liabilities of the Debtor by the Purchaser, and (iii) the payment by the Purchaser of certain allowed administrative expense claims in the Bankruptcy Case as more particularly described in the Asset Purchase Agreement. As of April 16, 2013, the amount of the Lenders Allowed Secured Claims was approximately $39,232,770.00. The Asset Purchase Agreement also provides that the Holders of Allowed Unsecured Claims against the Debtor in the Bankruptcy Case shall receive ten percent (10%) of the equity in the Purchaser in the event of a closing under the Asset Purchase Agreement, and that the Allowed Unsecured Claims shall not include any deficiency claim of the Lenders.

The Sale Motion requests approval by the Bankruptcy Court of the Bidding Procedures, which are attached to the Sale Motion, and attached to the Plan as Exhibit A to the Plan. The significant dates under the Bidding Procedures are (i) a deadline for receipt of qualified bids, which is 12:00 noon (Eastern Standard Time) on May 29, 2013; (ii) an auction, which will begin at 9:00 a.m. (Eastern Standard Time) on May 30, 2013; and (iii) a Sale Hearing to commence immediately prior to the Confirmation Hearing.

**Equity Committee's Motion to Appoint an Examiner or Chapter 11 Trustee**

On April 8, 2013, during the final hearing on the DIP Financing Motion, the Equity Committee filed a Motion to Appoint an Examiner or Chapter 11 Trustee (Doc. No. 137). The Debtor filed a response and objection to the Motion, on the basis that (i) the motion was a negotiating tactic by the Equity Committee to obtain leverage in connection with the plan and sale process; (ii) the allegations even if proven did not rise to the level necessary to appoint a trustee or examiner; and (iii) the allegations were false and misleading. At a hearing held on April 10, 2013, the Bankruptcy Court denied the motion, finding that the record made at the hearing and at previous hearings did not support the allegations contained in the motion, and determined that the allegations in the motion, even if proven, do not support the relief requested. The Court expressed sensitivity about disparagement and use of the process in connection with the motion to create leverage in connection with the plan or sale process. Finally, the Court determined that any concerns regarding the conduct of the sale process, other than concerns

131

regarding the timing which have been addressed in connection with the relief previous granted by the Court, may be raised separately after input from the investment banker to be employed in connection with the sale.

**Bar Dates**

On March 7, 2013, the Bankruptcy Court entered its Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines which, among other things, established May 20, 2013 as the deadline for filing Claims against the Debtor by all Creditors (not including Governmental Units), and the date that is 180 days from the Petition Date as the deadline for filing Claims against the Debtor by all Governmental Units.

The Court has not yet established a bar date for the filing of Administrative Expense Claims in the Bankruptcy Case, but it is expected that such bar date will be set forth in the Disclosure Statement Approval Order.

**Execution of Lease for New Corporate Offices in Tampa, Florida**

As of the Petition Date, the Debtor subleased approximately 7,400 square feet of office space in Tampa, Florida located at 324 S. Hyde Park Avenue (the "Current Leased Premises") at a monthly rental cost of approximately $16,000.00. The Debtor decided, in its business judgment, to reject the existing sublease for the Current Leased Premises and relocate its business operations in Tampa, Florida to smaller space and at a greatly reduced monthly rental cost. The Debtor filed a motion with the Bankruptcy Court seeking approval of the terms of a new lease, at a monthly rental cost of approximately $2,125.00, for a twelve month term beginning on or about April 8, 2013, which motion was granted at a hearing held on April 8, 2013.

**Rejection of Lease Current Leased Premises**

In conjunction with the Debtor's decision to relocate its corporate offices to a small space at a greatly reduced monthly rental rate, the Debtor filed a motion with the Bankruptcy Court seeking authority to reject a lease with sublease between the Debtor, as sublessee, and Accentia, as sublessor, including a rejection, if necessary, of the primary lease between Accentia, as tenant, and Hyde Park Plaza Associates, Ltd., as landlord. A hearing to consider the motion to reject has not yet been scheduled.

**Filing of Initial Plan of Reorganization**

On March 7, 2013, the Debtor filed its Plan of Reorganization of Biovest International, Inc. under chapter 11 of Title 11, United State Code, dated as of March 6, 2013 (the "Initial Plan"). The Initial Plan was the product of negotiations between the Debtor and the Independent Committee of the Debtor's Board of Directors, and the Secured Lenders, and resulted in what the Debtor believed was fair and equitable treatment of Holders of Unsecured Claims and Holders of Equity Interests. In summary, the Initial Plan provided for treatment of Claims and Interest as follows: (i) satisfaction of the Prepetition and Postpetition Claims of the Lenders by issuance of designated amounts of the Reorganized Biovest Common Stock constituting approximately

ninety percent (90%) of the issued and outstanding shares of the Reorganized Biovest Common Stock, (ii) issuance of designated amounts of the Reorganized Biovest Common Stock to Holders of Allowed Unsecured Claims, and (iii) exchange of shares of Existing Biovest Common Stock with designated amounts of Reorganized Biovest Common Stock to the Holders of Allowed Equity Interests. Based upon the objections to the DIP Financing Motion, the Debtor has filed the Amended Plan, which among other things designates ten percent (10%) of the Reorganized Biovest Common Stock to Holders of Allowed Unsecured Claims, and provides for the cancellation of Existing Biovest Common Stock, with such Holders not to receive or recovery under the Plan on account of such Equity Interests.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**General**

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests (collectively, "Holders") are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtor and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTOR'S GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

**General Federal Income Tax Consequences to Holders**

*In General.* The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and

the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests.* The Holders of Claims against and Equity Interests in the Debtor are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1)    The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2)    The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtor and the character of that gain or loss.

(3)    The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4)    Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5)    The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6)    The effect of a Holder of a Claim or Equity Interest receiving deferred distributions or distributions that are contingent in amount.

**Certain Federal Income Tax Consequences to the Debtor**

*Reduction of Tax Attributes and Cancellation of Debt.* The operation of the Debtor's businesses has resulted in significant losses. These losses have been reported on the consolidated federal income tax returns of the Debtor as those returns have been filed. Issues related to the preservation of the Debtor's net operating losses are complex and are still undergoing analysis and review by tax professionals. The information discussed below summarizes the current status of this analysis; the Debtor, however, reserves the right to modify or further amend such information.

Taxpayers are generally required to recognize taxable income as a result of cancellation of debt. The receipt of borrowed funds is not subject to tax, on the premise that the debtor will repay them. If the debt is cancelled without repayment, the recognition of income takes into account the debtor's receipt of the borrowed funds.

Special rules, however, apply to the cancellation of debt in a bankruptcy proceeding. Generally, a debtor in a bankruptcy case is not required to recognize income from the cancellation of debt. However, the debtor has to pay for this exclusion by reducing specified tax attributes, such as any net operating loss ("<u>NOL</u>") incurred by the taxpayer in the year that the debt discharge occurs, any NOL carryovers to that year, and tax credit and capital loss carryforwards.

Based on the assumed reorganization value of the Debtor, it is anticipated that the Debtor will recognize cancellation of indebtedness income. Because the discharge of indebtedness will occur in bankruptcy, the Debtor will not be subject to tax on this income, but will be required to reduce its tax attributes by the amount excluded from its income. The Debtor has NOL carryforwards as of September 30, 2012, and expects to incur further NOLs during its current taxable year. Thus, after reduction for the excluded cancellation of indebtedness income, the Debtor still expects to have NOL carryforwards remaining, subject however to the Plan as confirmed by the Bankruptcy Court. Many of these NOL carryforwards may be subject to limitation as a result of prior changes in ownership of the stock of the Debtor under the rules described in the following section. Any issuances of common stock that do not meet the criteria provided for in the Tax Code would impose an additional limitation under those rules on the Debtor's ability to use these NOL carryforwards to offset income earned after confirmation of the Plan.

*Limitation on NOL Carryforwards and Other Tax Attributes.* To deter "trafficking" in NOL carryforwards, Section 382 of the Tax Code limits a corporation's ability to use losses incurred before an "ownership change" to offset income earned thereafter. A similar limitation applies to tax credits. In general, an ownership change occurs if more than fifty percent (50%) of the stock of a corporation changes hands within a three-year period.

If an ownership change occurs, the corporation can use pre-change NOL carryforwards to offset only an amount of income each year equal to the value of the stock of the corporation immediately before the ownership change multiplied by a prescribed interest rate. The limitation is intended to estimate the earning power of the corporation's pool of capital at the time of the ownership change. The limitation thus prevents the use of pre-change NOL carryforwards to offset income from new capital contributed by the new owners.

Special rules apply, however, in the case of ownership changes that occur in a bankruptcy proceeding. Under the general rules, the annual limitation usually would be quite low, because the corporation's stock immediately before the ownership change often has little or no value. Essentially eliminating the NOL carryforwards of a corporation in bankruptcy could hinder the corporation's ability to reorganize successfully, contrary to the goals of the federal bankruptcy laws. Therefore, Congress provided special bankruptcy rules in Section 382. If an ownership change occurs in bankruptcy, Section 382(l)(6) allows the corporation, in computing the annual limitation on the use of NOL carryforwards, to increase its value to reflect the cancellation of claims in the bankruptcy reorganization. The regulations provide for this result by using as the value of corporation the lesser of the value of its gross assets immediately before the ownership change or the value of its stock immediately thereafter. This amount is multiplied by the prescribed interest rate to arrive at the annual limitation on the amount of income that can be offset by pre-change NOL carryforwards.

Another special rule, provided in Section 382(l)(5), applies if at least fifty percent (50%) of the corporation's stock immediately after the ownership change is owned by persons who were shareholders or creditors of the corporation immediately before the ownership change. For purposes of computing the fifty-percent threshold, however, stock issued to creditors who own at least five percent (5%) of the corporation's stock after the ownership change is taken into account only if the creditor held its claim for at least eighteen months before filing of the bankruptcy petition or if the claim arose in the ordinary course of the corporation's business and was owned at all times by the same person. When the conditions of Section 382(l)(5) are met, the annual limitation on NOL carryovers does not apply. Instead, the corporation is required to reduce its NOL carryforwards by the amount of deductions claimed in the prior three years for interest on debt that is exchanged for stock in the bankruptcy reorganization. The corporation can then use its remaining NOL carryforwards to offset future income without limitation. Even if the corporation qualifies for the special rule of Section 382(l)(5), it can still elect to apply instead the general bankruptcy rule of Section 382(l)(6), under which an annual limitation applies, but is computed under special rules taking into account the effect of the cancellation of claims on the value of the corporation.

Any limitation on NOL carryforwards that may result from the ownership change will probably also apply to "built-in" losses and deductions that accrued economically before the ownership change but are not taken into account under tax accounting rules until after the ownership change.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTOR MAKES THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTOR CANNOT AND DOES NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

## VOTING ON AND CONFIRMATION OF THE PLAN

### Confirmation and Acceptance by All Impaired Classes

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtor believes that it will be able to perform its obligations under the Plan without further financial reorganization.

136

The Plan provides for payment in full of Allowed Claims, including contingent, unliquidated and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. At the present time, the Debtor believes that Reorganized Biovest will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Claims in Class 1, and Allowed Secured Tax Claims in Class 6. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Allowed Claims in Classes 4, 5 and 7 will be derived from the operations of Reorganized Biovest, the DIP Facility, or from any new capital or financing raised by Reorganized Biovest, in each case as shown in the Projections. Accordingly, the Debtor believes that the Plan is per se feasible.

*Best Interests Standard.* The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtor were liquidated under Chapter 7 on the same date. The Debtor believes that Distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7. See "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN—Liquidation under Chapter 7 or Chapter 11."

**Confirmation Without Acceptance by All Impaired Classes**

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly.* The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard.* With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. The Debtor believes that the Plan meets these standards.

With respect to Impaired Classes of Equity Interests, Bankruptcy Code Section 1129(b)(2)(C) provides that a plan is "fair and equitable" if it provides that (i) each stockholder receives or retains on account of its stockholder interest, property of a value equal to the greatest

of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan. The Debtor believes that the Plan meets these standards.

The Debtor filed the Sale Motion to "market-test" the value of the Debtor, its assets, and its value on a going-concern basis, including in order to determine whether the structure proposed in the Plan is the highest or best value to be achieved for the Estate. If the Auction under the Sale Motion does not occur, the Debtor believes that the Plan, pursuant to which, among other things, the Senior Secured Lenders will exchange all of their prepetition and postpetition secured claims against the Debtor, or approximately $44 million, for shares representing ninety percent (90%) of the Reorganized Biovest Common Stock, with the remaining ten percent (10%) of the Reorganized Biovest Common Stock to be distributed in exchange for and in full satisfaction of all of the Allowed Unsecured Claims. In such event, and for purposes of meeting the requirements for confirmation of the Amended Plan under Section 1129 of the Bankruptcy Code, the Debtor asserts that the value of the Debtor and/or its assets or properties does not exceed the amount of the Lenders Allowed Secured Claims. The Debtor believes that the requirements of Bankruptcy Code Section 1129(a) and (b) are met under the Plan.

Accordingly, if necessary, the Debtor will seek Confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code and believes it meets the requirements for Confirmation by the Bankruptcy Court notwithstanding the non-acceptance by an Impaired Class of Claims or Equity Interests.

The Debtor intends to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7. In a Chapter 7 case, the Debtor's assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of priority claims. Due to the amount of the Secured Claims, there would be no such distribution for Unsecured Creditors in a Chapter 7 proceeding. In the event that the Auction does not occur, and the Plan is not confirmed, the Debtor intends to consummate a Sale Transaction with the Purchaser under the Asset Purchase Agreement.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtor.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

**Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtor or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Bankruptcy Case could attempt to formulate and propose a different plan or plans. Such plans might involve an orderly liquidation of their assets, or a combination thereof. The Debtor believes that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

**Liquidation under Chapter 7 or Chapter 11**

If a plan is not confirmed, the Bankruptcy Case may be converted to a Chapter 7 liquidation case. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor. The proceeds of the liquidation would be distributed to the Creditors and Holders of Equity Interests of the Debtor in accordance with the priorities established by the Bankruptcy Code. Because the Liens of Corps Real, LLC and the Laurus/Valens Entities exceed the value of the Debtor's assets, there would likely be no distribution in Chapter 7 to Unsecured Creditors. The Debtor has attached hereto as Exhibit 2 a Liquidation Analysis as of April 15, 2013 which shows that Unsecured Creditors would receive no distribution in a Chapter 7 proceeding.

In general, the Debtor believes that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtor's assets; (d) the inability to utilize the work product and knowledge of the Debtor and its Professionals; (e) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims; and (f) the loss to Unsecured Creditors of any ongoing equity interest in Reorganized Biovest.

In a liquidation under Chapter 11, the Debtor's assets would be sold in an orderly fashion over a more extended period of time than in liquidation under Chapter 7. The Debtor believes that the Plan is superior to liquidation under Chapter 7 or Chapter 11.

## SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan provides for an orderly and prompt distribution to Holders of Allowed Claims and Allowed Equity Interests against the Debtor. The Debtor believes that its efforts to maximize the return for Creditors and Holders of Equity Interests have been full and complete. The Debtor further believes that the Plan is in the best interests of all Creditors and Holders of Equity Interests. In the event of a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes there would be no distribution to Unsecured Creditors and, in addition, Unsecured Creditors and the Holders of Equity Interests would not receive the value attributable to the Reorganized Biovest Common Stock. For these reasons, the Debtor urges that the Plan is in the best interests of all Creditors and Holders of Equity Interests and that the Plan be accepted.

Dated as of April 18, 2013

Respectfully submitted,

BIOVEST INTERNATIONAL, INC.

By: _____
      David Moser, Secretary


/s/ Charles A. Postler
_____
Charles A. Postler (Florida Bar No. 455318)
Daniel R. Fogarty (Florida Bar. No. 0017532)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email:       cpostler@srbp.com
               dfogarty@srbp.com
Counsel for Debtor and Debtor in Possession

# EXHIBIT 1

Cash Flow Projections for Reorganized Biovest for the months ended April 30, 2013 through March 31, 2014

## Biovest Cash Forecast

| | Apr 2013 | May 2013 | Jun 2013 | Jul 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 465,000 | 12,000 | 101,000 | 97,000 | 5,000 | 45,000 | 14,000 | 10,000 | 51,000 | 85,000 | 68,000 | 17,000 |
| Proceeds from DIP Financing | 450,000 | 775,000 | 600,000 | 750,000 | 500,000 | 300,000 | 375,000 | 475,000 | 475,000 | 400,000 | 300,000 | 350,000 |
| Receipts from A/R Collections | 150,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 250,000 | 250,000 | 300,000 | 300,000 |
| Payroll | (330,000) | (325,000) | (320,000) | (480,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) |
| Employee Health Insurance | (40,000) | (40,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) |
| Inventory & Supplies | (85,000) | (85,000) | (100,000) | (85,000) | (85,000) | (85,000) | (85,000) | (85,000) | (85,000) | (85,000) | (85,000) | (85,000) |
| Rent | (46,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) | (39,000) |
| Utilities, Maintenance & Storage | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) |
| Legal Fees (IP & SEC) | (25,000) | (25,000) | (85,000) | (75,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) |
| Legal Fees - Bankruptcy Counsel | (100,000) | (100,000) | - | - | - | - | - | - | - | - | - | - |
| Legal Fees - Creditor's Committee | (62,500) | (62,500) | - | - | - | - | - | - | - | - | - | - |
| Legal Fees - Equity Committee | (12,500) | (12,500) | - | - | - | - | - | - | - | - | - | - |
| Investment Banking Fee | (25,000) | (25,000) | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | (10,000) | - | - | (10,000) | (10,000) | - | - | - | - | - | - | - |
| Audit, Tax and SEC Filing fees | (11,000) | (10,000) | (5,000) | (6,000) | - | - | (28,000) | - | (35,000) | (6,000) | (10,000) | - |
| Dr. Gangemi | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) |
| Dr. Larry Kwak | - | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Max Planck Research agreement | (9,000) | - | - | (45,000) | - | - | (20,000) | (103,000) | (25,000) | (45,000) | (25,000) | (25,000) |
| D&O and Liability Insurance | (45,000) | (25,000) | (25,000) | - | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | - |
| MiF and EDA Loans | - | - | - | (12,000) | - | - | - | - | - | - | - | - |
| Travel | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) |
| Payments to critical vendors | - | - | - | (100,000) | (94,000) | - | - | - | - | - | - | - |
| Priority wage claims | - | - | - | (110,000) | - | - | - | - | - | - | - | - |
| Research and Development | (155,000) | (145,000) | (175,000) | (50,000) | (50,000) | (25,000) | (25,000) | (25,000) | (25,000) | (10,000) | (10,000) | (10,000) |
| All Other | (30,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) |
| Ending Cash Balance | 12,000 | 101,000 | 97,000 | 5,000 | 45,000 | 14,000 | 10,000 | 51,000 | 85,000 | 68,000 | 17,000 | 26,000 |

# **EXHIBIT 2**

Liquidation Analysis as of April 15, 2013

**Liquidation Analysis as of April 15, 2013**

| Asset | Market Value | Liquidation Value | Secured Claims | Amount Available in Liquidation |
|---|---|---|---|---|
| **Real Property:** | N/A | N/A | N/A | N/A |
| | | | | |
| **Personal Property:** | | | | |
| Cash | $ 225,000.00 | $ 225,000.00 | $ 225,000.00 | 0.00 |
| Prepayments and Deposits | 50,000.00 | 50,000.00 | 50,000.00 | 0.00 |
| Accounts Receivable | 295,000.00 | 295,000.00 | 295,000.00 | 0.00 |
| Raw Materials and Work In Process Inventory | 450,000.00 | 315,000.00 | 315,000.00 | 0.00 |
| Finished Goods Inventory | 50,000.00 | 50,000.00 | 50,000.00 | 0.00 |
| Furniture, Fixtures and Equipment | 900,000.00 | 225,000.00 | 225,000.00 | 0.00 |
| Intellectual Property | Unknown | Unknown | Unknown | 0.00 |
| **Total Personal Property** | $ 1,970,000.00 | $ 1,160,000.00 | $ 1,160,000.00 | **0.00** |
| | | | | |
| **Totals** | $ 1,970,000.00 | $ 1,160,000.00 | $ 1,160,000.00 | **0.00** |

**Schedule of Distributions to Unsecured Creditors**

| | | | | |
|---|---|---|---|---|
| **Hypothetical Chapter 7:** | | | | |
| Total Funds Available After Payment of Secured Claims | $ - | | | |
| Chapter 11 Administrative Expense Claims | $ 300,000.00 | | | |
| Chapter 7 Liquidation Costs | $ 150,000.00 | | | |
| Funds Available for Distribution to Unsecured Creditors After Payment of Administrative Expense Costs | $ - | | | |
| Unsecured Claims | $ 10,680,000.00 | | | |
| Total Recovery for Unsecured Claims | $ - | | | |
| | | | | |
| **Chapter 11:** | | | | |
| Unsecured Claims | $ 10,680,000.00 | | | |
| Distribution to Unsecured Creditors Under the Plan of Reorganization | 10% of Reorganized Biovest | | | |

(1) Values set forth on this Liquidation Analysis are based on the good faith estimates of the Debtors' management. Management has no special training in the valuation of assets.

(2) Unsecured claims include a $4.98 million claim filed by Accentia Biopharmaceuticals Inc. The Debtors' management has not yet substantiated the balance of this claim.

# **EXHIBIT 3**

List of payments made by the Debtor
during the 90-day period prior to the Petition Date

In re   **Biovest International, Inc.** _____    Case No.   **8:13-bk-2892-KRM** _____

Debtor(s)

## STATEMENT OF FINANCIAL AFFAIRS
### 90 Day Check Register

Biovest International Inc.
Wachovia Operating Account

| Date Issued | Check Number | Payee | Amount |
|---|---|---|---|
| 12/06/12 | 6561 | First Insurance Funding, Corp. | 81,541.17 |
| 12/06/12 | 6474 | MEDTRONIC | 24,000.00 |
| 12/06/12 | 6475 | MACHINING CONCEPTS | 5,688.84 |
| 12/06/12 | 6476 | SEELYE CRAFTSMEN CO | 722.00 |
| 12/06/12 | 6477 | PRECISION ASSOCIATES | 53.54 |
| 12/06/12 | ACH | ADP | 67,312.58 |
| 12/06/12 | ACH | ADP | 24,546.02 |
| 12/10/12 | ACH | AMERICAN EXPRESS | 25,120.32 |
| 12/10/12 | 6478 | BAXTER HEALTHCARE | 4,560.00 |
| 12/10/12 | 6479 | LIBERTY CARTON CO | 2,801.50 |
| 12/10/12 | 6480 | MOLDING SOLUTIONS | 200.00 |
| 12/11/12 | 6564 | NORTHERN BALANCE AND SCALE | 504.00 |
| 12/11/12 | ACH | Wells Fargo Bank | 138.51 |
| 12/11/12 | CASH | Accentia | 4,000.00 |
| 12/11/12 | 6562 | City of Coon Rapids | 1,870.56 |
| 12/12/12 | 6565 | AFLAC | 885.26 |
| 12/12/12 | 6566 | NOVATEK INTERNATIONAL | 6,563.33 |
| 12/13/12 | 6567 | THE HARTFORD | 4,081.38 |
| 12/13/12 | 6481 | TOLL GAS & WELDING SUPPLY | 218.38 |
| 12/13/12 | 6483 | APPTEC (VIROMED) | 8.00 |
| 12/13/12 | 6484 | IMTRON CORPORATION | 32.78 |
| 12/13/12 | 6485 | MACHINING CONCEPTS | 885.00 |
| 12/13/12 | 6482 | SMITH ENGINEERING | 293.00 |
| 12/14/12 | ACH | ADP | 185.11 |
| 12/14/12 | 6570 | CARLSON BUILDING SERVICES, INC | 613.51 |
| 12/14/12 | 6590 | RSM LLC | 1,687.23 |
| 12/14/12 | 6596 | WALTERS | 584.60 |
| 12/14/12 | 6599 | Joseph D. Gangemi | 7,500.00 |
| 12/14/12 | 6573 | CONTINENTAL CARBONIC PRODUCTS | 332.00 |
| 12/14/12 | 6576 | G & K Services | 569.71 |
| 12/14/12 | 6578 | INTERTEK | 477.73 |
| 12/14/12 | 6581 | KILLMER ELECTRIC CO INC | 590.73 |
| 12/14/12 | 6582 | LIFE TECHNOLOGIES CORP. | 3,926.28 |
| 12/14/12 | 6584 | MEDICAL DISPOSAL SYSTEMS INC. | 1,536.66 |
| 12/14/12 | 6585 | METROPOLITAN MECHANICAL CONTRA | 1,897.68 |
| 12/14/12 | 6587 | MINNESOTA CONWAY | 1,112.18 |
| 12/14/12 | 6589 | NORTHLAND MECHAN CONTRACTORS | 834.20 |
| 12/14/12 | 6592 | STELLAR BIOTECHNOLOGIES INC | 3,384.69 |
| 12/14/12 | 6572 | COFFEE MILL | 682.89 |
| 12/14/12 | 6575 | DEX Imaging, Inc. | 413.27 |
| 12/14/12 | 6588 | Neopost USA Inc., d/b/a  Hasler | 93.86 |
| 12/14/12 | 6591 | SHRED-IT USA MINNEAPOLIS | 100.50 |
| 12/14/12 | 6579 | Iron Mountain Records Management | 167.12 |
| 12/14/12 | 6598 | Minnesota Revenue | 1,300.00 |

| | | | |
|---|---|---|---|
| 12/14/12 | 6568 | AT&T | 42.78 |
| 12/14/12 | 6569 | AT&T Mobility | 165.00 |
| 12/14/12 | 6571 | CenturyLink | 518.19 |
| 12/14/12 | 6577 | H.M. Investors,LLC. (DBA) Bayshore Solutions | 377.00 |
| 12/14/12 | 6586 | Mihaela Popa-McKiver | 437.17 |
| 12/14/12 | 6593 | T-Mobile | 101.51 |
| 12/14/12 | 6594 | Verizon | 158.99 |
| 12/14/12 | 6595 | VERIZON WIRELESS | 476.47 |
| 12/14/12 | 6597 | XO Holdings | 1,239.01 |
| 12/14/12 | 6574 | CURT GLEITER | 427.27 |
| 12/14/12 | 6580 | Ivan Sanabria | 340.21 |
| 12/14/12 | 6583 | MARK HIRSCHEL | 267.29 |
| 12/17/12 | 6600 | Stichter, Riedel, Blain & Prosser P.A. | 60,382.85 |
| 12/17/12 | 6486 | MARCH MANUFACTURING INC. | 1,305.00 |
| 12/18/12 | ACH | AMERICAN EXPRESS | 25,000.00 |
| 12/18/12 | 6487 | PRESSWRITE PRINTING | 641.34 |
| 12/17/12 | ACH | Royal Bank American Leasing | 2,401.23 |
| 12/17/12 | ACH | Accentia | 50,000.00 |
| 12/19/12 | 6488 | TOLL GAS & WELDING SUPPLY | 396.36 |
| 12/19/12 | 6489 | NORTHERN SANITARY SUPPLY | 307.57 |
| 12/20/12 | 6607 | THE HARTFORD | 7,587.74 |
| 12/20/12 | 6608 | United Healthcare | 38,047.76 |
| 12/20/12 | 6605 | Public Storage | 684.80 |
| 12/20/12 | 6606 | Public Storage | 603.92 |
| 12/20/12 | 6601 | CenturyLink | 407.47 |
| 12/20/12 | 6602 | CenturyLink | 48.78 |
| 12/20/12 | 6603 | David Moser | 254.22 |
| 12/20/12 | 6609 | Verizon | 431.76 |
| 12/20/12 | 6610 | William McNulty | 500.07 |
| 12/20/12 | 6611 | XO Holdings | 516.40 |
| 12/20/12 | 6490 | L-COM CONNECTIVITY PRODUCTS | 236.40 |
| 12/20/12 | 6604 | LAB SUPPORT | 5,916.00 |
| 12/20/12 | ACH | ADP | 66,124.75 |
| 12/20/12 | ACH | ADP | 24,540.14 |
| 12/21/12 | ACH | ADP | 14.60 |
| 12/26/12 | ACH | NORTHERN STATES POWER | 7,989.82 |
| 12/26/12 | 6660 | ROCHE DIAGNOSTICS CORP | 16,208.36 |
| 12/26/12 | 6491 | TOLL GAS & WELDING SUPPLY | 307.37 |
| 12/26/12 | ACH | AMERICAN EXPRESS | 17,402.34 |
| 12/27/12 | 6661 | Poppyridge, LLC | 4,460.02 |
| 12/27/12 | 6492 | ALCOHOL & GAMBLING ENFORCE DIV | 20.00 |
| 12/27/12 | ACH | Superior Press (entered under Wachovia) | 123.47 |
| 12/31/12 | 6662 | BRIAN BOTTJER | 318.62 |
| 12/28/13 | ACH | ADP | 185.11 |
| 01/02/13 | WIRE | CATS Consultants GmbH | 1,988.75 |
| 01/02/13 | 6663 | Anne McKay, Inc. | 600.00 |
| 01/02/13 | 6674 | Devcon Security | 95.32 |
| 01/02/13 | 6681 | Living Plants/Evergreen Interiors,LLC. | 260.01 |
| 01/02/13 | 6684 | RSM LLC | 562.41 |
| 01/02/13 | 6688 | WALTERS | 594.66 |
| 01/02/13 | 6499 | PLUNKETT'S PEST CONTROL | 309.83 |
| 01/02/13 | 6666 | Bright House Networks | 375.89 |
| 01/02/13 | 6671 | COMCAST | 534.24 |
| 01/02/13 | WIRE | Dr. Larry Kwak | 5,000.00 |
| 01/02/13 | 6665 | BenefitElect of Alabama | 409.00 |
| 01/02/13 | 6668 | CARVER INDUSTRIAL PROD | 194.65 |

| Date | Check | Payee | Amount |
|------|-------|-------|--------|
| 01/02/13 | 6672 | CONTINENTAL CARBONIC PRODUCTS | 166.00 |
| 01/02/13 | 6675 | DNA STAR INC | 3,402.00 |
| 01/02/13 | 6676 | G & K Services | 425.79 |
| 01/02/13 | 6677 | KIM ARNESON | 25.93 |
| 01/02/13 | 6678 | LAB SUPPORT | 2,040.00 |
| 01/02/13 | 6679 | LEE DOROSHWALTHER | 35.88 |
| 01/02/13 | 6680 | LIFE TECHNOLOGIES CORP. | 2,736.34 |
| 01/02/13 | 6683 | METROPOLITAN MECHANICAL CONTRA | 1,865.00 |
| 01/02/13 | 6685 | THOMAS KULKAY | 13.81 |
| 01/02/13 | 6686 | TOLL GAS & WELDING SUPPLY | 375.99 |
| 01/02/13 | 6689 | ZEE MEDICAL SERVICE | 330.44 |
| 01/02/13 | 6493 | MEDTRONIC | 24,000.00 |
| 01/02/13 | 6494 | BAXTER HEALTHCARE | 2,496.00 |
| 01/02/13 | 6495 | FLORELL GLASS BLOWING | 350.00 |
| 01/02/13 | 6496 | IMTRON CORPORATION | 331.80 |
| 01/02/13 | 6497 | SMITH ENGINEERING | 456.00 |
| 01/02/13 | 6498 | TOLL GAS & WELDING SUPPLY | 292.30 |
| 01/02/13 | CASH | NOVATEK INTERNATIONAL | 6,563.33 |
| 01/02/13 | 6690 | JAMES M STANTON | 35,901.18 |
| 01/02/13 | 6664 | Aramark Coffee | 122.51 |
| 01/02/13 | 6670 | COFFEE MILL | 316.00 |
| 01/02/13 | 6687 | Totalfunds by Hasler | 200.00 |
| 01/02/13 | 6667 | CARLOS SANTOS | 4,013.62 |
| 01/02/13 | 6673 | CURT GLEITER | 861.73 |
| 01/02/13 | 6682 | MARK HIRSCHEL | 142.46 |
| 01/02/13 | 6669 | CENTERPOINT ENERGY | 1,726.71 |
| 01/02/13 | ACH | ADP | 93,673.32 |
| 01/03/13 | ACH | ADP | 41,657.34 |
| 01/04/13 | 6692 | City of Coon Rapids | 1,870.56 |
| 01/04/13 | 6693 | First Insurance Funding, Corp. | 25,128.21 |
| 01/04/13 | 6694 | GMP LABELING | 492.95 |
| 01/04/13 | 6500 | MOTION INDUSTRIES INC. | 1,552.43 |
| 01/07/13 | 6612 | Central Package & Display | 301.64 |
| 01/07/13 | 6613 | CROWN PLASTICS | 312.40 |
| 01/07/13 | 6614 | HYCLONE LABORATORIES INC | 873.41 |
| 01/07/13 | 6615 | MACHINING CONCEPTS | 1,043.70 |
| 01/07/13 | 6616 | OPTI MEDICAL SYS. (OSMETECH) | 761.98 |
| 01/08/13 | 6617 | TECHNICAL EQUIP SALES | 1,750.05 |
| 01/08/13 | 6618 | VIKING ELECTRIC SUPPLY &TOOL | 78.66 |
| 01/09/13 | 6697 | Hyde Park Plaza Assoc.Ltd. | 16,110.81 |
| 01/09/13 | 6619 | PRESSWRITE PRINTING | 651.83 |
| 01/09/13 | 6620 | BROADLEY JAMES | 354.00 |
| 01/10/13 | 6621 | R.S. HUGHES COMPANY, INC | 16.60 |
| 01/10/13 | 6622 | OPTI MEDICAL SYS. (OSMETECH) | 72.40 |
| 01/10/13 | 6623 | TOLL GAS & WELDING SUPPLY | 323.39 |
| 01/11/13 | ACH | AMERICAN EXPRESS | 25,000.00 |
| 01/11/13 | ACH | ADP | 236.15 |
| 01/11/13 | ACH | Wells Fargo Bank | 165.68 |
| 01/11/13 | 6624 | CURT GLEITER | 124.10 |
| 01/14/13 | 6625 | PRECISION ASSOCIATES | 67.00 |
| 01/14/13 | 6626 | MACHINING CONCEPTS | 552.00 |
| 01/04/13 | 6695 | GCPA, Inc. | 28,691.36 |
| 01/07/13 | 6696 | Guardian | 1,371.99 |
| 01/15/13 | ACH | Chappelle | 1,409.22 |
| 01/15/13 | ACH | Chappelle | 1,000.00 |
| 01/15/13 | 6627 | SMITH ENGINEERING | 254.00 |

| | | | |
|---|---|---|---|
| 01/16/13 | ACH | Royal Bank American Leasing | 2,401.23 |
| 01/16/13 | ACH | ADP | 94,051.01 |
| 01/16/13 | 6698 | Max Planck Institute | 8,180.00 |
| 01/16/13 | 6700 | GRAINGER IND. SUPPLY CO. | 379.04 |
| 01/16/13 | 6628 | TOLL GAS & WELDING SUPPLY | 323.39 |
| 01/18/13 | ACH | Transfinancial | 6,154.36 |
| 01/17/13 | 6699 | EUROFINS LANCASTER LABORATORIES INC | 17,392.00 |
| 01/18/13 | 6629 | ARK-PLAS PRODUCTS, INC | 506.18 |
| 01/22/13 | ACH | Chappelle | 2,954.22 |
| 01/22/13 | 6630 | INNOTEK | 111.36 |
| 01/22/13 | 6631 | TECHNICAL EQUIP SALES | 4,462.46 |
| 01/22/13 | 6632 | STERIS ISOMEDIX SERVICES | 2,927.17 |
| 01/23/13 | ACH | Chappelle | 158.03 |
| 01/23/13 | 6702 | CARLSON BUILDING SERVICES, INC | 613.51 |
| 01/23/13 | 6719 | WALTERS | 616.08 |
| 01/23/13 | 6633 | TOLL GAS & WELDING SUPPLY | 536.43 |
| 01/23/13 | 6634 | IMTRON CORPORATION | 142.20 |
| 01/23/13 | 6709 | Douglas W. Calder | 4,936.13 |
| 01/23/13 | 6710 | Douglas W. Calder | 5,131.83 |
| 01/23/13 | 6713 | Samuel Duffey | 3,634.74 |
| 01/23/13 | 6714 | Samuel Duffey | 5,560.66 |
| 01/23/13 | 6715 | Samuel Duffey | 3,942.47 |
| 01/23/13 | 6701 | Bright House Networks | 375.89 |
| 01/23/13 | 6703 | CenturyLink | 423.74 |
| 01/23/13 | 6704 | CenturyLink | 51.31 |
| 01/23/13 | 6705 | CenturyLink | 407.47 |
| 01/23/13 | 6706 | CenturyLink | 95.67 |
| 01/23/13 | 6707 | David Moser | 238.58 |
| 01/23/13 | 6708 | Diann Boyer | 511.43 |
| 01/23/13 | 6711 | Jerome Joseph Quintero | 327.42 |
| 01/23/13 | 6712 | Mihaela Popa-McKiver | 238.90 |
| 01/23/13 | 6716 | Sewell, John M. II | 143.35 |
| 01/23/13 | 6717 | Verizon | 424.32 |
| 01/23/13 | 6718 | VERIZON WIRELESS | 416.76 |
| 01/23/13 | 6720 | XO Holdings | 515.10 |
| 01/24/13 | 6635 | MATCHLESS PLASTICS, INC. | 668.80 |
| 01/25/13 | 6721 | Rocke ,McLean & Sbar Attorneys at Law | 5,000.00 |
| 01/25/13 | 6722 | United Healthcare | 32,512.30 |
| 01/25/13 | ACH | AMERICAN EXPRESS | 14,417.61 |
| 01/25/13 | ACH | ADP | 246.11 |
| 01/25/13 | ACH | Chappelle | 193.84 |
| 01/28/13 | ACH | ADP | 168.00 |
| 01/28/13 | 6723 | Stichter, Riedel, Blain & Prosser P.A. | 51,034.80 |
| 01/28/13 | 6724 | Joseph D. Gangemi | 9,666.06 |
| 01/28/13 | 6636 | GENEVA LABORATORIES INC | 64.00 |
| 01/28/13 | 6637 | TRICORD TECHNOLOGIES/FKA OEM | 1,595.85 |
| 01/28/13 | 6638 | MATCHLESS PLASTICS, INC. | 4,110.00 |
| 01/29/13 | ACH | Transfinancial | 7,212.03 |
| 01/30/13 | ACH | ADP | 93,139.80 |
| 01/29/13 | 6725 | Tribridge Holdings,LLC. | 1,275.00 |
| 01/29/13 | 6639 | SMITH ENGINEERING | 254.00 |
| 01/29/13 | 6640 | SUSPA, INC | 500.00 |
| 01/30/13 | ACH | NORTHERN STATES POWER | 8,506.24 |
| 01/31/13 | ACH | ADP | 40,777.39 |
| 01/31/13 | 6641 | TOLL GAS & WELDING SUPPLY | 323.39 |
| 01/31/13 | 6642 | MOTION INDUSTRIES INC. | 340.10 |

| Date | Ref | Payee | Amount |
|---|---|---|---|
| 01/31/13 | 6643 | HYCLONE LABORATORIES INC | 1,126.81 |
| 01/31/13 | 6644 | KRUGE AIR | 120.30 |
| 02/01/13 | ACH | AMERICAN EXPRESS | 20,000.00 |
| 02/01/13 | 6645 | Life Science Alley | 800.00 |
| 02/01/13 | 6646 | BROADLEY JAMES | 1,154.60 |
| 02/01/13 | 6647 | SILENT KNIGHT SECURITY | 256.94 |
| 02/04/13 | ACH | Chappelle | 2,954.14 |
| 02/04/13 | 6727 | Poppyridge, LLC | 3,750.00 |
| 02/04/13 | 6648 | SMITH ENGINEERING | 495.00 |
| 02/04/13 | 6649 | INDEPENDENT PACKING | 501.00 |
| 02/04/13 | 6651 | LEE DOROSHWALTHER | 11.43 |
| 02/04/13 | 6652 | THOMAS KULKAY | 17.09 |
| 02/04/13 | 6728 | Chemical Abstracts Service | 140.00 |
| 02/04/13 | 6650 | CURT GLEITER | 236.49 |
| 02/04/13 | 6653 | MARK HIRSCHEL | 4,069.97 |
| 02/01/13 | 6726 | City of Coon Rapids | 1,870.56 |
| 02/05/13 | ACH | AMERICAN EXPRESS | 21,000.00 |
| 02/05/13 | ACH | First Insurance Funding, Corp. | 27,656.03 |
| 02/05/13 | 6729 | Public Storage | 603.92 |
| 02/05/13 | 6730 | Public Storage | 374.50 |
| 02/05/13 | 6731 | Public Storage | 310.30 |
| 02/05/13 | 6654 | BAXTER HEALTHCARE | 7,296.00 |
| 02/05/13 | 6655 | MEDTRONIC | 12,000.00 |
| 02/07/13 | ACH | Chappelle | 5,000.00 |
| 02/07/13 | 6656 | BROADLEY JAMES | 1,613.00 |
| 02/07/13 | 6657 | TOLL GAS & WELDING SUPPLY | 323.39 |
| 02/07/13 | 6658 | PIEZO KINETICS INC | 470.59 |
| 02/07/13 | 6659 | MACHINING CONCEPTS | 4,808.06 |
| 02/07/13 | 6831 | BenefitElect of Alabama | 700.00 |
| 02/07/13 | 6834 | Tammy Renner | 88.65 |
| 02/07/13 | 6832 | CARLOS SANTOS | 3,213.59 |
| 02/07/13 | 6833 | Douglas W. Calder | 3,619.36 |
| 02/08/13 | ACH | ADP | 231.51 |
| 02/08/13 | ACH | Chappelle | 197.00 |
| 02/08/13 | 6732 | STERIS ISOMEDIX SERVICES | 1,944.39 |
| 02/08/13 | 6733 | UNIVERSAL POWER CONVERSION | 61.90 |
| 02/08/13 | 6734 | GRAINGER IND. SUPPLY CO. | 151.18 |
| 02/08/13 | 6735 | UTi, United States, Inc | 204.33 |
| 02/11/13 | ACH | AMERICAN EXPRESS | 7,286.08 |
| 02/11/13 | ACH | Transfinancial | 6,962.75 |
| 02/11/13 | 6835 | BRIAN BOTTJER | 227.27 |
| 02/11/13 | 6836 | Cheryl Boggs Savage, CPA | 2,500.00 |
| 02/11/13 | ACH | ADP | 217.68 |
| 02/12/13 | 6736 | R.S. HUGHES COMPANY, INC | 30.91 |
| 02/13/13 | 6737 | TOLL GAS & WELDING SUPPLY | 268.24 |
| 02/14/13 | ACH | ADP | 65,909.62 |
| 02/14/13 | ACH | ADP | 28,831.73 |
| 02/14/13 | WIRE | Dr. Larry Kwak | 5,000.00 |
| 02/14/13 | 6738 | GENEVA LABORATORIES INC | 65.00 |
| 02/14/13 | 6739 | ALLEGIS | 173.93 |
| 02/14/13 | 6740 | LAKELAND ENGINEERING EQUIPMENT | 300.36 |
| 02/14/13 | 6741 | MOTION INDUSTRIES INC. | 1,362.91 |
| 02/15/13 | 6837 | Hyde Park Plaza Assoc.Ltd. | 10,000.00 |
| 02/15/13 | 6838 | CONTINENTAL CARBONIC PRODUCTS | 334.50 |
| 02/15/13 | 6742 | IMTRON CORPORATION | 86.07 |
| 02/18/13 | 6840 | Cherry Bekaert & Holland,LLP | 13,125.00 |

| | | | |
|---|---|---|---|
| 02/18/13 | 6839 | Stichter, Riedel, Blain & Prosser P.A. | 27,119.96 |
| 02/18/13 | 6842 | Joseph D. Gangemi | 18,021.15 |
| 02/18/13 | Wire | CATS Consultants GmbH | 7,137.80 |
| 02/18/13 | CASH | NOVATEK INTERNATIONAL | 6,563.33 |
| 02/18/13 | 6841 | Poppyridge, LLC | 3,750.00 |
| 02/19/13 | ACH | Chappelle | 2,954.14 |
| 02/19/13 | ACH | Royal Bank American Leasing | 2,401.23 |
| 02/19/13 | 6856 | H.M. Investors,LLC. (DBA) Bayshore Solutions | 297.00 |
| 02/19/13 | 6843 | CARLSON BUILDING SERVICES, INC | 613.51 |
| 02/19/13 | 6849 | CITY OF COON RAPIDS | 932.59 |
| 02/19/13 | 6861 | Living Plants/Evergreen Interiors,LLC. | 260.01 |
| 02/19/13 | 6867 | RSM LLC | 1,050.00 |
| 02/19/13 | 6874 | WALTERS | 619.13 |
| 02/19/13 | 6743 | CURT GLEITER | 17.25 |
| 02/19/13 | 6744 | MARK HIRSCHEL | 1,481.27 |
| 02/19/13 | 6852 | CONTINENTAL CARBONIC PRODUCTS | 85.50 |
| 02/19/13 | 6854 | G & K Services | 416.13 |
| 02/19/13 | 6855 | G & K Services | 408.81 |
| 02/19/13 | 6863 | MCKESSON | 569.23 |
| 02/19/13 | 6864 | MCKESSON | 606.34 |
| 02/19/13 | 6850 | COFFEE MILL | 340.71 |
| 02/19/13 | 6853 | DEX Imaging, Inc. | 240.58 |
| 02/19/13 | 6862 | Macke Water Systems, Inc. | 64.09 |
| 02/19/13 | 6865 | Office Products Solutions,LLC. | 1,061.57 |
| 02/19/13 | 6866 | ProShred Security | 110.00 |
| 02/19/13 | 6869 | SHRED-IT USA MINNEAPOLIS | 33.60 |
| 02/19/13 | 6876 | PITNEY BOWES INC. | 86.23 |
| 02/19/13 | 6870 | Stanford University | 10,000.00 |
| 02/19/13 | 6857 | Hyde Park Plaza Assoc.Ltd. | 6,110.81 |
| 02/19/13 | 6859 | Iron Mountain Records Management | 167.12 |
| 02/19/13 | 6845 | CenturyLink | 94.71 |
| 02/19/13 | 6846 | CenturyLink | 428.55 |
| 02/19/13 | 6847 | CenturyLink | 407.47 |
| 02/19/13 | 6848 | CenturyLink | 57.40 |
| 02/19/13 | 6860 | Ivan Sanabria | 426.78 |
| 02/19/13 | 6868 | Sewell, John M. II | 74.28 |
| 02/19/13 | 6871 | T-Mobile | 340.01 |
| 02/19/13 | 6872 | Verizon | 424.17 |
| 02/19/13 | 6873 | VERIZON WIRELESS | 389.78 |
| 02/19/13 | 6875 | XO Holdings | 515.10 |
| 02/19/13 | 6844 | CENTERPOINT ENERGY | 2,051.19 |
| 02/19/13 | 6851 | COMCAST | 533.98 |
| 02/19/13 | 6858 | INTERNET EXPOSURE | 198.00 |
| 02/20/13 | ACH | ADP | 37,563.34 |
| 02/20/13 | ACH | ADP | 19,253.93 |
| 02/20/13 | ACH | Transfinancial | 8,120.00 |
| 02/20/13 | 6745 | SMITH ENGINEERING | 456.00 |
| 02/20/13 | 6746 | TOLL GAS & WELDING SUPPLY | 323.39 |
| 02/20/13 | 6747 | BROADLEY JAMES | 3,457.70 |
| 02/22/13 | ACH | AMERICAN EXPRESS | 3,042.49 |
| 02/22/13 | ACH | ADP | 238.99 |
| 02/22/13 | 6878 | Amy McCord | 2,736.87 |
| 02/22/13 | 6888 | GUARDIAN | 3,411.79 |
| 02/22/13 | 6748 | STERIS ISOMEDIX SERVICES | 2,102.17 |
| 02/22/13 | 6749 | INNOTEK | 78.09 |
| 02/22/13 | 6750 | PRECISION REPAIR AND CALIBRATI | 37.00 |

| | | | |
|---|---|---|---|
| 02/22/13 | 6885 | EUROFINS LANCASTER LABORATORIES INC | 10,000.00 |
| 02/22/13 | 6886 | G & K Services | 279.77 |
| 02/22/13 | 6889 | HAGEMEYER (WARNER) | 1,009.60 |
| 02/22/13 | 6892 | JJC & ASSOCIATES | 223.32 |
| 02/22/13 | 6894 | LAB SUPPORT | 1,836.00 |
| 02/22/13 | 6895 | LAB SUPPORT | 1,428.00 |
| 02/22/13 | 6896 | LAB SUPPORT | 3,060.00 |
| 02/22/13 | 6898 | TOLL GAS & WELDING SUPPLY | 1,948.39 |
| 02/22/13 | 6897 | Saliwanchik, Lloyd & Eisenschenk | 11,858.61 |
| 02/22/13 | 6893 | KONICA MINOLTA BUSINESS SOLUTI | 353.85 |
| 02/22/13 | 6887 | GCPA, Inc. | 4,646.37 |
| 02/22/13 | 6877 | Fisher BioServices, Inc. | 4,347.80 |
| 02/22/13 | 6879 | Aramark Coffee | 287.34 |
| 02/22/13 | 6882 | COFFEE MILL | 247.18 |
| 02/22/13 | 6899 | Totalfunds by Hasler | 200.00 |
| 02/22/13 | 6880 | Bright House Networks | 375.89 |
| 02/22/13 | 6883 | David Moser | 278.66 |
| 02/22/13 | 6884 | Diann Boyer | 241.60 |
| 02/22/13 | 6890 | INTERNET EXPOSURE | 99.00 |
| 02/22/13 | 6891 | Jerome Joseph Quintero | 195.69 |
| 02/26/13 | ACH | First Insurance Funding, Corp. | 25,143.21 |
| 02/26/13 | 6900 | MEDICAL DISPOSAL SYSTEMS INC. | 512.22 |
| 02/27/13 | 6903 | Joseph D. Gangemi | 1,311.98 |
| 02/27/13 | 6905 | United Healthcare | 36,309.86 |
| 02/27/13 | 6906 | GUARDIAN | 4,783.78 |
| 02/27/13 | 6751 | IMTRON CORPORATION | 269.78 |
| 02/27/13 | 6901 | CAMI RESEARCH INC | 250.00 |
| 02/27/13 | 6908 | CONTINENTAL CARBONIC PRODUCTS | 171.00 |
| 02/27/13 | 6752 | TOLL GAS & WELDING SUPPLY | 440.93 |
| 02/27/13 | 6911 | G & K Services | 130.22 |
| 02/27/13 | 6914 | NORTHERN BALANCE & SCALE | 454.00 |
| 02/27/13 | 6917 | LEE DOROSHWALTHER | 32.08 |
| 02/27/13 | ACH | American Express | 14,433.13 |
| 02/27/13 | 6913 | INCORP Services, Inc. | 316.00 |
| 02/27/13 | 6921 | Rocke ,McLean & Sbar Attorneys at Law | 67.50 |
| 02/27/13 | 6909 | DEX Imaging, Inc. | 198.54 |
| 02/27/13 | 6910 | Docusource | 37.45 |
| 02/27/13 | 6912 | Google, Inc. | 60.50 |
| 02/27/13 | 6915 | ProShred Security | 55.00 |
| 02/27/13 | 6920 | QUALITY WATER SERVICES,INC. | 380.00 |
| 02/27/13 | 6918 | Public Storage | 603.92 |
| 02/27/13 | 6919 | Public Storage | 684.80 |
| 02/27/13 | 6902 | CARLOS SANTOS | 3,245.92 |
| 02/27/13 | 6922 | Samuel Duffey | 1,543.37 |
| 02/27/13 | 6904 | Mihaela Popa-McKiver | 218.06 |
| 02/27/13 | CASH | NORTHERN STATES POWER | 7,664.12 |
| 02/27/13 | 6907 | COMCAST | 542.46 |
| 02/27/13 | 6916 | MARK HIRSCHEL | 461.69 |
| 02/27/13 | 6923 | VERIZON WIRELESS | 384.01 |
| 03/01/13 | 6753 | GENEVA LABORATORIES INC | 65.00 |
| 03/01/13 | 6754 | SMITH ENGINEERING | 325.00 |
| 03/01/13 | 6755 | METROPOLITAN MECHANICAL CONTRA | 2,760.00 |
| 03/01/13 | 6756 | SWE FLO-CAL | 330.00 |
| 03/01/13 | 6757 | TECHNICAL EQUIP SALES | 3,272.42 |
| 03/01/13 | 6758 | MACHINING CONCEPTS | 842.28 |
| 03/01/13 | 6759 | SEELYE CRAFTSMEN CO | 280.00 |

| 03/01/13 | 6760 | M & D METAL FINISHING | 325.00 |
| 03/01/13 | 6762 | NORTHERN SANITARY SUPPLY | 275.46 |
| 03/01/13 | ACH | ADP | 55.19 |
| 02/28/13 | ACH | Chappelle | 384.00 |
| 02/28/13 | ACH | ADP | 301.30 |
| 03/04/13 | ACH | Chappelle | 2,791.14 |
| 03/05/13 | WIRE | Optum Insight (CAN REG) | 514.50 |
| 03/05/13 | WIRE | Dr. Larry Kwak | 5,000.00 |
| 03/05/13 | ACH | AMERICAN EXPRESS | 8,429.17 |
| 03/05/13 | WIRE | Stichter, Riedel, Blain & Prosser P.A. | 160,000.00 |
| 03/05/13 | 6925 | Florida UCC, Inc. | 35.00 |